**2021 UT 52**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

SCOTT KIRBY PATTERSON,
*Appellant,*

*v.*

STATE OF UTAH,
*Appellee.*

No. 20180108
Heard February 19, 2019
Reheard March 9, 2020
Filed August 26, 2021

On Direct Appeal

Second District, Farmington
The Honorable Thomas L. Kay
No. 160701113

Attorneys:

Kathryn N. Nester, Scott K. Wilson, Benjamin C. McMurray,
Nathan K. Phelps, Salt Lake City, for appellant

Sean D. Reyes, Att'y Gen., Daniel W. Boyer, Erin Riley,
Aaron Murphy, Shane D. Smith, Asst. Solics. Gen., Salt Lake City,
for appellee

JUSTICE PEARCE authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, JUSTICE HIMONAS, and
JUSTICE PETERSEN joined.

ASSOCIATE CHIEF JUSTICE LEE authored an opinion concurring in part
and concurring in the judgment.

JUSTICE PEARCE, opinion of the Court:

## INTRODUCTION

¶1 A jury convicted Scott Patterson of, among other things, aggravated sexual abuse of a child. The court of appeals affirmed that conviction. This court denied Patterson's petition for certiorari. More than three years after that denial, Patterson petitioned the

district court for post-conviction relief from his criminal conviction and sentence. He petitioned pursuant to the Post-Conviction Remedies Act (PCRA), UTAH CODE §§ 78B-9-101–503, and the district court's "authority under the Constitution."

¶2    The State of Utah moved for summary judgment, arguing that Patterson had petitioned outside the time period the PCRA permits. *See* UTAH CODE § 78B-9-107. The State also argued that because the PCRA wholly regulates this court's authority to issue extraordinary writs that challenge a conviction, the PCRA's time-bar foreclosed any other avenue Patterson claimed the court could utilize to give him the relief he sought. The district court granted the State's motion.

¶3    Patterson appeals. Patterson posits that the PCRA's time limitations should be tolled. Alternatively, he argues that he can invoke the court's constitutional writ power outside the PCRA. And he claims that, to the extent the PCRA is interpreted to constrain this court from exercising its constitutional writ authority, the PCRA is unconstitutional.

¶4    We affirm the district court's determination that the PCRA time-bars Patterson's petition. We agree with Patterson that the people of Utah gave the courts the power to issue writs. We also conclude that while the Legislature—and we—can regulate the procedures we use with respect to writs, neither the Legislature—nor we—can do so in a fashion that violates a petitioner's constitutional rights. But we further conclude that Patterson has not demonstrated that application of the time-bar contained in the PCRA, that this court has incorporated into Utah Rule of Civil Procedure 65C, to Patterson's petition violates his rights under the Utah Constitution.

¶5    We therefore affirm the district court with respect to most of the claims Patterson raises. We note, however, that the district court did not address Patterson's arguments that the PCRA's time bar did not apply to the two claims he argues are based on newly discovered evidence. We remand, without comment on the merit of those arguments, to permit the district court to address them.

## BACKGROUND

¶6    In 2010, a jury convicted Scott Kirby Patterson of two counts of aggravated sexual abuse of a child and two counts of lewdness involving a child. The court of appeals addressed the underlying facts of that case in its opinion upholding Patterson's conviction. *State v. Patterson*, 2013 UT App 11, 294 P.3d 662. If imitation is the

sincerest form of flattery, the court of appeals should blush because we shamelessly lift our recitation of the pertinent facts from that opinion:

> Patterson's convictions arose out of a ten-month period beginning in February 2008, during which he abused his step-daughter (Child), while married to Child's mother (Mother). Child disclosed the abuse to Mother on the first night that it happened. Mother confronted Patterson in front of Child that night, and he denied the allegations. . . .

> Shortly after Christmas that year, Mother confronted Patterson again after realizing that both Child's and Patterson's behavior had changed over the last few months and that the changes had started after Child accused Patterson of abuse in February. On December 27, 2008, Patterson admitted to Mother that he had molested Child twice. Mother immediately planned to move out of the house and filed for divorce on December 29, and in the process she called an ecclesiastical leader from her church (Bishop) to explain the situation and ask for his help. On February 9, 2009, Patterson was charged with two counts of aggravated sexual abuse of a child and two counts of lewdness involving a child.

> Patterson also reached out to Bishop for help, meeting him at his office several months after Mother moved out. Patterson later described his meeting with Bishop as "confidential clergy-penitent communication" that involved "discussions about confession in the church." Nonetheless, after Patterson was charged, he offered Bishop's name as a character reference to the medical professional (Doctor) retained by his trial counsel to prepare a psychosexual evaluation of Patterson; the evaluation was to be used in plea negotiations and, if necessary, during sentencing. The psychosexual evaluation contains Bishop's statement to Doctor that Patterson "told [him] how sorry he was for what he has done." Because of this statement in the psychosexual evaluation, the State, during a recess in the middle of the trial and before Patterson had testified, indicated to Patterson's trial counsel that the State would use Patterson's communication with Bishop to impeach Patterson's

3

testimony denying the abuse. Patterson decided to heed his trial counsel's advice and not testify, even though both he and his trial counsel later testified that they were prepared for him to take the stand.

At trial, the defense posed the theory that Child's allegations were fabricated and used as leverage by a "very vindictive" Mother during her and Patterson's divorce. Throughout the trial, testimony was elicited from both Mother and Child that suggested Patterson was an angry person, who could be frightening at times. Mother's testimony also described some of the details of their divorce and indicated that Patterson got most of the assets because she did not "want to deal with him anymore." Defense counsel used these comments to support the theory that Child is a liar and that Mother convinced Child to fabricate the charges out of bitterness and to gain leverage in the divorce. One of the detectives (Detective) present during Child's interview at the Children's Justice Center (CJC) also testified at trial. Detective's testimony addressed the consistency between Child's trial testimony and her CJC interview.

*Id.* ¶¶ 2–5 (second alteration in original) (footnotes omitted).

¶7    A jury convicted Patterson on all four counts. The district court sentenced him to consecutive terms of fifteen years to life for the felony convictions. After conviction, Patterson obtained new counsel, including Edwin Wall, and appealed the convictions. In January of 2013, the court of appeals affirmed Patterson's conviction. *Id.* ¶ 1. Patterson then petitioned this court for a writ of certiorari, which we denied.

¶8    In May 2013, six days after this court denied Patterson's petition for certiorari, Wall wrote a letter to Patterson to explain his options in the wake of the denial of certiorari. In the letter, Wall advised Patterson that "to challenge the state criminal conviction, [Patterson] may file a federal petition for writ of habeas corpus . . . or [he] may pursue post-conviction relief through Rule 65C of the Utah Rules of Civil Procedure, or both." Wall stated, "In order to give you an idea as to what might be done . . . . I will discuss both the proceedings for federal habeas and those for state post-conviction relief so that you may consider how you wish to proceed."

¶9    Wall then explained the federal habeas process. Wall detailed,

> The federal court cannot grant relief on habeas corpus claims unless [the] Utah Supreme Court has first had an opportunity to rule on the same federal claims. This is called *exhaustion of state court remedies. . . .* The Supreme Court explained the exhaustion requirement in *O'Sullivan v. Boerckel. . . .* You have now exhausted your state court remedies.

¶10  Wall further explained that the PCRA "sets forth the manner and extent to which a person may challenge the legality of a criminal conviction and sentence after the conviction and sentence have been affirmed in a direct appeal . . . ." He then advised Patterson that the PCRA requires that a petitioner file within one year after the cause of action accrued. Wall elaborated, "This means[,] Scott[,] [you] must file your petition within one year of May 16, 2013, or it will be barred." Wall explained how post-conviction proceedings work and confessed that he was not sure what Patterson's PCRA claims would be. He then concluded by stating, "Regardless of how you decide to take your next step, I adamantly urge you to seek relief at the very least through a federal habeas petition."

¶11  In August of 2014, Patterson filed a pro se federal habeas petition in federal district court. That court appointed Patterson counsel on October 22, 2015, and the Office of the Federal Public Defender (federal attorneys) entered an appearance for Patterson on November 2, 2015. On October 28, 2016, more than three years after Patterson's direct appeal ended, Patterson filed a state petition for post-conviction relief. Patterson then filed this amended petition on November 2, 2016.

¶12  In his amended petition, Patterson seeks "postconviction relief from his conviction and sentence pursuant to the Postconviction Remedies Act (Utah Code Ann. § 78B-9-101 *et seq.*) and [the] court's authority under the Utah Constitution." Patterson's petition includes a section entitled "Grounds For Relief," which, in its entirety, outlines the elements of a claim for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984).

¶13  Patterson then lists twelve grounds for relief detailing the facts relevant to each ground and the prejudice he alleges flows from each alleged error. In other words, he attempts to set forth the facts

to support a claim of ineffective assistance of counsel under *Strickland.*[1]

¶14   Patterson acknowledges that he filed his petition more than three years after the denial of certiorari, but he offers three reasons why his petition is nonetheless timely. First, Patterson notes that under the PCRA, the time to file "is tolled for any period during which the petitioner was prevented from filing a petition due to state action in violation of the United States Constitution." (Quoting UTAH CODE § 78B-9-107(3).) Patterson avers that Wall provided constitutionally deficient assistance of counsel when he advised Patterson that he had exhausted his state court remedies. This deficient performance, Patterson argues, should be imputed to the State and thus toll the time period for filing his state post-conviction petition.

¶15   Second, Patterson claims that his petition is timely because it was filed within one year of his discovery of new evidence. The PCRA states that a petition must be brought within one year after the cause of action accrues. UTAH CODE § 78B-9-107(1). One possible

_____

[1]   These twelve grounds are: (1) "Mr. Patterson received ineffective assistance of counsel when his trial attorneys failed to protect statements made to and by [Bishop]"; (2) "Mr. Patterson received ineffective assistance of appellate counsel in how Mr. Wall handled claims related to the psychosexual evaluation"; (3) "[The trial prosecutor] committed prosecutorial misconduct and violated Due Process when he threatened to call [Bishop] even though he knew he could not do so"; (4) "Counsel was ineffective for failing to offer expert evidence of faulty interviewing techniques or evidence of fabrication"; (5) "Counsel was ineffective for failing to investigate and locate readily available impeachment evidence"; (6) "Trial counsel failed to object to inadmissible testimony by [Child and Mother], and appellate counsel failed to rebut inference from strategy"; (7) "Counsel unreasonably allowed improper bolstering testimony without objection or rebuttal"; (8) "Trial counsel unreasonably failed to object to the prosecutor's comments on the burden of proof and Mr. Patterson's right to remain silent"; (9) "Counsel performed deficiently in failing to obtain the results of a polygraph that would have required the prosecutor to dismiss the charges"; (10) "Mr. Patterson's decision to reject the plea offer was the result of ineffective assistance of counsel"; (11) "Trial counsel was ineffective at sentencing"; and (12) "The harm from these errors was cumulative."

accrual date is "the date on which petitioner knew or should have known, in the exercise of reasonable diligence, of evidentiary facts on which the petition is based." *Id.* § 78B-9-107(2)(e). Patterson argues that he did not know that a state post-conviction relief petition was a viable option because Wall "affirmatively misled him." Patterson only had reason to know that it was an option, he argues, once the federal attorneys were appointed. Thus, claims Patterson, the earliest he "could have had knowledge attributed to him was when he was finally appointed counsel." Because this petition was filed within a year of the day his current counsel entered an appearance on his behalf, Patterson argues the petition is timely.

¶16 Third, Patterson advances that the statute of limitation can be equitably tolled. He avers it would be unjust to apply the PCRA's general statute of limitation to his petition because he has been endeavoring to have his conviction reviewed but dodgy legal advice slowed him down.

¶17 Alternatively, Patterson argues that even if the PCRA bars his claims and equitable tolling is unavailable, this court could still hear his petition under its "residual constitutional authority." For this proposition, Patterson points to two opinions from this court where we indicated that we might, in an appropriate case, recognize an egregious injustice exception to the PCRA's procedural bars. *See Gardner v. State*, 2010 UT 46, ¶¶ 93–95, 234 P.3d 1115; *Winward v. State*, 2012 UT 85, ¶¶ 13–28, 293 P.3d 259.

¶18 The district court, as Utah Rule of Civil Procedure 65C requires, reviewed Patterson's petition to determine if "any claim has been adjudicated in a prior proceeding, or if any claim in the petition appears frivolous on its face." UTAH R. CIV. P. 65C(h)(1). The court summarily dismissed two of the twelve claims—grounds for relief 6 and 7—because they had been adjudicated in a prior proceeding. The district court required a response from the State on the remaining claims.

¶19 The State filed a motion for summary judgment, arguing that Patterson's petition is time-barred.[2] The State responded to each of Patterson's arguments.

_____

[2] At the same time it filed its motion for summary judgment, the State filed a motion to stay its full merits response to the petition

(continued . . .)

¶20 First, the State tackled Patterson's argument that Wall's alleged ineffective assistance could be imputed to the State and therefore toll the statute of limitation. The State argued that Wall's actions cannot be imputed to it. It further contended that Wall's advice was, in fact, sound. The State argued that even if the district court considered Wall's representation to be ineffective, Patterson was complaining about advice Wall had given after the appeal ended. According to the State, Patterson had no right to state-provided counsel at that point, so he could not raise an ineffective assistance claim.

¶21 Second, the State rebuffed Patterson's attempt to argue that his petition was timely because it was filed within one year of his current counsel's appointment. The State noted that Patterson's claim that Wall had misled him had nothing to do with the "evidentiary facts on which the petition is based." Therefore, the fact that Patterson learned from his new counsel that he could file a state post-conviction petition does not trigger a later accrual date. The State also countered Patterson's assertion that he could not have known about the claims before his new counsel was appointed. The State argued that the fact that "Patterson's current counsel has thought of new claims to raise . . . does not excuse Patterson from the time bar. Patterson knew, or at the very least should have known, of all the facts forming the bases of his current claims as early as his direct appeal. . . . Legal research and later-developed knowledge concerning these facts 'do not constitute evidentiary facts on which the petition is based.'" (Quoting *Collum v. State*, 2015 UT App 229, ¶ 7, 360 P.3d 13.)

¶22 Third, in response to Patterson's equitable tolling argument, the State averred that equitable tolling is not available under the PCRA. And, even if it were, Patterson had pled nothing that would entitle him to equitable tolling.

¶23 Finally, in response to Patterson's alternative argument, the State argued that the district court did not have the power to apply any "egregious injustice" exception to the PCRA.

¶24 In his response to the summary judgment motion, Patterson reiterated the arguments for timeliness he made in his petition and added that applying the statute of limitation to his petition would

---

pending the court's ruling on its motion for summary judgment. The district court granted this stay.

violate the Open Courts Clause of the Utah Constitution[3] and the Suspension Clauses of the Utah and United States Constitutions.[4]

¶25 The district court granted the motion for summary judgment and dismissed the petition. The district court rejected Patterson's statutory tolling argument. The court found nothing "to support the idea that 'the state deprived [Petitioner] of his right to access the courts,'" or that Wall's alleged ineffective assistance of counsel could be imputed to the State. (Alteration in original.) The court also found that even if there were an egregious injustice exception, Patterson's claim would not merit its application, and that the statute of limitation was constitutional.

¶26 The district court did not address Patterson's argument that at least two of his claims for relief were based on newly discovered evidence. Patterson appeals. After we heard arguments in this case, we requested supplemental briefing from the parties on Patterson's constitutional claims.

---

[3] The Utah Open Courts Clause states,
> All courts shall be open, and every person, for an injury done to the person in his or her person, property, or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay; and no person shall be barred from prosecuting or defending before any tribunal in this State, with or without counsel, any civil cause to which the person is a party.

UTAH CONST. art. I, § 11.

We note that Utah voters approved a constitutional amendment which took effect in January 2021, that replaced gendered language with gender-neutral or gender-equal language. Because this amendment has no impact on the substance of our analysis, we cite and quote the current version of the constitution, even though the language differs slightly from the language the constitution used when Patterson filed his petition.

[4] The Utah Suspension Clause states, "The privilege of the writ of habeas corpus shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it." UTAH CONST. art. I, § 5. The Suspension Clause of the federal constitution states, "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9(2).

**STANDARD OF REVIEW**

¶27 We review a district court's grant of summary judgment for correctness. *Orvis v. Johnson*, 2008 UT 2, ¶ 6, 177 P.3d 600. "A district court should grant summary judgment only when, viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party, there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Morra v. Grand Cnty.*, 2010 UT 21, ¶ 12, 230 P.3d 1022 (alteration in original) (citations omitted) (internal quotation marks omitted).

¶28 For the types of claims Patterson raises under the PCRA, "the petitioner has the burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." UTAH CODE § 78B-9-105(1)(a). And once the respondent has pled a time bar to the claims "the petitioner has the burden to disprove its existence by a preponderance of the evidence." *Id.* § 78B-9-105(2).

¶29 Finally, "[a] summary judgment movant, on an issue where the nonmoving party will bear the burden of proof at trial, may satisfy its burden on summary judgment by showing . . . that there is no genuine issue of material fact. Upon such a showing, whether or not supported by additional affirmative factual evidence, the burden then shifts to the *nonmoving* party, who may not rest upon the mere allegations or denials of the pleadings, but must set forth specific facts showing that there is a genuine issue for trial." *Orvis*, 2008 UT 2, ¶ 18 (citations omitted) (internal quotation marks omitted).

¶30 Therefore, we must determine, viewing all facts and reasonable inferences in the light most favorable to Patterson, whether there exists a genuine issue of material fact regarding whether Patterson's claims are time-barred. Patterson bears the burden to set forth specific facts showing that there is a genuine issue for trial.

¶31 With respect to Patterson's constitutional claims, "[t]he interpretation and constitutionality of a statute are questions of law that we review for correctness." *Waite v. Utah Lab. Comm'n*, 2017 UT 86, ¶ 5, 416 P.3d 635.

**ANALYSIS**

¶32 Patterson argues that all of his claims can be heard, even those that the PCRA would consider untimely, because the PCRA's time limitations should be either statutorily or equitably tolled. Alternatively, Patterson argues that the courts can hear his petition

because the courts possess constitutional writ authority separate from the PCRA and that the PCRA is unconstitutional if it purports to limit the courts' ability to hear the claims he raises. Patterson also argues two of the claims he raises are timely under the PCRA.

¶33 We reject Patterson's arguments that his claims are tolled under the PCRA. But we agree that the courts of this state have constitutional writ authority independent of the PCRA. We clarify the interaction between the PCRA and this writ authority, as it pertains to Patterson's argument that we should recognize an egregious injustice exception to the procedural time bars. We reject Patterson's arguments that the time bars found in the PCRA and Utah Rule of Civil Procedure 65C are unconstitutional. Finally, we conclude that the district court should have addressed two of Patterson's claims that he argues are based on new evidence and thus timely under the PCRA.[5] And we remand to permit the district court to address that argument.

## I. THE MAJORITY OF PATTERSON'S CLAIMS ARE TIME-BARRED

¶34 The PCRA requires that a petitioner bring her claims within one year after her cause of action accrues. UTAH CODE § 78B-9-107(1).[6] This means that the PCRA required Patterson to bring his

---

[5] The State also argues that a number of Patterson's grounds for relief are additionally barred under the PCRA because those grounds had been raised in a previous proceeding. The district court did not rule on this issue because it found those claims were time-barred. Because we affirm the district court's ruling that these claims are untimely, we do not address the State's alternative argument.

[6] Section 107 provides:
> (1) A petitioner is entitled to relief only if the petition is filed within one year after the day on which the cause of action has accrued.
> (2) For purposes of this section, the cause of action accrues on the later of the following dates:
>> (a) the last day for filing an appeal from the entry of the final judgment of conviction, if no appeal is taken;
>> (b) the entry of the decision of the appellate court that has jurisdiction over the case, if an appeal is taken;

(continued . . .)

11

(c) the last day for filing a petition for writ of certiorari in the Utah Supreme Court or the United States Supreme Court, if no petition for writ of certiorari is filed;

(d) the entry of the denial of the petition for writ of certiorari or the entry of the decision on the petition for certiorari review, if a petition for writ of certiorari is filed;

(e) the date on which petitioner knew or should have known, in the exercise of reasonable diligence, of evidentiary facts on which the petition is based; or

(f) the date on which the new rule described in Subsection 78B-9-104(1)(f) is established.

(3)(a) The limitations period is tolled for any period during which the petitioner was prevented from filing a petition due to state action in violation of the United States Constitution, due to physical or mental incapacity, or for claims arising under Subsection 78B-9-104(1)(g), due to force, fraud, or coercion as defined in Section 76-5-308.

(b) The petitioner has the burden of proving by a preponderance of the evidence that the petitioner is entitled to relief under this Subsection (3).

(4) The statute of limitations is tolled during the pendency of the outcome of a petition asserting:

(a) exoneration through DNA testing under Section 78B-9-303; or

(b) factual innocence under Section 78B-9-402.

(5) Sections 77-19-8, 78B-2-104, and 78B-2-111 do not extend the limitations period established in this section.

(6) This section does not apply to a petition filed under Part 3, Postconviction Testing of DNA, or Part 4, Postconviction Determination of Factual Innocence.

UTAH CODE § 78B-9-107(1)–(5). We note that, after Patterson filed his petition in 2016, the PCRA has been amended multiple times, including in 2017, *see* H.B. 274, § 9, 2017 Utah Laws 2604, 2608–09, and in 2021, *see* H.B. 100, 64th Utah Leg., Gen. Sess. (2021). We quote and cite the current statute because the amendments do not impact the substance of our analysis.

PCRA claims within one year after the time period expired for him to petition the United States Supreme Court for certiorari. *See id.* § 78B-9-107(2)(c). He failed to do so. And, by its express terms, the PCRA bars his petition from advancing to consideration on the merits.

¶35 However, Patterson claims that this statute of limitation is tolled for his petition. He argues that either the statutory tolling provision from the PCRA applies or that this court can equitably toll the statute of limitations. We disagree on both counts.

*A. Patterson's Claims Are Not Tolled Under the PCRA*

¶36 The PCRA allows the limitations period to be "tolled for any period during which the petitioner was prevented from filing a petition due to state action in violation of the United States Constitution." *Id.* § 78B-9-107(3)(a). Once the State pleads the statute of limitation as a bar to the claims, "the petitioner has the burden to disprove its existence by a preponderance of the evidence." *Id.* § 78B-9-105(2). To meet his burden, Patterson points to two alleged constitutional violations that he argues would trigger the PCRA's tolling provision.

1. Appellate Counsel's Advice

¶37 Patterson first argues that his appellate counsel provided constitutionally ineffective assistance which prevented him from filing a timely petition. This claim fails because a reasonable trier of fact could not conclude, based upon the facts Patterson used to support his petition, that Wall provided ineffective assistance of counsel.

¶38 Claims of ineffective assistance of counsel are governed by the oft-repeated standard the United States Supreme Court laid out in *Strickland v. Washington*, 466 U.S. 668 (1984). To establish a violation of his constitutional right to effective assistance of counsel, Patterson would have to "show (1) 'that counsel's performance was deficient' and (2) that 'the deficient performance prejudiced the defense.'" *State v. Gallegos*, 2020 UT 19, ¶ 33, 463 P.3d 641 (citation omitted). This requires a defendant to demonstrate "that counsel's representation fell below an objective standard of reasonableness," *Strickland*, 466 U.S. at 688, against the backdrop of a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *id.* at 689.

¶39 To support his assertion that Wall provided constitutionally deficient assistance, Patterson alleges that Wall met with Patterson in person shortly after this court denied his petition for certiorari.

Patterson states that Wall "told me this would be the end of the state case and the next step, if I wished to pursue it, was to file a writ of habeas petition in federal court." Patterson also avers that he does not remember Wall mentioning the possibility of filing anything in state court. And Patterson asserts that "Wall had told me the next step after the Utah Supreme Court denied certiorari was to file a federal . . . petition."

¶40 But after the meeting Patterson describes, Wall sent Patterson a letter. In that letter, Wall advised Patterson that he had two options: he could file in federal court or file a post-conviction petition in state court. Wall's letter told Patterson a state post-conviction relief petition would "have to be based on matters that have not already been litigated," and "I do not know what claims could be made."

¶41 Wall's letter then outlined the filing deadlines and requirements of each process. He explained that the issue for the federal petition would be "the deprivation of your right to testify in your own defense," and that he recommended pursuing federal habeas relief. Wall explained that before a federal court can grant relief, the issue must be raised with the state court. He continued, "This is called *exhaustion of state remedies*. The Supreme Court explained the exhaustion requirement in *O'Sullivan v. Boerckel* . . . . You have now exhausted your state court remedies."

¶42 When it came to a state court petition, Wall's letter explained the procedural and substantive requirements and advised that claims that had been previously raised would be dismissed. Wall advised that "those issues that have been addressed in the appeals we have taken would likely be summarily dismissed" if raised again in state court. But Wall also told Patterson that if there were issues that had not been raised on appeal, he might be able to press them in a PCRA petition.

¶43 Wall concluded the letter by telling Patterson, "You will need to decide how you wish to proceed. . . . Regardless of how you decide to take your next step, I adamantly urge you to seek relief *at the very least* through a federal habeas petition." (Emphasis added.)

¶44 This advice did not fall below an objective standard of reasonableness. Wall correctly told Patterson that the issues he had raised in the Utah courts *could* be raised in federal court, *could not* be raised in state court because they had been previously adjudicated, and that it was therefore a good idea to at least pursue his case in federal court. Wall also correctly advised Patterson any claim he wanted to raise in state court would have to be a claim that he had

not raised during the initial appeal. Wall admitted that he was not sure what those claims might be.

¶45 Patterson focuses in on several discrete parts of the letter to argue that Wall offered deficient advice. First, Patterson quotes the letter where Wall said, "I recommend you pursue federal habeas relief in your case," and "You have now exhausted your state court remedies." Second, Patterson alleges Wall incorrectly explained when and what could be raised in a federal petition. Finally, Patterson faults Wall for telling Patterson that he had "no right to counsel," on a habeas petition, when United States Supreme Court precedent requires that either legal materials or persons trained in the law be available to assist habeas petitioners make "a meaningful initial presentation to the trial court." (Citing *Bounds v. Smith*, 430 U.S. 827, 828 (1977).)

¶46 As to Patterson's first contention, Wall advised Patterson to pursue federal relief in the context of explaining the federal petition. Thus, Wall's recommendation to pursue federal habeas relief was just that, a recommendation based on the information available to Wall. Wall never advised Patterson in the letter that he should forego relief in state court. Similarly, Wall's statement that Patterson had exhausted his state court remedy was made in the context of informing Patterson that the federal court required Patterson to exhaust his state court claim before it could be raised federally. And Wall made clear that he was only talking about one issue: Patterson's right to testify in his own defense, which had been appealed and exhausted at the state level.

¶47 Patterson's second and third points are likewise unavailing. They both focus on Wall's allegedly deficient advice about when and what to argue in federal court. But these allegations, even if they could be shown to constitute objectively unreasonable representation, would not support a claim that Patterson suffered the prejudice Patterson would need to demonstrate to succeed under *Strickland*. This advice all spoke to his federal petition and did not prejudice his ability to raise his claims in state court.

¶48 In sum, nothing about Wall's advice would objectively suggest to Patterson that he would be prohibited from raising new claims in state court. To the contrary, Wall told Patterson that he could bring a petition in state court if they had not been previously raised. Wall repeatedly told Patterson he would have to decide what to do next: file in either state or federal court *or both*. And that he should "at least" pursue his arguments in federal court. Wall correctly told Patterson that any claims raised in state court would

have to be new and that he did not know what those claims would be. Even giving Patterson the benefit of the inferences to which he is entitled on summary judgment, a reasonable trier of fact could not conclude that Wall provided Patterson with objectively unreasonable advice that prevented him from timely filing a PCRA petition.[7]

2. Access to the Courts

¶49 Patterson also claims that he was prevented from filing his petition because the State failed to provide him access to the courts while he was imprisoned. According to Patterson, because he is incarcerated, "mere access is an empty right unless prisoners are provided with adequate legal resources so they can prepare 'meaningful legal papers.'" (Citing *Bounds*, 430 U.S. at 828.)

¶50 In *Lewis v. Casey*, the United States Supreme Court discussed the right to access the courts. 518 U.S. 343, 350–55 (1996). The Court stated that there is not "an abstract, freestanding right to a law library or legal assistance." *Id.* at 351. The Court also opined that "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts." *Id.* (citation omitted) (internal quotation marks omitted).

¶51 To establish a violation of the right to access the courts, an inmate must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Id.* In the course of reaching that conclusion, the Supreme Court specifically rejected the argument that the "State must enable the prisoner to *discover* grievances, and to *litigate effectively* once in court." *Id.* at 354. If this were required, it would "effectively . . . demand permanent provision of counsel, which we do not believe the Constitution requires." *Id.*

¶52 Patterson argues that he was deprived of his right to access the courts because he "was unaware of the existence of [attorneys contracted with the Department of Correction to assist inmates] when he was first imprisoned." And "[w]hen he found out about

---

[7] The district court dismissed Patterson's petition on a different basis, but "[w]e may affirm a grant of summary judgment upon any grounds apparent in the record." *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 36, 250 P.3d 465. We elect to address the representation Wall provided Patterson as the basis to affirm.

their existence and sought out their help, their responses were always dilatory, and the assistance they provided was deficient. Rather than help Mr. Patterson identify claims and prepare filings, the contract counsel instead simply provided him forms and directed him to file *pro se*."

¶53 In response to the first contention that he was unaware of the prison's contract counsel, the district court found that Patterson had not cited any authority "to suggest that the state has an affirmative duty to make prisoners aware of the contract attorneys." The district court also noted that if other inmates were aware of the contract attorneys, "it seems to follow that Petitioner should have known of them as well if he was diligently attempting to file another challenge to his conviction."

¶54 The State argues that the district court correctly noted that "none of the authorities guaranteeing prisoners right of access to the courts obliges contract attorneys to offer their services to inmates who have not sought them out." The State avers that "Patterson provided no evidence that the State prison actually prevented him from meeting the PCRA's filing deadline."

¶55 We agree. Even if we accept Patterson's assertion that he was unaware of the contract attorneys, Patterson does not forward any evidence that he sought them out or that the State hindered his ability to discover them. Patterson claims that the district court failed to indulge all reasonable inferences in his favor, but it would be an *unreasonable* inference to infer from the facts Patterson alleged that the State had hindered him from taking advantage of the legal resources the prison provides.[8]

¶56 As noted, Patterson also argues that the assistance the contract attorneys provided once he talked to them was deficient and improperly prohibited him from filing his petition in a timely manner. However, as the State notes, Patterson did not seek assistance from the contract attorneys until March 2015. This was

---

[8] Nothing we say should be interpreted as an endorsement of the state of affairs at the Utah State Prison with respect to the provision of legal services to inmates. We do not know enough about the situation to offer an opinion, but we recognize that it was Patterson's burden to forward facts to allow the district court to conclude that there was a genuine issue of material fact with respect to the State's efforts—or lack of efforts—to meet its obligation. We conclude only that Patterson failed to meet his burden.

well after the statute of limitations on his PCRA claims ran. Thus any claim based on what the contract attorneys did or did not do could not have prevented Patterson from timely filing his petition—it was already untimely.

¶57 Because we are not convinced that there is a genuine issue of material fact regarding whether State action hindered Patterson from timely filing this petition, we affirm the district court order finding that Patterson was not entitled to statutory tolling.

*B. Patterson's Claims Are Not Equitably Tolled*

¶58 Patterson next argues that this court should apply equitable tolling principles and toll the PCRA's statute of limitation for the period he lacked counsel. Patterson avers that,

> [u]nder the circumstances in his case, it would be unjust to blindly apply the statute of limitations without reason. Mr. Patterson diligently sought further review of his case. He filed a timely petition in federal court because he had been told that his state remedies had been exhausted and he should proceed next to federal court. . . . Had he known he needed to file first in state court, he would have done so.

We are not convinced that equitable tolling, if even applicable to PCRA claims, could be appropriately applied to Patterson's claims.

¶59 We have stated that "[t]he doctrine of equitable tolling should not be used simply to rescue litigants who have inexcusably and unreasonably slept on their rights, but rather to prevent the expiration of claims to litigants who, *through no fault of their own*, have been unable to assert their rights within the limitations period. Under our traditional principles of equitable tolling, the party seeking equitable tolling must first show that he was indeed disabled . . . from protecting his claim." *Garza v. Burnett*, 2013 UT 66, ¶ 11, 321 P.3d 1104 (alterations in original) (citations omitted) (internal quotation marks omitted).

¶60 Patterson relies, in part, on *Sevy v. Security Title Co. of Southern Utah*, 902 P.2d 629 (Utah 1995). In *Sevy*, this court held that a statute of limitations could be tolled in "exceptional circumstances where the application of the general rule would be 'irrational or unjust.'" *Id.* at 636 (citation omitted). Patterson points to similar language from the United States Supreme Court: "[A] petitioner is entitled to equitable tolling only if he shows (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." *Holland*

*v. Florida*, 560 U.S. 631, 649 (2010) (citation omitted) (internal quotation marks omitted). In a similar vein, Patterson cites *Martinez v. Ryan*, 566 U.S. 1 (2012), for the proposition that equitable tolling might apply when attorney error results in a procedural default.

¶61 As to Patterson's first point, applying the statute of limitation to Patterson here would not be "irrational" or "unjust." Patterson has not introduced facts that demonstrate that some extraordinary circumstance prevented him from timely filing. As discussed above, Wall's advice did not prevent Patterson from filing a petition. *See supra* ¶¶ 37–48. In contrast, in *Holland*, the attorney conduct that excused the late filing included the attorney failing to file the petition despite the client repeatedly asking him to do so, not informing the client that his state cases had been decided, and failing to communicate with the client "over a period of years, despite various pleas from [the client] that [the attorney] respond to his letters." 560 U.S. at 652. The facts of the case here fail to compare to the "unjust" and "extraordinary circumstances" in cases like *Holland*.

¶62 Patterson also relies on *Martinez*, 566 U.S. 1. In that case, the United States Supreme Court held that a court hearing a federal habeas petition can excuse a procedural default caused by ineffective assistance of state post-conviction counsel in a narrow set of circumstances. *Id.* at 9. *Martinez* involved a state, Arizona, where claims of ineffective assistance of trial counsel could only be brought by a petition for post-conviction relief. *Id.* at 4. The *Martinez* court reasoned that where post-conviction is the first opportunity a person will have to raise claims of ineffective trial counsel, a federal habeas court may hear those claims where the defendant's ability to raise them in a post-conviction petition has been lost by the ineffective assistance of counsel. *Id.* at 13–14.

¶63 This case is not *Martinez*. Utah allows claims for ineffective assistance of trial counsel on direct appeal. Patterson had a venue to raise his ineffective-trial-counsel claims and enjoyed the right of counsel to help him press those claims. Therefore, the policy concerns that animated the *Martinez* court are not implicated here.

¶64 Finally, we disagree that in this case the timely filing of a federal habeas petition should toll the state statute of limitation. Patterson was told that he had to file his state petition within the statute of limitation and that it would have to be based on new claims. It is not "irrational" or "unjust" to apply the statute of limitation where Patterson received accurate advice about his path forward.

¶65 Because no tolling provision applies, Patterson's claims (except possibly for two we discuss later in this opinion) are untimely under the PCRA. As such, the district court did not err when it granted the State's summary judgment motion.[9]

## II. THE COURTS' CONSTITUTIONAL AUTHORITY TO ISSUE POST-CONVICTION EXTRAORDINARY WRITS

¶66 Patterson argues that even if the PCRA bars his claims, a court can hear them pursuant to the writ power the Utah Constitution grants the courts. According to Patterson, the district court and this court possess constitutional authority to issue post-conviction extraordinary writs that is independent of a statutory scheme like the PCRA. Patterson recognizes that the PCRA states that it is "the sole remedy" for post-conviction relief, UTAH CODE § 78B-9-102(1)(a), and so he asserts that the PCRA is unconstitutional if it purports to replace or regulate this court's writ authority.

¶67 Patterson also avers that the courts could hear his petition by applying an "egregious injustice" exception to the procedural bars. In cases like *Gardner v. State*, 2010 UT 46, 234 P.3d 1115, and *Winward v. State*, 2012 UT 85, 293 P.3d 259, we left open the possibility that we might have the ability to hear a time-barred case if an egregious injustice would result if we did not.

¶68 The State asks us to repudiate the things we said in *Gardner* and *Winward* and close the door once and for all on any type of extra-statutory exception to the PCRA. In the State's view, the PCRA represents a completely legitimate exercise of legislative authority to wholly regulate the writ power the Utah Constitution grants the Utah judiciary.

¶69 We asked for supplemental briefing on these questions. And we appreciate the excellent research and analysis the parties provided in response. We commend Patterson and the State for the

---

[9] In addition to seeking relief under the PCRA, Patterson also seeks relief under the court's "authority under the Utah Constitution." As we explain below, this court incorporated the terms of the PCRA into Utah Rule of Civil Procedure 65C. *See infra* ¶¶ 174, 182 & n.41. Rule 65C sets forth the manner in which we have decided to exercise our constitutional writ authority. *See infra* ¶ 183 & n.42. Consequently, if Patterson's petition is untimely under the PCRA, it is also barred by rule 65C.

thoughtful arguments they advanced on a complicated set of issues. We especially appreciate the manner in which they delved into the historical record to provide information on how the people of Utah would have understood the writ power at various times in our history.

¶70 Even though the parties raised constitutional issues in their initial briefs, and despite the fact that we asked for supplemental briefing on some of those issues, and then held a second hearing to discuss those issues, the concurrence invokes principles of constitutional avoidance to chide us for addressing the questions the parties asked us to resolve concerning the origin and scope of the constitutional writ authority. *Infra* ¶¶ 235–40. But, as the concurrence in another case noted while chiding this court for *failing to reach* a constitutional question, constitutional avoidance is not an iron-clad rule; it simply gives rise to a presumption that "is rebuttable in cases where 'specific reasons exist for offering broader guidance . . . .'" *State v. Walker*, 2011 UT 53, ¶ 66, 267 P.3d 210 (Lee, A.C.J., concurring) (quoting *Gallivan v. Walker*, 2002 UT 89, ¶ 97, 54 P.3d 1069 (Durham, C.J., concurring)).

¶71 This matter does not present a classic constitutional avoidance scenario. This is not like the case the concurrence cites where we avoided reaching constitutional issues by ruling on non-constitutional grounds. *See infra* ¶ 235 (citing *State v. Argueta*, 2020 UT 41, ¶ 55, 469 P.3d 938).[10] Here, Patterson argues that dismissal of

---

[10] *Argueta* was a case in which we avoided any constitutional issue by concluding that even if there were a constitutional violation, Argueta suffered no prejudice. *Argueta*, 2020 UT 41, ¶ 18. We did so in spite of a concurring opinion that urged us to address the question of whether Argueta's Fifth Amendment rights had been violated because, in part, it was "an important question." *Id.* at ¶ 76 (Lee, A.C.J., concurring in part and concurring in the judgment). In addressing that concurrence's argument that we should answer Argueta's constitutional question, we noted that we had said that we "have gone so far in the past as to assert that it is 'our obligation to avoid addressing constitutional issues unless required to do so.'" *Id.* at ¶ 55 (majority) (quoting *Gardner*, 2010 UT 46, ¶ 93). But we acknowledged that "it may be that these prior cases overstated the principle of constitutional avoidance by speaking broadly in terms of 'obligation[s]' and 'fundamental rule[s].'" *Id.* at ¶ 55 n.14 (alterations in original). And we put off addressing that language for another day. *Id.*

(continued . . .)

his petition violates his constitutional rights. This argument is a backstop to his statutory and common law claims. If we were to find for Patterson on his statutory or common law arguments, then we would not need to reach his constitutional claims. But because we conclude that Patterson's statutory and common law arguments fail, we must examine whether the constitution affords him any remaining form of redress. And we ultimately hold—even under the version of the opinion the concurrence envisions—that there is no egregious injustice exception to the time bars of the PCRA or rule 65C, and that Patterson has not convinced us that those time bars violate the Utah Constitution's Open Courts Clause or Suspension Clause.

¶72 The concurrence agrees we need to reach those particular questions and signs off on those conclusions. *See infra* ¶ 220. As such, the concurrence does not really advocate for constitutional avoidance. The concurrence just wants us to avoid the constitutional questions on which it disagrees with the answers. If we were to practice constitutional avoidance, we would decide this case the way we decided *Winward*, 2012 UT 85. We would decline to opine on whether the constitution requires us to recognize an egregious injustice exception to the PCRA because we conclude that Patterson would not qualify for that exception. *Cf. id.* ¶ 21. And we would leave open the question of whether the Utah Constitution either requires or forbids us from recognizing an exception to the PCRA until we were presented with a case where we could not avoid the question by taking a non-constitutional route.[11]

---

We need not decide today how best to articulate the constitutional avoidance standard. However we may phrase it, the court unanimously agrees that we should address some of the constitutional questions the parties have placed before us. Thus, regardless of how we define the burden a party faces to convince us to take a constitutional path when we have a non-constitutional option, Patterson and the State have convinced us to reach the constitutional issues.

[11] We decided *Winward* over the objection of a separate opinion that chastised the court for failing to order supplemental briefing to reach the constitutional question. *See Winward*, 2012 UT 85, ¶ 45 (Lee, A.C.J., concurring) ("I concede the need for briefing addressed more explicitly to the question of the constitutional source of our authority to recognize an exception to the PCRA's time-bar provisions. For

(continued . . .)

¶73 But here "specific reasons exist for offering broader guidance" and answering the other constitutional questions. *Walker*, 2011 UT 53, ¶ 66 (Lee, A.C.J., concurring) (citation omitted). Patterson and the State put the constitutional questions in front of us and engaged with the original understanding of the constitutional language. As we stated in our supplemental briefing order, the parties have asked us to "definitively state [whether] we have constitutional authority to issue writs that is broader than the PCRA allows." At our invitation, the parties dedicated additional time and resources to the four questions posed in our order and provided us with excellent briefing on the subject. We put the parties to this additional work in part because the State made a compelling argument that our unwillingness to address constitutional questions made "arguments over the existence of an 'egregious injustice' exception . . . ubiquitous in the district courts, the court of appeals, and this [c]ourt." In other words, we set down this path because the parties convinced us that the bench and bar needed certainty in this area of the law. By answering the questions the parties have briefed and argued, we can explain the framework that will guide the resolution of future disputes in this area. In contrast, the constitutional avoidance the concurrence presses would only cause us to swap one set of unanswered questions for another with no guidance on how to approach those questions when they arise.

¶74 In essence, the concurrence wants to play Jenga with the opinion, pulling out a couple of conclusions and hoping that the tower still stands in the end. But without explaining the source and scope of the writ power the Utah Constitution authorizes, our opinion cannot persuasively explain to Patterson that the Utah Constitution offers him no relief. Nor can we explain to the State why we do not embrace its assertion that the Legislature has near unfettered power to regulate the writ.[12] If we do not address these

_____

that reason I would have entered an order calling for such briefing in this case."). Even without that briefing, the concurrence ventured forth to address the constitutionality of the egregious injustice exception. *See id.* ¶ 64.

[12] The concurrence also asserts that "[t]his is not the right case for our court to be opining" on the questions we address, *infra* ¶ 226, which the concurrence says are not "directly implicated." *Infra* ¶ 236. And it states that the questions are not ripe for adjudication because all we have is a "hypothetical application of a provision to a situation in which the parties might, at some future time, find

(continued . . .)

questions, we will just inject new uncertainty into this area of law. And we will do so in the same opinion we say we are willing to tackle other constitutional questions—that we could avoid—because we want to provide certainty. For these reasons, the presumption against deciding constitutional questions has been overcome.

¶75 To answer the questions the parties have posed about the relationship between the PCRA and our constitutional writ authority, we need to understand three things. First, we need to understand the source of the courts' writ power; that is, we need to know what provisions of the Utah Constitution invest the judiciary with power over writs. Second, we need to understand the scope of the writ power the Utah Constitution gives to the judiciary. And third, we need to understand to what extent the Utah Constitution permits the Legislature to regulate that writ power.

*A. Article VIII of the Utah Constitution Grants Courts Authority to Issue Habeas Writs*

¶76 Patterson and the State agree that the Utah Constitution provides the judicial branch the power to issue writs that challenge

---

themselves." *Infra* ¶ 229 (quoting *Metro. Water Dist. v. Sorf*, 2019 UT 23, ¶ 10, 445 P.3d 443) (emphasis omitted). This is a novel extension of what it means for an issue to be unripe.

Patterson wants to know why he cannot present his claim that he was afforded ineffective assistance of counsel by using the writ power the Utah Constitution gives the courts. The district court ruled that the PCRA prevented him from raising that claim. Part of what Patterson argues is that the Legislature does not have the power to place substantive restrictions on his constitutional right to ask this court for a writ. *See supra* ¶ 66. The State responded to that argument, arguing that the Legislature could and did do exactly that. *See supra* ¶ 68. Thus the issue is squarely presented for resolution.

Moreover, it is not a hypothetical application of the law to Patterson. It is, in the language of the case the concurrence cites, "an actual . . . clash of legal rights." *Sorf*, 2019 UT 23, ¶ 10 (citation omitted) (emphasis omitted). The only reason that we would not need to reach that question is if we decide the case on a different ground. The concurrence's view of ripeness would mean that any time a party presents alternative grounds for affirmance or reversal, ruling on one of those bases would render the other unripe, such that we could not address it without finding an exception to the ripeness doctrine. That is not our law.

the detention of an individual—such writs have traditionally been called writs of habeas corpus. But the parties disagree over what part of the constitution invests the courts with the writ power. And this fuels their disagreement over the scope of the writ the constitution guarantees. That is, they disagree over whether post-conviction writs fall within the court's constitutional writ power and whether the constitution gives the Legislature the ability to limit it.

¶77   Patterson argues that writ authority comes from article VIII, sections 3 and 5. Section 3 provides that "[t]he Supreme Court shall have original jurisdiction to issue all extraordinary writs," UTAH CONST. art. VIII, § 3, and section 5 provides that "[t]he district court shall have . . . power to issue all extraordinary writs."[13] *Id.* art. VIII, § 5. The people of Utah enacted this particular language as part of a new constitutional article in 1984, but the authority to issue important writs has been in the Utah Constitution since it was first adopted in 1895. *Infra* ¶¶ 121–22.

---

[13] The parties do not dispute that the term "extraordinary writ" encompasses the writ of habeas corpus. Although our constitutional authority to issue "extraordinary writs" also includes other types of writs, like writs of mandamus, and the remedies outlined in our Rule of Civil Procedure 65B, our analysis here applies specifically to those that would traditionally be covered by the label "writ of habeas corpus."

We have recognized that references to extraordinary writs include writs of habeas corpus. By at least 1972, our rules of civil procedure recognized the writ of habeas corpus as an "extraordinary writ." *See Crist v. Mapleton City*, 497 P.2d 633, 636 (Utah 1972) (Crocket, J., dissenting) (noting that then rule 65B(a) referred to "writs in habeas corpus . . . and other extraordinary writs"). And prior to 1984, we had recognized this in a host of cases. *See Granato v. Salt Lake Cnty. Grand Jury*, 557 P.2d 750, 751 (Utah 1976); *Andreason v. Turner*, 493 P.2d 1278, 1279 (Utah 1972); *Rees v. Turner*, 491 P.2d 1093, 1093 (Utah 1971); *Syddall v. Turner*, 437 P.2d 194, 195 n.3 (Utah 1968); *Sullivan v. Turner*, 448 P.2d 907, 908 (Utah 1968); *Bryant v. Turner*, 431 P.2d 121, 122 (Utah 1967); *Aldridge v. Beckstead*, 396 P.2d 870, 870 (Utah 1964); *see also Hurst v. Cook*, 777 P.2d 1029, 1033 (Utah 1989) ("[T]here is no doubt that [the term 'extraordinary writ' in article VIII] also includes the most important of all ancient writs, the writ of habeas corpus."); *McMahan v. Hunter*, 179 F.2d 661, 662 (10th Cir. 1950).

¶78 The State avers that it is "not the Article VIII reference to this Court's power to 'issue' the writ that [does] the work of protecting or defining" the writ authority. The State claims that "it was—and still is—the Suspension Clause that limits the legislature's power to suspend the core writ." The Suspension Clause, found in article I, section 5 of the Utah Constitution, states, "The privilege of the writ of habeas corpus shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it."

¶79 We agree with Patterson and the constitution's plain language. The "power" to issue writs described in section 5 and the "original jurisdiction" in section 3 both connote a sphere of authority to do something.

¶80 Original jurisdiction is a "court's *power to hear and decide a matter* before any other court can review the matter." *Original Jurisdiction*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added).[14] Dictionaries published close in time to the enactment of this language confirm this meaning.[15]

---

[14] This is in contrast to subject matter jurisdiction, which places boundaries on the exercise of jurisdiction. *See Subject-Matter Jurisdiction*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining subject matter jurisdiction as "[j]urisdiction over the nature of the case and the type of relief sought; the extent to which a court can rule on the conduct of persons or the status of things").

[15] As we discuss below, the language of article VIII, sections 3 and 5 entered the constitution in 1984, so we look to language from that period. *See Jurisdiction*, WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1983) (defining jurisdiction as "1: the power, right or authority to interpret and apply the law[.] 2: the authority of a sovereign power to govern or legislate[.] 3: the limits or territory within which authority may be exercised"); *Jurisdiction*, OXFORD ENGLISH DICTIONARY (2d. ed. 1989) (defining jurisdiction as "1. Administration of justice; exercise of judicial authority, or of the functions of a judge or legal tribunal; power of declaring and administering law or justice; legal authority or power. . . . 2. Power or authority in general; administration, rule, control. . . . 3. The extent or range of judicial or administrative power; the territory over which such power extends. . . . 4. A judicial organization; a judicature; a court, or series of courts, of justice."); *Jurisdiction*, OXFORD AMERICAN DICTIONARY (1980) (defining jurisdiction as: "1. authority to interpret and apply the law. 2. official power exercised within a particular

(continued . . .)

¶81   Although the 1984 amendment changed the constitutional language, the core principle has been present since the people of Utah originally adopted their constitution. Not long after statehood, we recognized that the Utah Constitution "expressly conferred upon the courts and reserved unto them the power to issue the writs mentioned in the Constitution." *State v. Durand*, 104 P. 760, 764 (Utah 1908).

¶82   The State's argument—that the writ authority arises from the Suspension Clause—tracks how federal courts have talked about the federal habeas power. The State's argument is flawed because the federal constitution does not have an analog to Utah's article VIII, sections 3 and 5. Indeed, the Suspension Clause is the only reference to the habeas writ authority in the federal constitution.

¶83   Additionally, the federal Suspension Clause does not expressly grant power to issue, or jurisdiction over, writs to any federal court.[16] Indeed some have argued that the federal Suspension Clause does not affirmatively provide authority to issue writs, but merely proscribes suspension *if* the writ exists. *See* Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text, Imperial Contexts, and American Implications*, 94 VA. L. REV. 575, 580 (2008) ("The Suspension Clause does not itself confer jurisdiction on any court to enforce the 'privilege of the writ.'"); *Dep't of Homeland Sec. v. Thuraissigiam*, 140 S. Ct. 1959, 1969 n.12 (2020) (noting the debate over "whether the [Suspension] Clause independently guarantees the availability of the writ or simply restricts the temporary withholding

---

sphere of activity. 3. the extent or territory over which legal or other power extends"); *Jurisdiction*, AMERICAN HERITAGE DICTIONARY (2d. college ed. 1982) (defining jurisdiction as "1. The right and power to interpret and apply the law. 2 a. Authority or control. b. The extent of authority or control. 3. The territorial range of authority or control."); *Jurisdiction*, MERRIAM-WEBSTER DICTIONARY OF SYNONYMS (1984) (listing the following synonyms for "jurisdiction": "power, authority, control, command, sway, dominion").

[16] The Suspension Clause of the U.S. Constitution provides: "The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9(2). Utah's Suspension Clause is nearly identical: "The privilege of the writ of habeas corpus shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it." UTAH CONST. art. I, § 5.

of its operation"). But the United States Supreme Court has nonetheless found that the federal Suspension Clause "ensures that . . . the Judiciary will have . . . the writ," even if not expressly granted by statute. *Boumediene v. Bush*, 553 U.S. 723, 745 (2008).

¶84    To be clear, that Utah's constitution provides that the "privilege of the writ of habeas corpus shall not be suspended," UTAH CONST. art. I, § 5, provides further evidence that this writ authority is constitutionally protected. But the State offers us no reasoning or authority for why the plain language of article VIII, sections 3 and 5 does not also, and more firmly, establish the courts' power to issue writs.

¶85    Simply stated, the State misplaces its reliance when it bases its argument on cases interpreting the United States Constitution, which lacks an express grant of writ authority to the federal judiciary. The people of Utah expressly granted the writ power to its judiciary in a way that the federal constitution does not.

### B. The Courts of This State Have Constitutional Authority to Issue Extraordinary Writs for Post-Conviction Relief

¶86    The next issue we need to understand concerns the scope of our constitutionally granted writ authority. Patterson argues that the writ authority found in our constitution includes the power to issue writs related to post-appeal petitions that collaterally attack a conviction or sentence—for simplicity's sake, we will refer to these types of petitions as post-conviction petitions.

¶87    The State takes a much narrower view of our constitutional authority. The State avers that the habeas writ the constitution authorizes does not encompass post-conviction petitions. The State argues that a post-conviction petition falls outside the "constitutional writ." According to the State, "the post-conviction process is a creation of state law not mandated by the constitution [and] states have plenary power to regulate it or do away with it altogether."[17] Thus, the State envisions that the writ the

---

[17] The implications of this argument should not be overlooked. The PCRA currently contains an exception for newly discovered evidence, such as new DNA evidence that exonerates a petitioner. UTAH CODE § 78B-9-107(4)(a). The State takes the position that because the PCRA is entirely a creature of statute, and the constitution does not guarantee the ability to mount a post-conviction challenge, the Legislature could remove that

(continued . . .)

constitution authorizes allows a person to challenge detention *prior* to conviction but not in most post-conviction circumstances.

¶88   The differing views of the writ power spring, in part, from a disagreement about what the original public meaning of the constitutional language is, as well as at what point we should measure that meaning. This question arises because, while the constitution adopted in 1895 contained language granting writ authority to the courts, in 1984 the judicial article of the constitution was repealed and replaced with new language, including the sections 3 and 5 we have discussed.[18]

¶89   The State concedes that by 1984, Utah courts heard writ petitions in post-conviction cases. But it argues that the constitutional language adopted in 1984 did not change the scope of writs the Utah Constitution authorized. According to the State, the expansion of the writ to encompass post-conviction challenges occurred in the twentieth century. Because that power was, in the State's view, beyond the scope of the original grant of writ power to the courts, the courts heard these writs pursuant to a common-law, non-constitutionally based writ authority. The State argues that the "public meaning" we need to understand to interpret the Utah Constitution is the meaning the people of Utah would have given to the constitution in 1895.

¶90  Patterson agrees that the understanding of habeas expanded in our courts after the adoption of our constitution to include petitions for post-conviction relief. But he argues that the people of Utah enshrined this broader understanding when they enacted the new judicial article of the constitution in 1984. Thus, according to Patterson, we should address the public meaning of the court's writ authority as the people of Utah would have understood it when they voted on the 1984 constitutional amendment.

---

exception and leave a prisoner with no avenue to permit a court to review that newly-discovered DNA evidence.

[18] The parties consistently refer to Utah's original constitution as the 1896 constitution, and their arguments refer to the meaning of its terms in 1896. But the Utah Constitution was drafted and ratified by the voters in 1895. For simplicity, we will reference 1895 as the relevant year for thinking about the public meaning of the original constitution.

¶91   When interpreting constitutional language, we look to the "plain language" of the text and "start with the meaning of the text as understood when it was adopted." *S. Salt Lake City v. Maese*, 2019 UT 58, ¶¶ 18, 23, 450 P.3d 1092. And "our focus is on the objective original public meaning of the text, not the intent of those who wrote it." *Id.* ¶ 19 n.6. We have noted that the purpose "of our constitutional inquiry is . . . to interpret the Constitution according to how the words of the document would have been understood by a competent and reasonable speaker of the language at the time of the document's enactment." *Id.* (citation omitted) (internal quotation marks omitted). And "[a]lthough the text's plain language may begin and end the analysis, . . . constitutional inquiry does not require us to find a textual ambiguity before we turn to those other sources. Where doubt exists about the constitution's meaning, we can and should consider all relevant materials." *Id.* ¶ 23.

¶92   As a matter of logic, when the people of Utah amend the constitution, we look to the meaning that the public would have ascribed to the amended language when it entered the constitution. Other courts agree. *See Pestka v. State*, 493 S.W.3d 405, 411 (Mo. 2016) (discussing that in interpreting constitutional amendments, courts should "give effect to the intent of the people in adopting the amendment"(citation omitted)); *Brewer v. Fergus*, 79 S.W.3d 831, 834 (Ark. 2002) (discussing that the language of constitutional amendments should be given its plain meaning at time of adoption); *Calvey v. Daxon*, 997 P.2d 164, 170 (Okla. 2000) (stating when courts interpret constitutional amendments, "the voters expect the courts to be familiar with settled rules of constitutional construction and to follow them"); *Neel v. Shealy*, 199 S.E.2d 542, 545 (S.C. 1973) (discussing the need for the court to determine the intent of the framers of the constitutional amendment and the intent of the legislature which approved the amendment); *In re Opinion of the Justices*, 85 N.E.2d 761, 763 (Mass. 1949) (detailing that a constitutional amendment "should be interpreted in 'a sense most obvious to the common understanding at the time of its adoption'" (citation omitted)).

¶93   The language we are asked to interpret entered our constitution in 1984. So we need to understand what the public would have understood the writ power to be when it invested its Supreme Court with "original jurisdiction to issue all extraordinary writs" and its district courts with "power to issue all extraordinary writs." *See* UTAH CONST. art. VIII, §§ 3, 5.

¶94   To understand the meaning of the constitutional language, and what the public would have considered the writ power to

include in 1984, we will give a short summary of the long history of habeas proceedings to understand the state of affairs at the time Utah became a state and adopted its constitution. We then address the changes that occurred between 1895 and 1984. Finally, we discuss the language of the constitution as it now stands after the 1984 enactment. Against that historical backdrop we can better discern what the people of Utah would have understood they were putting in the constitution when they adopted the amended article VIII.

1. The Early History of Habeas Corpus

¶95    The writ of habeas corpus has tended, over time, to expand in scope and meaning. At its core, the writ of habeas corpus provides the mechanism for people to exercise their privilege as the sovereign power to hold their government answerable to the law. What began as simply a procedural mechanism to bring a party before the court became the privilege of the king to ensure his subjects were not imprisoned by another authority. It then became the privilege of the subjects to ensure the king did not imprison them without cause. From there, the writ further evolved to permit people a vehicle to challenge their imprisonment.[19]

¶96    Some scholars trace the writ to Roman times. WILLIAM S. CHURCH, A TREATISE ON THE WRIT OF HABEAS CORPUS § 1, at 2 (2d. ed. 1893) [hereinafter CHURCH TREATISE]. At least by the reign of Edward Longshanks in thirteenth century England, the writ was "known and used in some form." *Boumediene*, 553 U.S. at 740. In its earliest form, the writ was "simply an auxiliary device to assure the presence of a party before the court." Dallin H. Oaks, *The "Original" Writ of Habeas*

---

[19] "In the long quest to build a cathedral of government under law, the inevitable failures of fallible humans to act in accord with our government's promise of freedom and liberty periodically arouses tempests that damage the partially-completed structure. The invocation of the writ of habeas corpus by those unlawfully detained is a central tool to the restoration and preservation of the government under law. Through petitions for writs of habeas corpus, judges can hear the previously inaudible sighs of prisoners, and utilize the 'protean dynamism' of the writ to inspect our government's failures and efficaciously repair its freedoms." Eric M. Freedman, *Habeas Corpus in Three Dimensions Dimension I: Habeas Corpus as a Common Law Writ*, 46 HARV. CIV. RTS.-CIV. LIBERTIES L. REV. 591, 618 (2011) (citation and footnotes omitted).

*Corpus in the Supreme Court*, 1962 SUP. CT. REV. 153, 175. By the seventeenth century, it had evolved to be "a substantive remedy and independent means for inquiring into the cause of detention." *Id.* But although the writ was used to "inquire into the authority of a jailer to hold a prisoner," *Boumediene*, 553 U.S. at 741, initially it was only used "to assist the King in the exercise of his power," *id.* at 740.

¶97 The writ embodied the prerogative of the king to demand an account "for his subject who is restrained of his liberty." Paul D. Halliday & G. Edward White, *The Suspension Clause: English Text, Imperial Contexts, and American Implications*, 94 VA. L. REV. 575, 600 (2008) (citation omitted). It was through the writ that the justices of the King's Bench, exercising the king's prerogative, "supervise[d] the discretion of judicial and administrative officers of all kinds." *Id.* at 608. Through the writ, subjects also asserted the king's prerogative "against those whose authority threatened them most: . . . the justices of the peace and statutory commissioners who lived in their own communities." *Id.*

¶98 But by the seventeenth century, the writ was no longer limited to holding lower authorities to the ultimate authority of the king. It began to be used to hold the king to the law. "[G]radually the writ of habeas corpus became the means by which the promise of Magna Carta was fulfilled." *Boumediene*, 553 U.S. at 740.[20] Importantly, the writers of the Magna Carta said the writ means "that the king is and shall be below the law." *Id.* at 741 (citation omitted).

¶99 The famous English case known as "Darnel's case," and its aftermath, illustrate the point. In the 1627 case, five knights, including Sir Thomas Darnel, had been imprisoned for not contributing to a loan the king had demanded. CHURCH TREATISE, *supra*, § 3b, at 4; *Boumediene*, 553 U.S. at 741. They petitioned the court for a writ of habeas corpus. CHURCH TREATISE, *supra*, § 3b, at 4; *Boumediene*, 553 U.S. at 741. The justices of the bench required that a "return" be made, meaning the one imprisoning the men was required to explain the basis for their imprisonment. *See* CHURCH TREATISE, *supra*, § 3b, at 4. In the return, however, the only reason

---

[20] The Magna Carta had declared that "[n]o freeman shall be seized, or imprisoned, or dispossessed, or outlawed, or in any way destroyed; nor will we condemn him, nor will we commit him to prison, excepting by the legal judgment of his peers, or by the laws of the land." CHURCH TREATISE, *supra*, § 2, at 3 (citation omitted).

given for their imprisonment was the "special command of the king." *Id.*; *see also id.* § 5, at 6–7. The men argued to the court that this was not enough to justify imprisonment, that even the king's command could not excuse imprisoning the knights without a legal basis. *Id.* § 4, at 4-6. The justices held that such a return had been sufficient justification in the past and remanded the knights back to the king's custody. *See id.* § 6, at 7–8; *Boumediene*, 553 U.S. at 741–42.

¶100 "There was an immediate outcry of protest" at this result. *Boumediene*, 553 U.S. at 742. In its next meeting, the House of Commons passed a resolution detailing to the king that century old laws such as the Magna Carta forbade imprisonment without cause. *Id.*; CHURCH TREATISE, *supra*, § 8, at 8–9. The House of Commons decried that the king was trampling on writ of habeas corpus when the court denied release to a person imprisoned only on the king's special command. CHURCH TREATISE, *supra*, § 8, at 9. The document then declared that "no freeman in any such manner as is before mentioned be imprisoned or detained." *Id.* Although the King's Bench had denied Darnel's arguments, the immediate response from the House of Commons demonstrated that the people of England understood the importance of the writ of habeas corpus in ensuring that even the king should be answerable to the law.

¶101 Over the next half century, the writ continued to expand. A large shift came in 1671 when the "constitutionally minded" Mathew Hale became chief justice of the King's Bench and, although the king was opposed to the broader view, habeas became enforced "as a right for any subject deprived of his liberty *by whatever authority*." Helen A. Nutting, *The Most Wholesome Law — The Habeas Corpus Act of 1679*, 65 AM. HIST. REV. 527, 539 (1960) (emphasis added).

¶102 Parliament codified these expansions, among others, in the Habeas Corpus Act of 1679. *See* Halliday & White, *supra*, at 611. But these parliamentary decrees generally "codified practices generated by King's Bench justices." *Id.* Indeed, even before the 1679 Act, "the writ of habeas corpus was fully recognized as available against the government," CHURCH TREATISE, *supra*, § 10, at 13, and "[m]any of the technical provisions enacted in 1679 were in actual operation by the middle 1670's as a result of reforms within the court itself," Nutting, *supra*, at 539. It thus may be a "misapprehension about the English history of habeas . . . that 'the Great Writ' was a parliamentary rather than a judicial gift." Halliday & White, *supra*, at 611. Legislation was necessary nevertheless to fully protect what had up until then been accomplished judicially. Nutting, *supra*, at 542. Even so, "in the century after the passage of the Habeas Corpus Act of 1679, all the important innovations in habeas corpus jurisprudence" still came

through the courts rather than parliament. Halliday & White, *supra*, at 612. "In the latter years of the eighteenth century, judges, not Parliament, would expand the writ's application to new questions as they continued to exercise the king's prerogative to protect the subject's liberty." *Id.* at 613.

¶103 At the same time "the privilege of the writ of habeas corpus was transmitted into American law principally through tradition and the common law." Dallin H. Oaks, *Habeas Corpus in the States—1776–1865*, 32 U. CHI. L. REV. 243, 247 (1965) [hereinafter Oaks, *Habeas Corpus*]. Colonial courts entertained writs of habeas corpus as early as one hundred years before the United States Constitution. A.H. Carpenter, *Habeas Corpus in the Colonies*, 8 AM. HIST. R. 18, 22 (1902).[21]

¶104 Colonial legislatures attempted to enshrine habeas protections in statute. For example, in 1692, the Massachusetts colony attempted to adopt habeas corpus legislation similar to the 1679 Act. Carpenter, *supra*, at 21. The crown disallowed the legislation because the 1679 Habeas Corpus Act had not yet been extended to the colonies. *Id.* But, importantly, the lack of colonial legislation did not negate the writ's existence. We know, for example, that Massachusetts judge Samuel Sewall issued writs of habeas corpus even after the colony's act was disallowed, "show[ing] that the writ did not depend upon any statute law." *Id.* at 22. There was not "anything new in the asking for such a writ. . . . [I]t must have been a

---

[21] And unlike "rights" enshrined in constitutions in America, habeas corpus was protected as a "privilege" and benefit. Oaks, *Habeas Corpus*, *supra*, at 247; Halliday & White, *supra*, at 593. According to some scholars, this designation as a "privilege" came from an historical understanding of habeas as the royal prerogative, or privilege, of the sovereign. It was the privilege of the sovereign and his or her court to demand an accounting of why a subject was imprisoned. Indeed, habeas arose from "the royal prerogative and issued, on motion, at the discretion of the justices sitting in King's Bench." Halliday & White, *supra*, at 593. Indeed, this origin in the sovereign "would give to habeas corpus its distinctive *judicial* power to defend" the people's rights under the law. *Id.* (emphasis added).

When translated into the new constitutions of this country, habeas was named the privilege of the new sovereign—the people— to demand an accounting through *their* courts for imprisonment. And liberty would find refuge in the writ "because habeas corpus stood on the most solid ground of sovereignty." *Id.*

common practice." *Id.*; *see also* Eric M. Freedman, *Habeas Corpus in Three Dimensions Dimension I: Habeas Corpus as a Common Law Writ*, 46 HARV. CIV. RTS.-CIV. LIBERTIES L. REV. 591, 597–601 (2011) (discussing New Hampshire and federal habeas corpus cases from the 1700s). In sum,

> the rights of the colonists as regards the writ of habeas corpus rested upon the common law. . . . The lack of statute law did not mean that the colonists had no protection for their personal rights, for the want was supplied by the common law, and also by the placing of habeas corpus provisions in their court laws.

Carpenter, *supra*, at 26.

¶105   In 1787, the United States Constitution declared that "[t]he Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it." U.S. CONST. art. I, § 9(2). The framers of the Constitution "considered the writ a vital instrument for the protection of individual liberty," and the separation of powers. *Boumediene*, 553 U.S. at 743 ("Surviving accounts of the ratification debates provide additional evidence that the Framers deemed the writ to be an essential mechanism in the separation-of-powers scheme."). And as the United States Supreme Court has noted, "[i]n a critical exchange with Patrick Henry at the Virginia ratifying convention[,] Edmund Randolph referred to the Suspension Clause as an 'exception' to the 'power given to Congress to regulate courts.'" *Id.* (citation omitted).

¶106   But even by the time the United States Constitution was adopted, "lawmakers in the . . . original thirteen states apparently had no sense of urgency about enacting habeas corpus legislation." Oaks, *Habeas Corpus*, *supra*, at 251. For example, Connecticut did not have habeas legislation until 1821. *Id.* North Carolina did not enact its legislation until 1836. *Id.* at 252. But both states were nonetheless hearing and granting writs. *See, e.g., Nickols v. Giles*, 2 Root 461, 461 (Conn. Super. Ct. 1796) (hearing a petition for writ of habeas corpus but declining to grant the writ on its merits); *Whitmore v. Carr*, 3 N.C. 181, 181 (N.C. Super. Ct. 1802) (same). Writing for the United States Supreme Court in 1807, Chief Justice Marshall explained that "for the meaning of the term *habeas corpus*, resort may unquestionably be had to the common law." *Ex parte Bollman*, 8 U.S. 75, 93–94 (1807).

¶107   As in England, even after states passed habeas legislation, the common law writ was not supplanted. Thus, although there are some examples of a court denying a habeas petition because the statute excluded the petitioner from the writ, Oaks, *Habeas Corpus*,

*supra*, at 261, in other jurisdictions, "statutory habeas corpus jurisdiction was generously supplemented by powers derived from the common law," *Id.* at 255. For example, "[a] court exercising common law powers . . . may not have been inhibited in the exercise of this power by statutory exceptions such as those relating to" post-conviction petitioners. *Id.* And even though some state legislatures may have excluded persons committed for "felony or treason" from the statutory protections of the writ, cases in the mid-nineteenth century favored the view that courts could nonetheless grant the writ to such prisoners under common law power. *Id.* at 260.

¶108 Thus, by the second half of the nineteenth century, the writ power continued to be acknowledged as a standard feature of common law. *Ex parte Lange*, 85 U.S. 163, 183 (1873) ("Authorities in support of [the proposition that one in custody can petition for writ of habeas corpus] are unnecessary, as wherever the principles of the common law have been adopted or recognized they are universally acknowledged.").

2. The Meaning of Writ of Habeas Corpus in the Late Nineteenth Century

¶109 The State argues that in 1895, the people of Utah would have understood habeas review to extend to post-conviction petitions in very narrow circumstances, namely when subject matter jurisdiction was challenged or it was argued that the conviction was entirely void. Patterson, on the other hand, recognizes that these types of limitations existed in some courts, but argues that other courts had continued to expand habeas review to cover a broader set of situations. Both the State and Patterson can find support for their views.

¶110 Certainly, the limitations the State describes were recognized during the nineteenth century. The protections of the Act of 1679, and many state statutes patterned after it in the 1800s, did not extend to "persons convict or in execution by legal process." Oaks, *Habeas Corpus*, *supra*, at 261. And it does not appear that the common law power was much broader at the time. Rex A. Collings, Jr., *Habeas Corpus for Convicts — Constitutional Right or Legislative Grace?*, 40 CAL. L. REV. 335, 345 (1952); Oaks, *Habeas Corpus*, *supra*, at 262.[22]

---

[22] It is unclear the extent to which members of the Church of Jesus Christ of Latter Day Saints ("LDS") would have carried the

(continued . . .)

¶111 Indeed, at the close of the nineteenth century, the Utah Territorial Court and the Utah Supreme Court reiterated this general limiting principle. *See Ex parte Douglas*, 1 Utah 108, 109 (Sup. Ct. Territory Utah 1873) ("[U]pon the hearing on a writ of *habeas corpus*, where the party asks a discharge from imprisonment on final process from a court of competent jurisdiction, and where the judgment is regular upon its face and entered in the ordinary course of justice, the party will not be discharged, but be compelled to seek a correction of the irregularities in the court where they are alleged to have occurred, and if he fail of redress in that way, to resort to his appeal."); *Ex parte Hays*, 47 P. 612, 613 (Utah 1897) ("[C]an this court, in a collateral proceeding by habeas corpus, look beyond the judgment, and determine questions which arose during the trial of the case . . . ? We think not.").[23]

¶112 Patterson acknowledges this authority but argues that the general understanding of the purpose of habeas and the limitations

---

understanding of the writ that prevailed in the LDS community of Nauvoo, Illinois in the 1840s when they relocated to what would become the Utah Territory. And it is even less clear the extent to which those views would still be in currency in the Utah Territory in 1895. But it is interesting to note that the Nauvoo City Council took an approach to habeas corpus that one historian has described as "imaginative" and not reflective of "the contemporary consensus." BENJAMIN E. PARK, KINGDOM OF NAUVOO: THE RISE AND FALL OF A RELIGIOUS EMPIRE ON THE AMERICAN FRONTIER 126 (2020). In 1842, the Nauvoo City Council passed a habeas corpus ordinance that allowed a Nauvoo citizen to have a Nauvoo municipal court review the "origin, validity & legality" of a warrant regardless of what jurisdiction had issued the warrant. *Id.* This "granted the municipal court the authority to try the merits of cases, not just of arrests." *Id.* at 127. And it permitted the Nauvoo courts to pass upon the validity of warrants issued by other courts. *Id.*

[23] However, many states recognized that a court could exercise its habeas power with respect to a convicted person when the convicting court had no subject matter jurisdiction, when the law upon which the person was convicted was unconstitutional, when the punishment given was greater than the court was authorized to give, and when "subsequent events such as a pardon or expiration of the term of imprisonment" made the confinement illegal. Oaks, *Habeas Corpus, supra*, at 263; *see also* CHURCH TREATISE, *supra,* § 81, at 109–11.

on the scope of the habeas power were continuing to evolve in and around the time of Utah Statehood. Patterson points to an 1880 California Supreme Court case, *Ex Parte Kearny*, 55 Cal. 212 (Cal. 1880), as proof of that evolution.

¶113   In *Kearney,* the defendant had been convicted in a court that had jurisdiction under an ordinance that met constitutional muster. *Id.* at 220. The California Supreme Court nevertheless exercised its writ authority to release Kearney because it found that Kearney's conduct did not meet the definition of the crime the ordinance described. *Id.* at 228–29.

¶114   Closer to home, Patterson recounts the history of *Ex parte Snow*, 120 U.S. 274 (1887), and *Ex parte Nielsen*, 131 U.S. 176 (1889), to show the people of Utah would have understood that the scope of what relief could be granted on a habeas petition was expanding.

¶115   In *Snow*, a case that originated in Utah Territorial Court, the defendant was charged with three separate crimes for cohabiting with more than one woman. 120 U.S. at 276. The three charges corresponded to different time periods. *Id.* That is, each charge involved the same seven women with whom Snow was cohabiting, but each charge involved a different year of their plural marriage.

¶116   Snow petitioned for habeas relief, arguing that the three charges should be considered a single charge since they related to the same conduct. *Id.* at 280. The respondent asserted that Snow had advanced this argument to the trial court, so the United States Supreme Court could only review the decision pursuant to a writ of error. *Id.* at 281. In other words, it argued that Snow was misusing the writ of habeas corpus.

¶117   The United States Supreme Court ruled for Snow. *Id.* at 286–87. It held that a defendant could not be charged separately for one continuous infraction of the statute and that therefore the trial court lacked jurisdiction to impose more than one sentence. And the Supreme Court held that because the error appeared on the face of the judgment, it could grant relief by habeas petition. *Id.*

¶118   In *Nielsen*, another Utah case, the United States Supreme Court considered a petition by a defendant who, after he had been convicted of illegal cohabitation with multiple women, was charged with adultery. 131 U.S. at 176. Nielsen argued that the adultery charge was the same offense as the cohabiting conviction and thus barred. *Id.* at 178. The Supreme Court agreed that the adultery charge was "comprised within" the cohabitation conviction, and thus would be barred. *Id.* at 187–90.

¶119   To reach that decision, the United States Supreme Court had to consider whether it could reach such a challenge when it is advanced by a petition for a writ of habeas corpus. *Id.* at 182. The Court recognized the general rule that a conviction could not be collaterally attacked by a habeas petition, but observed exceptions to that general rule had been developed. *Id.* One such development, the court noted, was that convictions based on unconstitutional laws could be addressed by writ. *Id.* at 182–83. The court opined, "It is difficult to see why a conviction and punishment under an unconstitutional law is more violative of a person's constitutional rights than an unconstitutional conviction and punishment under a valid law." *Id.* at 183. Thus, although the trial court had jurisdiction and the adultery law was not unconstitutional, the United States Supreme Court directed that the petition be granted because of a defect in the process of the trial. *Id.* at 191.

¶120  Patterson argues that these cases—cases that received much newspaper attention in the Utah Territory and were therefore presumably part of Utah's collective consciousness—demonstrate that the writ was being used to mount collateral attacks on convictions prior to the framing of the Utah Constitution.[24] Patterson

---

[24] *See, e.g.*, *Petition of Habeas Corpus*, DESERET EVENING NEWS, Oct. 22, 1886, at 3, https://newspapers.lib.utah.edu/details?id=23181922 (reporting on Snow's petition for habeas corpus); *The Decision of the Supreme Court in the Snow Case*, OGDEN HERALD, Feb. 7, 1887, at 4, https://newspapers.lib.utah.edu/ark:/87278/s6qz3brt/7403223 (reporting on the United States Supreme Court decision to rule in favor of Snow); *The Snow Decision*, SALT LAKE TRIB., Feb. 8, 1887, at 4, https://newspapers.lib.utah.edu/ark:/87278/s6r5110v/13158248 (same); *see also, e.g.*, *Gone to Washington*, UTAH ENQUIRER, Mar. 29, 1889, at 3, https://newspapers.lib.utah.edu/ark:/87278/s6pr900q/1399401 (reporting that Nielsen's case would be heard by the United States Supreme Court); *Only One Punishment*, OGDEN SEMI-WEEKLY STANDARD, May 14, 1889, at 4, https://newspapers.lib.utah.edu/ark:/87278/s6766gq7/6239698 (reporting the Court's decision in favor of Nielsen); *The Nielsen Case*, UTAH ENQUIRER, May 17, 1889, at 4, https://newspapers.lib.utah.edu/ark:/87278/s6mw3m6b/1400235 (reporting the court's decision in favor of Nielsen and noting that "[t]he history of [Nielsen's] case has been detailed in these columns, the brief of counsel for the appellant has been summarized, and the

(continued . . .)

has a point. In *Snow*, the court granted relief on an error that was procedural, not a matter of subject matter jurisdiction. *See Snow*, 120 U.S. at 286. In *Nielsen*, the court extrapolated from the jurisdictional exception in the name of preserving the defendant's constitutional rights. *See Nielsen*, 131 U.S. at 183.

¶121   The scope of habeas corpus continued to evolve in other ways. For example, many courts had originally been of the view that habeas could not be used to determine custody of minors. However, "through the natural development of the common law," this changed during the nineteenth century, and most courts evolved a way to use the habeas writ "in a manner best adapted to serve the welfare of the child." Oaks, *Habeas Corpus*, *supra,* at 274. And, until the United States Supreme Court disallowed the practice, states could exercise writ power to release prisoners held by federal officers. *Id.* at 275.

¶122   As a result, there is reason to believe, as Patterson contends, that at the time of statehood, the people of Utah would have understood a writ of habeas corpus that was expanding in use and purpose. And, as explained below, even though this court sometimes referenced limitations on the writ of habeas corpus, this evolution continued throughout the twentieth century.[25]

3. The Twentieth Century Expansion in Utah of the Scope of the Writ of Habeas Corpus

¶123   By the middle of the twentieth century, we granted relief pursuant to a habeas petition on increasingly broader grounds.

---

able argument of Hon. F.S. Richards on his behalf has been given to our readers in full").

[25] One of the original Utah statutes relating to habeas corpus suggested that a petitioner could collaterally attack a conviction in certain circumstances. Section 1090 of the Revised Statutes of Utah of 1898 states,

> No person who shall have been *discharged by order of the court or judge upon habeas corpus*, shall be again imprisoned, restrained, or kept in custody for the same cause, except in the follow cases: . . . If, after a discharge for a defect of proof, or for any defect of the process, warrant, or commitment *in a criminal case*, the prisoner shall be again arrested on sufficient proof and committed by legal process for the same offense.

(Emphases added.)

*Thompson v. Harris*, 144 P.2d 761 (Utah 1943), provides a solid example of this continued expansion.[26] In *Thompson*, the petitioners argued that an alleged evidentiary error during sentencing had deprived them of their due process rights in violation of the constitution. *Id.* at 766. This court noted that habeas review normally reviewed the jurisdiction of the trial court. *Id.* And the petitioners' allegations did not challenge the trial court's jurisdiction. However, this court then stated,

> We must never lose sight, however, of the fact that habeas corpus is the precious safeguard of personal liberty. That jurisdictional questions only are reachable by the writ is not such an inflexible rule as cannot yield to exceptional circumstances. It may be better to say that the rule which apparently limits the scope of the writ to jurisdictional questions is not a rule of limitation, but a rule defining the appropriate spheres in which the power should be exercised. Thus it has been held that the writ will lie if the petitioner has been deprived of one of his constitutional rights such as due process of law.

*Id.*

¶124 This was not an outlier. We used similarly expansive language in other decisions. *See, e.g.*, *Thompson v. Harris*, 152 P.2d 91, 92 (Utah 1944) (stating that habeas corpus should only be used for "the correction of jurisdictional errors and . . . *errors so gross as to in effect deprive the defendant of his constitutional substantive or procedural rights*" (emphasis added)).

¶125 We did not hide this shift from public view. To the contrary, we transparently explained our evolving understanding. For example, in *Ward v. Turner*, we reviewed a petition from an inmate seeking to be "release[d] from the prison for lack of due process of law occurring during his trial." 366 P.2d 72, 72 (Utah 1961) (plurality). The court unanimously reversed the district court's grant

---

[26] The State argues that the *Thompson* court was incorrect in how it read federal case law and points out that federal habeas review is largely defined by statute. However, the State does not dispute that *Thompson* was and is precedential case law in Utah. Indeed, the State concedes that after statehood, this court "engaged in piecemeal common law expansion of the writ" to include review of post-conviction, post-appeal habeas petitions, like Patterson's.

of the petition. But two justices noted that although writs of habeas corpus, "in a sense . . . invade the usual rules for the finality of judgments," the petitioner could have raised enough evidence to "justify a release of a convicted person" based on the due process claim. *Id.* at 74. Writing separately, Justice Crockett noted the broadening role of habeas. He stated that using habeas corpus to collaterally attack a conviction "runs crossgrain" to traditional procedures and he individually found it a "misconception of the purpose" of the writ. *Id.* at 75 (Crockett, J., concurring). But he acknowledged the "expanding notion" that the writ could in some ways be used to collaterally attack a judgment and that the court would grant a writ when "due process of law has been so denied or abused." *Id.* He explained,

> The utmost caution and forbearance should be observed to avoid the incongruity above stated and to see that the writ is used in aid of the administration of justice and not to abuse or embarrass it. To this purpose, even when the court deems that due process of law has been so denied or abused that the writ of habeas corpus should be granted, the proper order is not necessarily the complete release of the defendant.
>
> I appreciate the reasoning that the judgment should be regarded as a nullity before such a writ is warranted, and that some illogic may be confronted in holding a defendant after his conviction is so declared. However, the expanding notion of some of our courts as to the function of post-conviction writs in practical effect turns them into writs of error, which the writer protests is a misconception of the purpose and a misuse of such a writ. Nevertheless, the facts of life must be reckoned with, and in my opinion a necessary concomitant of that view is that there should only be a remand to the proper custodial officer or to the court having jurisdiction because this is necessary to avoid the palpable distortion of the processes of justice which may result from freeing the accused entirely.

*Id.* (citation omitted). In other words, even a justice who lamented the expansion of the understanding of the writ of habeas corpus found that he had to accept the reality that it had expanded.

¶126   Four years later, Justice Crockett delivered the unanimous opinion of the court in *Gallegos v. Turner* and wrote that habeas could be used to collaterally attack a conviction where, for example, "there has been a substantial failure to accord the accused due process of

42

law," "there has been a knowing and wilful falsification of the evidence," or "some other such circumstances that it would be wholly unconscionable not to re-examine the conviction." 409 P.2d 386, 387 (Utah 1965).

¶127   And in 1967, we recognized that the "functions of habeas corpus" had undergone a "gradual expansion" to where habeas could now be granted in collateral attacks. *Bryant v. Turner*, 431 P.2d 121, 122–23 & n.5 (Utah 1967), *disapproved of on other grounds by Dunn v. Cook*, 791 P.2d 873 (Utah 1990).

¶128 In the years leading up to the 1984 constitutional amendment, we consistently described a habeas petition as a mechanism a person could use to collaterally challenge her conviction. For example, in *Brown v. Turner*, we stated that habeas could be used

> when the court had no jurisdiction over the person or the offense, or where the requirements of law have been so disregarded that the party is substantially and effectively denied due process of law, or where some such fact is shown that it would be unconscionable not to re-examine the conviction.

440 P.2d 968, 969 (Utah 1968); *see also, e.g., Clark v. Turner*, 387 P.2d 557, 558 (Utah 1963) ("A petition for habeas corpus brought by one who is imprisoned after conviction or purported conviction of crime tests only matters of jurisdiction; *or some such grave error or impropriety that it would deprive one of fundamental due process of law*." (emphasis added)); *Syddall v. Turner*, 437 P.2d 194, 195 (Utah 1968) ("[A] collateral attack under habeas corpus [is allowed] . . . in circumstances which cannot be adequately dealt with by the ordinary rules of procedure."); *Johnson v. Turner*, 473 P.2d 901, 904 (Utah 1970) (reaffirming "our previously stated position" that a habeas petition is allowed "where it appears that there has been such miscarriage of justice that it would be unconscionable not to reexamine a conviction"); *Webster v. Jones*, 587 P.2d 528, 530 (Utah 1978) ("[The habeas] writ may be used in certain exigent circumstances, including where the court was without jurisdiction, or there has been such unfairness or failure to accord due process of law that it would be wholly unconscionable not to re-examine the conviction."); *Morishita v. Morris*, 621 P.2d 691, 693 (Utah 1980) (recognizing that habeas is not intended as a substitute for appeal but can lie when there is a "claim of fundamental unfairness in the trial or a substantial and prejudicial denial of a person's constitutional rights").

¶129 Thus by 1984 the writ of habeas corpus was well established as a tool that could be used to collaterally attack convictions in certain circumstances.

4. The Effect of the 1984 Amendment

¶130 In 1984, Utah voters approved an overhaul of the judicial article of the Utah Constitution. And that is when the language we interpret in this opinion entered our constitution. Almost fifty-six percent of Utah voters placed article VIII, sections 3 and 5 into our constitution. STATE OF UTAH, GENERAL ELECTION REPORT (1984), https://elections.utah.gov/Media/Default/Documents/Election_Results/General/1984Gen.pdf. Section 3 states:

> The Supreme Court shall have original jurisdiction to issue all extraordinary writs and to answer questions of state law certified by a court of the United States. The Supreme Court shall have appellate jurisdiction over all other matters to be exercised as provided by statute, and power to issue all writs and orders necessary for the exercise of the Supreme Court's jurisdiction or the complete determination of any cause.

UTAH CONST. art. VIII, § 3. And section 5 states:

> The district court shall have original jurisdiction in all matters except as limited by this constitution or by statute, and power to issue all extraordinary writs. The district court shall have appellate jurisdiction as provided by statute.

*Id.* art. VIII, § 5.

¶131 These sections were part of a new article that the people of Utah adopted into the constitution to replace the existing judicial article. In the older version, the courts were provided with authority to issue specific writs, namely, "writs of mandamus, certiorari, prohibition, quo warranto and habeas corpus." *See* UTAH CONST. art. VIII, §§ 4, 7 (enacted 1895, repealed 1984). As the State notes, the new article "removed antiquated references to historical writs in favor of a more generic and modern 'all extraordinary writs.'" Because we look at the public meaning of the writ to the people in 1984, the question becomes what the people of Utah would have understood the term "all extraordinary writs" to include in 1984, when they inserted that phrase into the constitution.

¶132 Our cases in the years leading up to 1984 and closely following it confirm that it was generally understood that extraordinary writs could be used to collaterally challenge a

conviction based on factors other than lack of jurisdiction. *See, e.g.*, *Brady v. Shulsen*, 689 P.2d 1340, 1341 (Utah 1984) ("[T]he writ of habeas corpus can be used to attack a judgment of conviction in the event of an obvious injustice or a substantial and prejudicial denial of a constitutional right in the trial of the matter."); *Andreason v. Turner*, 493 P.2d 1278, 1279 (Utah 1972) ("[A] judgment is subject to a collateral attack by an extraordinary writ . . . where the requirements of the law have been so ignored or distorted that the party has been substantially denied due process of the law, or where some other circumstance exists that it would be wholly unconscionable not to re-examine the conviction."); *see also, e.g.*, *Hurst v. Cook*, 777 P.2d 1029, 1034 (Utah 1989); *Chess v. Smith*, 617 P.2d 341, 343 (Utah 1980); *Brown*, 440 P.2d at 969; *Bryant*, 431 P.2d at 122–23; *Thompson*, 144 P.2d at 766.

¶133   Indeed, as we recognized in *Hurst*, "Although this Court had already expanded the role of the Writ to protect against the denial of a constitutional right in a criminal conviction in *Thompson*, procedures implementing that function were provided by the addition of Rule 65B(i) in 1969 to allow for 'post-conviction proceedings' as a branch of habeas corpus." 777 P.2d at 1034.

¶134   Utah newspapers in the years leading up to 1984 discussed cases where courts, both Utah and federal, heard post-conviction petitions for habeas-like writs from inmates. *See, e.g.*, *High Court Orders Inquiry Into Plea*, PROVO DAILY HERALD, Oct. 25, 1979, at 3, https://newspapers.lib.utah.edu/ark:/87278/s6mm0vrh/23941279 (reporting that the Utah Supreme Court had granted a petition for writ of habeas corpus that collaterally attacked a conviction and specifically noting that this court overturned the district court's reasoning that the petition should be rejected because it should have been brought as an appeal); *Court of Appeals Hears Murder Case*, MIDVALE JOURNAL SENTINEL, Jan. 14, 1971, at 1, https://newspapers.lib.utah.edu/ark:/87278/s62r863k/23737573 (reporting that the U.S. District Court of Utah granted a habeas corpus petition alleging violation of constitutional rights in the course of the trial); *Counsel Named to Defend Men*, TIMES INDEPENDENT, Mar. 5, 1970, at 7, https://newspapers.lib.utah.edu/ark:/87278/s68g9xvm/20457948 (reporting that a writ of habeas corpus had been issued on an argument that the convicted had not been advised of their constitutional rights); *Allan Howe's Request to Have Charge Set Aside Rejected by Federal Court*, PROVO DAILY HERALD, Mar. 13, 1977, at 19, https://newspapers.lib.utah.edu/ark:/87278/s6qp0pkt/23921432 (describing a convicted individual petitioning for habeas corpus

based on alleged constitutional errors in the procedure of his conviction).[27]

¶135 Thus, Patterson forwards ample evidence from which we can conclude that the people of Utah would have understood a writ power that was broad in scope. Indeed, for decades prior to the constitutional amendment, both legal opinions and news reports described a writ that could be used to mount a post-conviction challenge. This supports the conclusion that the people of Utah gave district courts, and this court, the constitutional authority to issue an extraordinary writ that challenges a conviction on the basis of a substantial error in the proceeding.[28]

¶136 The State argues that we should ignore what happened with the writ by 1984 and interpret the constitution consistent with how it would have been understood in 1895. We have rejected this type of argument. In *State ex rel. Lloyd v. Elliott*, this court was faced with the interpretation of the term "writ of quo warranto" in the constitution. 44 P. 248, 249 (Utah 1896). There, the court, much as we have done here, traced the history of the term and noted how its meaning had evolved throughout the years. *Id.* at 249–50. At least one party in *Elliott* argued that the authority conferred in the constitution to issue the writs of "quo warranto" encompassed a meaning of the term from before the language entered the constitution. *Id.* at 249.

¶137 This court rejected that argument and instead pointed to the term's "known meaning, as used in common parlance in the United States." *Id.* at 250. This court continued,

> It would be unreasonable to assume that the framers of our constitution, regardless of the meaning attributed to the term "writ of quo warranto" in this country, looked back through the centuries, into the middle

---

[27] These newspapers are available digitally at https://newspapers.lib.utah.edu.

[28] That is not to imply that no limitations exist on our writ power. We have explained that a habeas petition "is not a substitute for appeal," but may be used in "unusual circumstances," such as when there has been "a substantial and prejudicial denial of a constitutional right." *Hurst*, 777 P.2d at 1035. As explained below, Utah Rule of Civil Procedure 65C sets forth those limitations. *See infra* ¶¶174, 182 & n.41.

> ages, designing to confer upon this court such jurisdiction, and such only, as was exercised by the courts of Westminster and king's bench under the prerogative of the crown, no matter how enlarged the use of the writ had become, through the process of time and the requirements of justice. No such meaning was intended. The constitution was framed by practical men, who aimed at useful and practical results, without reference to any process which has long ago fallen into disuse, even in the country of its origin.

*Id.* It would be similarly unreasonable to look back to the time of statehood to understand language the voters approved in 1984 without some evidence that the voters intended the amended language to carry a meaning from the previous century.

¶138 What the State advocates is fundamentally inconsistent with the logic of an original public meaning interpretive approach. *See supra* ¶ 92. To accept the State's argument would require us to accept that in 1984, the public evaluating the proposed amendment would have understood that by returning the word "writ" to the constitution, they were not using the term as they generally understood it, but as people in 1895 would have understood it.

¶139 But that is what the State argues. It claims that the constitutional article adopted in 1984 was just "linguistic clean up." The State thus concludes that "the contemporaneous record does not show that the 1984 Amendment intended any substantive change to the scope of the writ of habeas corpus as it was originally established in [1895]."

¶140 We disagree with the State's assertion as a matter of logic, as we have just described. We also disagree with the assertion as a matter of fact. We take particular issue with the way the State characterizes the information that was in front of the voters. The people of Utah would not have understood that they were voting on a "linguistic clean up." Rather, the people of Utah would have understood that they were being asked to enact a new judicial article of the constitution.

¶141 The text of the constitutional proposition asked, "Shall Article VIII of the State Constitution be repealed and reenacted . . . to provide a Judicial Article which: establishes the authority and jurisdiction of the Supreme Court and District Courts . . . ." *Proposition No. 3: Judicial Article Revision*, *in* UTAH VOTER INFORMATION PAMPHLET, at 14 (1984),

https://elections.utah.gov/Media/Default/Historical%20VIPs/1984%20VIP.compressed.pdf.

¶142   The preamble to the official text of Proposition No. 3 stated that the proposition was "[a] joint resolution of the Legislature proposing to amend the Utah Constitution; relating to the judicial article of the Utah Constitution; . . . Providing for the composition and jurisdiction of the supreme court, the district court, and other courts. . . ." *Id.* at 18. Section 1 of the proposition stated, "It is proposed to repeal and reenact Article VIII of the Utah Constitution, to read: . . . ." *Id.* The proposition then gave the full text of the new article. *Id.* Thus, from the voters' perspective, the ballot asked them to place an entirely new judicial article into the constitution. And nothing in front of the voters informed them that they should construe the words they considered in any fashion other than by their ordinary meanings.[29]

---

[29] The State also references two parts of the Constitutional Revision Committee (CRC) report. One part states, "The original jurisdiction to issue extraordinary writs has been retained, but is written in more general language than that found in the present provision." CONST. REV. COMM'N, REPORT OF THE UTAH CONSTITUTIONAL REVISION COMMISSION SUBMITTED TO THE GOVERNOR AND THE 45TH LEGISLATURE OF THE STATE OF UTAH FOR THE YEARS 1982 AND 1983, at 26 (1982) https://digitallibrary.utah.gov/awweb/guest.jsp?smd=1&cl=all_lib&lb_document_id=78702 (alteration in original). The State also highlights that the CRC outlines "three major objectives" of the new judicial article. *See id.* at 15–16. The State argues that those objectives "make no mention of redefining the Court's writ power generally, or of habeas corpus specifically."

The problem with the State's reliance on the CRC report is that it can also be read to support Patterson's argument. Indeed, Patterson points to these sections of the CRC as well. That is, if the purpose of the amendment was to retain the writ power, the people of Utah would have understood that they were authorizing the courts to issue the writ as they currently understood it. To accept the State's contrary conclusion, one would have to indulge the belief that the people of Utah in 1984 understood that the writ they had come to know was different than the writ that existed at the time of statehood. And the 1984 voters would have had to assume that the reference to "all extraordinary writs" in the constitution referred to writs as the people of Utah would have understood them in 1895,

(continued . . .)

### C. The Legislature Cannot Diminish the Scope
### of the Constitutional Writ Power

¶143   Now that we have clarified that the judicial writ power comes from article VIII of the Utah Constitution and that the scope of that power should be understood consistent with how a voter in 1984 would have viewed the writ, we need to examine the Legislature's constitutional ability to restrict that power. Patterson reasons that "because the courts' writ power is granted directly by the constitution," the Legislature cannot substantively "diminish or restrict that power." The State argues that even the constitutional writ authority can be regulated by the Legislature so long as that regulation is reasonable. The State avers that the Suspension Clause, the existence of regulations when the constitution was adopted in 1895, and this court's case law bolster its argument.

¶144   We agree with Patterson that the constitution's plain language supports the proposition that the Legislature can neither expand nor diminish the substantive writ authority the people of Utah granted the judicial branch. We are unconvinced by the State's arguments to the contrary.

¶145   The State points to nothing in article VIII, sections 3 and 5 that would support the conclusion that the people of Utah intended that the Legislature be able to regulate the substance of the writ power. The plain language of sections 3 and 5 do not suggest that the people intended that the Legislature could regulate extraordinary writs in a way that substantively diminished their scope. To the contrary, those sections point to the opposite conclusion.

¶146   Article VIII, section 5 states that district courts "shall have original jurisdiction in all matters except as limited by this constitution or by statute, and power to issue all extraordinary writs." UTAH CONST. art. VIII, § 5. Thus, the people of Utah gave the district court the power to issue all extraordinary writs but did not include the clause "except as limited . . . by statute" that was put on the exercise of the district court's original jurisdiction. We presume that the people of Utah chose the words of their constitution with

_____

not the writ as they currently understood it. And the 1984 voters would have had to arrive at that understanding despite the absence of explanation that the drafters of the amendment thought that is how the people of Utah should understand that language. There is nothing in the CRC report that would allow us to treat the State's mythology as history.

care, and that causes us to conclude that the omission of "as provided by statute" and "except as limited . . . by statute" was intentional.[30] And the intention to take from that omission is that the Legislature is not permitted to, by statute, modify the district court's power under article VIII, section 5 to issue writs. Nor may it, by statute, substantively limit the supreme court's original jurisdiction under article VIII, section 3 to hear writs.

¶147  The concurrence resists the conclusion the plain language requires and instead employs the *expressio unius* canon. It concludes that the constitution's grant of "original jurisdiction" to the supreme court and "power" to the district court to issue "all extraordinary writs"—without an "as provided by statute" limitation—simply forecloses the Legislature from "abrogating or expanding our 'original jurisdiction' to issue extraordinary writs" but does not restrict the Legislature's power to impose "'substantive' limits on the scope of a writ." *See infra* ¶¶ 245–47, 249–55, 270 n.67 (citations omitted). And presumably, the concurrence would say the same thing about the district court's power to issue writs—that the Legislature can place "'substantive' limits" on that power as long as it does not eliminate it entirely.

¶148 We see no textual basis for that interpretation. And, indeed, the most natural application of the *expressio unius* canon would suggest that by explicitly providing that the Legislature could limit the district court's original and appellate jurisdiction, the people intended that the Legislature could not restrict the district court's power to issue writs. The concurrence points to nothing in the constitutional language that even hints at the possibility that the people of Utah intended that the Legislature be permitted to place conditions on the power to issue a writ so long as the conditions did

---

[30] Section 3 of article VIII of the Utah Constitution similarly states that "[t]he Supreme Court shall have original jurisdiction to issue all extraordinary writs." But that section also provides that "[t]he Supreme Court shall have appellate jurisdiction over all other matters to be exercised *as provided by statute*." UTAH CONST. art. VIII, § 3 (emphasis added). In other words, the people of Utah gave the Legislature power to define when the Supreme Court can exercise its appellate jurisdiction by including the words "as provided by statute." *Id.* But the people did not give the Legislature the same ability when it came to the writ.

not rise to the level of an "abrogation." And there is nothing in the constitution's text to support that interpretation.

¶149 We are not breaking new ground in recognizing that the Legislature may not substantively regulate the judicial branch's power to issue writs. Not long after statehood, a newspaper deliverer sued a man named Durand in justice court for an unpaid newspaper subscription. *State ex rel. Robinson v. Durand*, 104 P. 760 (Utah 1908). Durand appeared specially to argue that the justice court did not have jurisdiction because he did not live in that city. *Id.* at 761. The justice court ruled against Durand. *Id.* A statute at the time stated that a district court could review, on a writ of prohibition, a decision regarding whether an action was brought in the wrong city. *Id.* Durand, apparently emboldened by this statute, petitioned the district court for a writ of prohibition. *Id.* at 762. The district court decided that the original action had indeed been brought in the wrong city and issued the writ of prohibition against the original justice court. *Id.* The justice of the peace appealed. *Id.*

¶150 We reversed the district court and directed it to dismiss the petition. *Id.* at 765. We noted that the correct understanding of the writ of prohibition would not encompass the claims at issue, but that, by statute, the Legislature had clearly attempted to "make the writ of prohibition available to review the ruling in hand." *Id.* at 762. We stated that although we were not concerned with the "wisdom" of this expansion, "[w]e are, however, unable to yield assent to the conclusion that it was within the province of the Legislature to so modify and enlarge the office of the writ of prohibition." *Id.* We held that it is the constitution that grants courts the authority to issue writs of prohibition and "whatever power was conferred upon the courts by the Constitution cannot be enlarged or abridged by the Legislature." *Id.* at 763.

¶151 We rejected the suggestion that such legislative overstepping could be excused because it was reasonable. We stated,

> It may be suggested that it was competent for the Legislature to provide some remedy to review the ruling of the justice other than on appeal. That is undoubtedly true; but in doing so the Legislature must not break in upon the Constitution or encroach upon the prerogative of courts. The framers of the Constitution we think wisely and for a good purpose expressly conferred upon the courts and reserved unto them the power to issue the writs mentioned in the Constitution. If they had intended that the courts

should have such power as may be prescribed by law, and to issue writs of prohibition as may be defined by the Legislature, they would have said so.

*Id.* at 764. We further reasoned that,

If it is within the power of the Legislature to enlarge the office of the writ, it must also be within its power to abridge it. If such power to enlarge and abridge exists, then the power of courts to issue the writs, and the cases to which they may apply, are wholly dependent upon the will and discretion of the Legislature. In such case the power of courts to issue the writs is as by statute provided, and not as provided by the Constitution.

*Id.* [31]

---

[31] The State cites *Winnovich v. Emery*, a case we issued two months before *Durand*, and argues that it supports the opposite conclusion. *See* 93 P. 988 (Utah 1908). In *Winnovich,* the prosecution had charged Winnovich with murder. *Id.* at 989. A judge found sufficient evidence to hold Winnovich until trial. *Id.* Winnovich petitioned a different judge for habeas relief, which that judge granted for lack of evidence. *Id.* The sheriff, Emery, who was holding Winnovich, appealed. *Id.* In the course of reaching our decision, we stated,

[T]he writ of habeas corpus, well known to the common law, did not receive the respect from the common-law courts its importance merited, and for that reason it was made more effective in the reign of Charles II by what is known as the "Habeas Corpus Act." Since then, to a large extent, it has been and now is regulated by statute. In modern times habeas corpus may, therefore, be considered as a statutory proceeding, although it had its origin in the common law.

*Id.* at 990 (citation omitted). And that is the language the State cites back to us in support of its argument that the Legislature can regulate the substance of the writ.

We have concerns about the State's reliance on *Winnovich.* First, the passage the State cites is dicta; we were not asked to decide the source of our writ authority in *Winnovich.* Second, *Winnovich's* analysis is at odds with what we stated the same year in *Durand* where the question was squarely before us. And finally, although we

(continued . . .)

¶152 And lest one thinks this principle is outdated, we have reaffirmed it in two more recent cases: *Petersen v. Utah Bd. of Pardons*, 907 P.2d 1148, 1152 (Utah 1995), and *Brown v. Cox*, 2017 UT 3, ¶ 14, 387 P.3d 1040.

¶153 In *Petersen*, a parolee appealed the decision of the Utah Board of Pardons to revoke his parole. *Petersen*, 907 P.2d at 1150. He argued that, in revoking his parole, the Board violated his constitutional rights. *Id.* at 1151. We held that we lacked appellate jurisdiction to hear his appeal from a Board decision. *Id.* A statute at the time expressly stated that Board decisions were "final and . . . not subject to judicial review." *Id.* (citation omitted). However, we then declared that "[a]lthough the Legislature can refuse to provide a statutory appeal from orders of a governmental agency, *the Legislature cannot curtail the constitutional powers of this Court to issue extraordinary writs*" as found in article VIII, section 3 of the Utah Constitution. *Id.* at 1152 (emphasis added). We held that "[b]ecause this Court's writ powers are derived from the constitution, the Legislature cannot diminish them." *Id.* We then addressed Petersen's claims under our writ authority. *Id.* at 1152–55.

¶154 In *Brown*, a candidate for the Utah Legislature challenged the outcome of a party primary election. 2017 UT 3, ¶ 1. At the time, the elections code directed a party who wished to challenge the result of a multi-county primary election to file a complaint directly with the Utah Supreme Court. *Id.* ¶ 12. We acknowledged that this would expand our original jurisdiction. *Id.* We rejected the

---

stated that the writ "now is regulated by statute," the only statutory regulations at the time governed the procedural aspects of the writ. *See infra* ¶¶ 158–60. *Winnovich* does not compel a different conclusion than the one we reach.

The concurrence likewise prefers to rely on *Winnovich* over *Durand. See infra* ¶¶ 275–82. In so doing it prefers an earlier-decided case over a later one and *Winnovich's* dicta over *Durand's* holding. That having been said, we agree with the concurrence that the lesson from *Durand* is that the Legislature "lacks the power to abridge or enlarge our courts' jurisdiction to issue extraordinary writs." *See infra* ¶ 282. Where we part ways with the concurrence is the concurrence's argument that *Durand* also supports the proposition that the Legislature may place substantive limitations on extraordinary writs "so long as they do not abridge or enlarge our courts' jurisdiction." *See infra* ¶ 282. The concurrence does not explain how a substantive limitation on the writ power does not abridge that power.

petitioner's argument that we should "take 'a liberal view of the Legislature's power to grant Supreme Court jurisdiction.'" *Id.* ¶ 13. We agreed that "the Legislature clearly has the power to create appellate jurisdiction beyond that granted in the Constitution." *Id.* (citation omitted). But, like we do here, we noted that this view is of "the Legislature's authority to create *appellate* jurisdiction." *Id.* We stated that while the "Utah Constitution provides that this court possesses 'appellate jurisdiction over . . . matters to be exercised as provided by statute[,]' . . . *the Utah Constitution does not grant the Legislature authority to alter our original jurisdiction.*" *Id.* (first alteration in original) (citation omitted) (emphasis added).

¶155   The State has no direct answer to these statements and makes no attempt to square these principles with the arguments it advances. Instead, the State argues that the writ powers preserved in the constitution are subject to regulation, so long as those regulations are reasonable and do not amount to a suspension. In support of this contention, the State first points to the Suspension Clauses in the Utah and United States Constitutions. These clauses generally state that the "[t]he privilege of the writ of *habeas corpus* shall not be suspended, unless, in the case of rebellion or invasion, the public safety requires it." UTAH CONST. art. I, § 5 (emphasis added).

¶156   The State avers that this clause "give[s] the respective legislatures power to regulate the core writ of habeas corpus so long as the regulation is not a suspension." The State does not, however, engage with the more pertinent language and structure of the Utah Constitution, namely the language in article VIII. As we have explained, the Utah Constitution contains an express grant of writ authority that does not contemplate substantive statutory regulation. *See* UTAH CONST. art. VIII, §§ 3, 5. The State does not even attempt to explain why this language does not dictate a different interpretation than that given to the federal Suspension Clause, which lacks the express grant of authority included in Utah's constitution.[32] *See supra*

---

[32] It is interesting to note that during Utah's Constitutional Convention, Weber County Delegate Thomas Maloney proposed that the Suspension Clause include a provision stating that the writ would be suspended "in such manner as shall be prescribed by law." PROCEEDINGS AND DEBATES OF THE CONVENTION ASSEMBLED TO ADOPT A CONSTITUTION FOR THE STATE OF UTAH, DAY 18, https://le.utah.gov/documents/conconv/18.htm. This would have explicitly granted the Legislature the ability to suspend, and

(continued . . .)

¶¶ 82–85. And while the concurrence echoes the State's view, it likewise fails to persuasively address the text.

¶157 Moreover, the State does not distinguish between substantive and procedural limitations on the writ. Thus far, we have spoken about the ability to limit the substance of the writ—which we have repeatedly held to be beyond legislative grasp.[33] The State appears to argue that the Legislature may impose any kind of regulation on writs—substantive or procedural. The State supports this by asserting that "the writ of habeas corpus was regulated by territorial statutes prior to statehood and was regulated by state statute immediately after the Utah Constitution was ratified."

¶158 The regulations the State cites, however, governed only the procedural aspects of the writ. A review of title 23 Habeas Corpus of the Revised Statutes of Utah of 1898 reveals no substantive limitations on the scope of the writ. *See generally* REV. STATUTES OF UTAH (1898). But there were *procedural* requirements found in statute.

---

presumably regulate, the writ. The delegates rejected this proposal. *Id.*

[33] The Legislature appears to understand this distinction. In 2009, the Utah Legislature considered a joint resolution that would have put a constitutional amendment before Utah voters to consider. *See* S.J. Res. 14, 2009 Gen. Sess. (Utah 2009), https://le.utah.gov/~2009/bills/sbillamd/SJR014.pdf. That amendment would have asked the voters to add article I, section 30 to provide, in part:

> After a person's conviction and sentence have been affirmed in a direct appeal under Article I, Section 12, or the time to file a direct appeal has expired, and notwithstanding any other provision of this Constitution, the person may challenge the legality of the conviction or sentence only in the manner and to the extent provided by statute . . . .

*Id.* In other words, the Legislature understood that only the people could modify the substance of the writ authority they had granted to the courts. The joint resolution passed the Senate but failed to reach the supermajority it needed in the House to be placed on the ballot. *See S.J. Res. 14 Joint Resolution - Challenging the Legality of a Conviction or Sentence Bill Status / Vote*, UTAH STATE LEG., https://le.utah.gov/~2009/status/sbillsta/SJR014.htm (last visited Aug. 5, 2021).

For example, in the 1898 laws, section 1069 details what must be included in a petition,[34] section 1070 requires that the petition be sworn to, section 1074 requires the petition be made to the nearest court, and sections 1079 through 1081 explain how to serve the petition. *See id.* §§ 1069, 1060, 1074, 1079–81.

¶159 Contrary to the State's contention, we can find no substantive limitations on the writ in either the territorial statutes or in the first set of laws adopted after statehood. *See* COMPILED LAWS OF THE TERRITORY OF UTAH (1876), Title XIX, Ch. 1; COMPILED LAWS OF UTAH (1888), Title IX, Ch. X, §§ 5282–5304. And we continue to see no substantive limitation on the scope of the writ in the compiled laws that followed in 1907, 1917, and 1933.

¶160 In the 1940s and 50s, procedural rules were generally moved out of the Utah Code and into court-promulgated rules. *See Brown*, 2017 UT 3, ¶ 17 n.8. And in 1984, the new judicial article enacted into the constitution assigned the adoption of "rules of evidence and procedure" to the court. *Id.* ¶ 17. As Patterson

---

[34] Section 1069 stated,

The petition for the writ of habeas corpus must state:

1. That the person in whose behalf it is sought is restrained of his liberty, and the person by whom, and the place where he is so restrained, mentioning the names of the parties, if known, and if unknown, describing them with as much particularity as practicable.

2. The cause or pretense of such restraint, according to the best information of the applicant; and if by virtue of any legal process, a copy thereof must be annexed, or a satisfactory reason given for its absence.

3. That the restraint is illegal, and wherein.

4. That the legality of the imprisonment has not already been adjudged upon a prior proceeding of the same character, to the best knowledge and belief of the applicant.

5. Whether application for the writ has been before made to, and refused by, any court or judge, and if so, a copy of the petition in that case must be attached, with the reasons for the refusal, or satisfactory reasons given for the failure to do so.

REV. STATUTES OF UTAH § 1069 (1898).

recognizes, article VIII, section 4 of the Utah Constitution allows the Legislature to amend the court's procedures by a vote of two-thirds of each chamber. *See id.* (discussing UTAH CONST. art. VIII, § 4). And in this way, the Legislature does retain the ability to regulate the procedure by which a party seeks an extraordinary writ. But that is not the same as an ability to regulate the substance of the writ. Thus, we disagree that the authority the State advances supports the proposition that the Utah Constitution permits the Legislature to *substantively* limit the scope of this court's writ power. But we acknowledge that the Legislature has a say in the *procedures* that govern the writ process through the mechanism provided in article VIII, section 4 of the Utah Constitution.[35]

¶161   The concurrence offers two additional arguments. First, the concurrence analogizes to the clause in article VIII, section 3 that vests us with original jurisdiction to "answer questions of state law certified by a court of the United States." The concurrence posits that this "does not foreclose the legislative regulation of the elements of and defenses to claims that come before us in the exercise of that jurisdiction." *Infra* ¶ 260. But the correctness of that assertion depends on what the concurrence means by "legislative regulation." If that means the Legislature defines the elements and defenses of the substantive law that we apply to the questions the federal courts

---

[35] The concurrence asserts that the text and structure of article VIII, sections 3 and 5 do not support the proposition that the Legislature lacks power to adopt any "substantive" limits on the scope of a writ, or confines the Legislature's power to amending our "procedural" rules in this field. *Infra* ¶ 247. If article VIII, section 4 did not speak directly to the issue, we might conclude that the Legislature had no role to play in defining either the substance or the procedure governing the writ. But section 4, which entered the constitution at the same time as sections 3 and 5, makes clear that the Legislature can modify the procedural rules the court employs if it follows the constitutionally mandated process. In this way, the constitution distinguishes between substance and procedure in the context of the judiciary's power to issue writs.

We also note that we are only speaking of the scope of the constitutional writ authority and nothing in this analysis prevents the Legislature from creating a statutory remedy for post-conviction relief that exists independent from the constitutional writ. But the Legislature cannot, consistent with the Utah Constitution, replace the writ with a statutory remedy.

certify, then of course the Legislature has the power to "regulate" that underlying law.

¶162 If, on the other hand, the concurrence interprets "legislative regulation" to mean that the Legislature can tell us what types of certified questions we can answer, there is no textual basis for that conclusion. In other words, we agree that if the federal district court certifies a question of Utah estate law, we would apply the Utah Probate Code the Legislature enacted. But nothing in the constitution permits the Legislature to pass a law telling this court that it cannot answer certified questions concerning estate law. That substantive regulation of our jurisdiction over certified questions—as opposed to the substance of the underlying law we examine to answer the certified question—lies outside the Legislature's constitutional authority.

¶163 This is consistent with the way we have described our original jurisdiction, and the district court's power, to issue extraordinary writs. The Legislature defines the elements and defenses that the courts apply when we hear a writ arising out of a theft conviction. But nothing in the Utah Constitution permits the Legislature to tell the judiciary that it cannot hear writs challenging theft convictions.

¶164 Second, the concurrence relies on the Legislature's "plenary" authority to make law as a basis to conclude that the Legislature can put substantive limitations on the judicial writ power. *See infra* ¶¶ 256–57. The concurrence points to two constitutional sections—the Open Courts Provision and article XVI, section 5's ban on the abrogation of a wrongful death cause of action (Wrongful Death Clause)—to bolster that claim. *See infra* ¶ 266. Specifically, the concurrence argues that because we have interpreted those clauses, which constrain legislative action, to permit the Legislature to enact some restrictions, the Legislature can similarly place restrictions on the court's writ authority. For example, the concurrence notes that, in the face of the constitutional prohibition that such claim "shall never be abrogated," we have upheld the Legislature's ability to "'enact reasonable procedures for the enforcement of wrongful death actions' and to 'provide for reasonable defenses that are not inconsistent with the fundamental nature of the wrongful death action itself.'" *See infra* ¶¶ 267–68. And the concurrence notes that we have upheld a statute of repose in the face of Open Courts provision challenges. *See infra* ¶ 269 (citing *Waite v. Utah Lab. Comm'n*, 2017 UT 86, ¶ 19, 416 P.3d 635).

¶165 The concurrence argues that we have "identified no meaningful basis for interpreting article VIII any differently from these provisions." *Infra* ¶ 270. We disagree. There is a fundamental difference between a restriction on legislative authority and a constitutional grant of power to a co-equal branch of government. The way we approach questions of whether the Legislature violates a constitutional restriction on its power differs from how we approach questions of whether the Legislature has ventured into terrain the constitution assigns to another branch.

¶166 For example, the Wrongful Death Clause protects an individual's right to bring a wrongful death action by providing that "[t]he right of action to recover damages for injuries resulting in death[] shall never be abrogated." UTAH CONST. art. XVI, § 5. We agree with the concurrence that the bar on "abrogat[ing]" wrongful death actions implies that restrictions or regulations on wrongful death actions that do not rise to the level of an abrogation may be permissible. *See infra* ¶¶ 267–68. But that does not answer the question Patterson and the State place before us.

¶167 The question here is the extent to which the Legislature may, consistent with the Utah Constitution, regulate a power that is expressly granted to another branch of government. When questions concerning the distribution of powers arise, we answer them by reference to article V, section 1 of the Utah Constitution.[36] For example, if we were to examine whether the Legislature could pass a law telling the Governor what qualifications her general counsel must have, we would not assume that the Legislature's near plenary authority to make law would allow the Legislature to tell the Governor who she could hire. Rather, we would ask whether the Legislature was, by wading into the question of what the Governor should look for in an attorney, "exercis[ing] any function[] appertaining to" the executive branch. *See* UTAH CONST. art. V, § 1.

---

[36] Article V, section 1 of the Utah Constitution provides:
> The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

As such, cases interpreting limitations on legislative authority, like those dealing with the Wrongful Death and Open Courts Clauses, do not answer questions about what the Utah Constitution permits the Legislature to do with the writ authority granted to the courts.

¶168 And here, the Utah Constitution has already supplied the answer to the distribution of powers question. Article VIII, section 4 of the Utah Constitution requires the Supreme Court to "adopt rules of procedure and evidence to be used in the courts of the state." That provision also permits the Legislature to "amend the Rules of Procedure and Evidence adopted by the Supreme Court upon a vote of two-thirds of all members of both houses of the Legislature." UTAH CONST. art. VIII, § 4. Thus, the Utah Constitution gives the Legislature a significant role in determining how the writ process is managed.[37] But, as we have described above, the Utah Constitution omits language that would give the Legislature authority to regulate the substance of the writ power. *See supra* ¶¶ 145–60. Because the people of Utah charged the judiciary with the exclusive power to issue writs and did so without reserving any role for the

---

[37] The concurrence notes that we "stop[] short of defining the proposed line between 'substance' and 'procedure.'" *Infra* ¶ 253; *see also infra* ¶ 223. That is true, and it is by design. Unlike the other questions we address in this opinion, the parties did not specifically brief this question. And, in fairness to them, we did not ask them, in our supplemental briefing order, to address whether, in this context, a time bar should be considered a substantive restriction or a procedural requirement. This is a question we leave for a case where it has been fully briefed under the rubric we set forth in this opinion. The concurrence asserts that this casts a "vague constitutional cloud over the PCRA without giving the legislature or the lower courts any indication of the scope of the supposed problem." *Infra* ¶ 253. This is an unduly pessimistic view. In response to the State's argument that the Legislature has near plenary authority to regulate the writ, we explain that the constitution does not give the Legislature such broad powers. And we outline the constitutional power that the Legislature has to amend the rules that govern procedure. Should a question arise about whether the Legislature has placed an unconstitutional restriction on the writ, parties will know that the question they need to brief is whether the restriction is substantive or procedural. Contrary to the concurrence's forecast, the skies have not been this clear in this area for quite some time.

Legislature,[38] the Legislature exercises a function that appertains to the judiciary when it attempts to place substantive restrictions on the writ.

¶169   In short, we have now answered the three questions that we posed above. Our writ power comes from article VIII of the Utah Constitution. The scope of the writ power must be understood with reference to what the people of Utah would have understood a writ to mean in 1984. And the Legislature may not diminish the substance of that writ power, but it may regulate writ procedure by the method article VIII outlines.

### III. THE PCRA AND RULE 65C DO NOT CONTAIN AN EGREGIOUS INJUSTICE EXCEPTION

¶170   Patterson argues that even if his petition is untimely, this court could employ an egregious injustice exception and hear the untimely petition. We acknowledged the possibility of an egregious injustice exception in *Gardner v. State*, 2010 UT 46, 234 P.3d 1115, and explored it in *Winward v. State*, 2012 UT 85, 293 P.3d 259. But we have not definitively opined that such an exception actually exists.

¶171   In *Gardner*, a post-conviction petitioner was barred from raising his claims under the PCRA. 2010 UT 46, ¶¶ 1–2. Gardner argued that this court had the constitutional authority "to apply exceptions to the procedural and limitations bars of the PCRA." *Id.* ¶ 90. In response to this argument, we stated that we had not decided "whether the PCRA and Rule 65[C] now wholly accommodate the full measure of our constitutional authority or whether the Utah Constitution requires that we be able to consider, in some cases, the merits of claims otherwise barred by the PCRA." *Id.* ¶ 93. We ultimately decided that we did not need to "define the full extent of our authority to remedy an egregious injustice" because not hearing Gardner's petition would not constitute an egregious injustice. *Id.* ¶ 94.

¶172   In *Winward*, the petitioner argued that we should recognize the egregious injustice exception we previewed in *Gardner*. 2012 UT 85, ¶ 5. We offered our view on what might constitute an "egregious injustice" and what showing a petitioner would have to make to trigger the exception. *Id.* ¶¶ 13, 17–20. But we again declined to

---

[38] Aside, perhaps, from the ability to suspend the writ "in case of rebellion or invasion" when "the public safety requires it." UTAH CONST. art. I, § 5.

recognize the exception because Winward's petition would not, in the end, warrant its application. *Id.* ¶¶ 13, 17–20.

¶173 Neither *Gardner* nor *Winward* addressed the difference between a petition brought under the PCRA and our constitutional writ power. The analysis in both these cases started from the premise that we had constitutional authority "to apply exceptions to the procedural and limitations bars of the PCRA." *Gardner*, 2010 UT 46, ¶ 90.

¶174 As we reread *Winward,* we can see that characterizing our constitutional authority over the writ power as an "exception" to the PCRA may have contributed to our willingness to speculate about the existence of an egregious injustice exception. As we reiterate in this case, and as we had explained it before 2008—when the Legislature amended the PCRA to state that act is the "sole legal remedy" for post-conviction relief, *see infra* ¶ 182—we exercise our writ power independent of the PCRA. But that independent exercise is largely hidden from view because Utah Rule of Civil Procedure 65C—which incorporates the PCRA—governs the exercise of that power. And we exercise that power in total harmony with the PCRA.

¶175 To understand how the adoption of rule 65C changed the landscape and may have led us to our statements in *Winward* about the egregious injustice exception, it is helpful to review the history of rule-making in this arena. In 1969, this court first adopted procedural rules aimed at post-conviction habeas petitions. We located these procedures in Utah Rule of Civil Procedure 65B(i). *See Hurst v. Cook*, 777 P.2d 1029, 1032 (Utah 1989). We based rule 65B(i) substantially on the Uniform Post-Conviction Procedure Act. *Id.* at 1034.

¶176 After we adopted rule 65B(i), we did not do a very good job of abiding by it. We continued to apply procedural bars and exceptions to those bars that rule 65B(i) did not contain. For example, even though rule 65B(i) did not prohibit a habeas petition from raising a claim that was or should have been raised on appeal, we held that a petitioner could not. *See Fernandez v. Cook*, 783 P.2d 547, 549 (Utah 1989) ("[I]n the ordinary case, a party may not raise issues in a habeas corpus petition that could or should have been raised on direct appeal."). *But see State v. West*, 765 P.2d 891, 894 (Utah 1988) ("Even though both of defendant's postconviction proceedings involved similar (but not the same) issues, rule 65B(i) does not prevent our consideration of his claims."). We also recognized an exception to this rule even though rule 65B(i) contained no such provision. This exception permitted a petitioner to raise a claim she

could or should have raised on appeal if there were "unusual circumstances." *Dunn v. Cook*, 791 P.2d 873, 876 (Utah 1990).

¶177 And we continued to interpret that rule in our case law. Rule 65B(i) required that the petitioner bring all her constitutional claims in one habeas proceeding. *See West*, 765 P.2d at 894. But the rule allowed a petitioner to escape this bar for "good cause shown." *Id.* In *Hurst*, we outlined several circumstances that constituted good cause. 777 P.2d at 1037. For example, we said the discovery of new facts could constitute "good cause" and excuse the procedural bar. *Id.* The good cause circumstances *Hurst* laid out were repeatedly recognized and were sometimes referred to as the *Hurst* factors. *See, e.g., Gardner v. Galetka*, 2004 UT 42, ¶¶ 11–12, 94 P.3d 263; *see also Tillman v. State*, 2005 UT 56, ¶ 22, 128 P.3d 1123.

¶178 Against this backdrop, the Legislature adopted the PCRA in 1996. *See* Post-Conviction Remedies Act, 1996 Utah Laws 881 (codified as amended at UTAH CODE § 78B-9-101–503). The PCRA resembled rule 65B(i) in a number of respects. It outlined bars for issues that were or could have been raised on appeal. § 6, 1996 Utah Laws at 882. And it barred petitioners from raising issues that had been previously raised in a post-conviction proceeding. *Id.* The PCRA did not specifically include the exception we had recognized that permitted a party to raise a claim that "could have been raised on appeal" in "unusual circumstances." *See* 1996 Utah Laws 881–83. Nor did the PCRA recognize the "good cause" exception to the successive-petitions bar that had been in our rules of procedure. *See id.* But the PCRA did contain an exception to its statute of limitations where "interests of justice" excused the untimeliness. § 7(3), 1996 Utah Laws at 882.

¶179 After the Legislature passed the PCRA, we grappled with how it interacted with our existing judicially created procedural bars and associated exceptions.[39] For example, in *Gardner v. Galetka*, we

---

[39] In *Brown v. Cox*, we recounted the history of the push and pull between the judicial and legislative branches with respect to the authority to enact the rules that govern judicial process. 2017 UT 3, 387 P.3d 1040. There we explained,

> Before 1943, the Utah Supreme Court enacted procedural rules, but the Legislature could supersede those rules by statute. Between 1943 and 1951, the Legislature shifted primary procedural rule-making authority to the Utah Supreme Court "by providing

(continued . . .)

faced a petitioner who brought a second post-conviction petition. 2004 UT 42, ¶¶ 5–6. The State argued that the petition should be dismissed because it raised an issue that was or could have been raised in a prior postconviction proceeding. *Id.* ¶ 10. It based this argument on the PCRA's bar, which, by way of reminder, did not contain the "good-cause" exception that rule 65B(i) did. *Id.*

¶180 Gardner argued that we should nevertheless apply the good-cause exception. *Id.* ¶ 11. We noted that, notwithstanding the PCRA's omission of a good-cause exception, we could analyze whether Gardner's claim would qualify for that exception. We concluded that exception would "retain [its] independent constitutional significance and may be examined by this court in our review of post-conviction petitions." *Id.* ¶ 15. We further stated that "to the degree that the PCRA purports to erect an *absolute* bar to this court's consideration of successive post-conviction petitions, it suffers from constitutional infirmities," *id.* ¶ 17, and we "will continue to exercise our constitutionally vested authority where appropriate," *id.* ¶ 18. In other words, we recognized that this judicially created exception that predated the PCRA constituted an

---

that 'all laws in conflict [with court rules] . . . shall be of no further force and effect.'" By 1951, the Legislature "expanded the supreme court's rule-making responsibilities to encompass evidentiary as well as procedural rules." In 1983, we reasoned that procedural rulemaking was "the exclusive prerogative of this [c]ourt." While the 1984 amendment to article VIII, section 4 of the Utah Constitution tempered our holding in *Brickyard* by preserving legislative power to "amend" certain court rules, the amendment solidified our constitutional authority to adopt rules of evidence and procedure.

*Id.* ¶ 17 n.8 (alterations in original) (citations omitted). In *Brown*, we clarified that, after the 1984 constitutional amendments, if the Legislature wanted to amend a rule of evidence or procedure, it needed to do so in a manner that conveyed a "clear indication" to amend our rules, preferably a joint resolution passed by the constitutionally required super majority of each house. *Id.* ¶ 23.

Uncertainty surrounding the interplay between the PCRA and rule 65C echoes this history of the two branches exploring how the Utah Constitution expects us to exercise our shared power to create court rules of procedure and evidence.

exercise of our constitutional authority that existed independent of the PCRA and its exceptions. *See id.* ¶¶ 15–18.

¶181 We later opined that our "exceptions" were based on our constitutional authority. *Tillman*, 2005 UT 56, ¶¶ 20–22 ("[B]ecause 'the power to review post-conviction petitions "quintessentially . . . belongs to the judicial branch of government,"' and not the legislature, all five common law exceptions 'retain their independent constitutional significance and may be examined by this court in our review of post-conviction petitions.'" (quoting *Galetka*, 2004 UT 42, ¶¶ 17, 15)); *see also Gardner*, 2010 UT 46, ¶ 92 ("[W]e held that [the good-cause exception] related to our constitutional authority to grant relief in cases of obvious injustice." (citing *Tillman*, 2005 UT 56, ¶¶ 20–22)).[40]

¶182 In 2008, the Legislature amended the PCRA to state that it was the "sole legal remedy" for a post-appeal challenge to a conviction or sentence. *Gardner*, 2010 UT 46, ¶ 91. The following year, we amended our rules of procedure to incorporate the PCRA as the "sole legal remedy" for post-conviction petitions. *Id.* ¶ 92.[41]

¶183 By adopting the terms of the PCRA into our rules, we largely avoided having to consider constitutional questions that were raised by the inconsistencies between our rules and the PCRA.[42] For example, we did not have to consider whether the

---

[40] This is consistent with how we talked about the good-cause exception when we addressed it comprehensively in *Hurst*. We stated that, "[q]uintessentially, the Writ belongs to the judicial branch of government." *Hurst*, 777 P.2d at 1033. And the constitution "presupposes, a judicial department armed with process sufficient to fulfill its role as the third branch of government." *Id.*

[41] As a reminder, Utah Rule of Civil Procedure 65C(a) states,
> This rule governs proceedings in all petitions for post-conviction relief filed under the Post-Conviction Remedies Act, Utah Code Title 78B, Chapter 9. The Act sets forth the manner and extent to which a person may challenge the legality of a criminal conviction and sentence after the conviction and sentence have been affirmed in a direct appeal . . . or the time to file such an appeal has expired.

[42] Patterson argues that rule 65C is an improper cede of our constitutional power to the Legislature. We wholeheartedly disagree

(continued . . .)

Legislature could constitutionally place a statute of limitations on a petition entreating us to exercise our constitutional writ authority. After we adopted rule 65C, the procedural bars and exceptions to those bars were the same, whether they were housed in statute or court rule.[43]

¶184   However, the adoption of rule 65C, and our acceptance of the PCRA's narrowed set of exceptions to the procedural bars, precipitated another question: Were the broader, open-ended exceptions that we abolished constitutionally required? Or, in the words of the *Gardner* court, does "the Utah Constitution require[] that we be able to consider, in some cases, the merits of claims otherwise barred by the PCRA" and rule 65C? *Gardner*, 2010 UT 46, ¶ 93. And we began to employ principles of constitutional avoidance to evade that question when it was presented to us.

---

with that contention. The Utah Constitution gives this court the authority to promulgate rules of evidence and procedure. UTAH CONST. art. VIII, § 4. We enacted rule 65C pursuant to that constitutional authority. That we elected to exercise that authority in a way that mirrors what the Legislature did in the PCRA does not evidence an abdication of our constitutional authority. To the contrary, it is an expression that we believed at the time that we agreed that the PCRA set forth an acceptable manner of regulating the procedure by which we would hear writ petitions.

[43] One consequence of this is that we began to be less precise in the way we talked about the PCRA and our writ power. For example, in 2012, we stated that "[t]he PCRA was amended in 2008 to 'extinguish' the common law exceptions found in *Hurst v. Cook*." *Taylor v. State*, 2012 UT 5, ¶ 11 n.3, 270 P.3d 471. And again in 2015, we noted that *Hurst*'s "common law 'exceptions' . . . were repudiated by the legislature in 2008." *Pinder v. State*, 2015 UT 56, ¶ 56, 367 P.3d 968.

But neither of these cases mentioned our own role in eliminating those exceptions. Neither did those cases address what we had recognized in *Gardner v. Galetka*, 2004 UT 42. That is, that even after the Legislature enacted the PCRA, the procedural-bar exceptions, which existed before the PCRA, retained their "independent constitutional significance and may be examined by this court in our review of post-conviction petitions." *Id.* ¶ 15. In other words, we did not, in those cases, explore the possible constitutional ramifications of that elimination.

¶185 For example, in 2010, Gardner—the same Gardner, whose petition was at issue in *Gardner v. Galetka*, 2004 UT 42—brought another post-conviction petition. *See Gardner*, 2010 UT 46. The State argued that Gardner could have raised those claims in his prior post-conviction proceeding and so was barred by the PCRA.[44] *Id.* ¶ 1. Gardner argued that this court had the authority, as we stated in *Gardner v. Galetka,* to hear cases even when barred by the PCRA. *Id.* ¶ 90. Quoting *Galetka* back to us, Gardner argued we could apply the exceptions that this court had recognized before the PCRA.[45] We responded to this argument by noting that cases like *Galetka* were decided before the PCRA was amended to say that its terms were exclusive, and before we incorporated those limits into rule 65C. *Id.* ¶ 91. And we had not yet examined how the scope of our authority changed after these enactments. *Id.* ¶ 93.

¶186 But in the end, we decided that even if these judicially made exceptions had survived the amendment of the PCRA and the adoption of rule 65C, Gardner would nonetheless fail to meet the requirements of the exception he wanted the court to adopt. *Id.* ¶¶ 94–95. So we upheld the dismissal of his procedurally-barred petition. *Id.* ¶ 98.

¶187 But in our discussion, we hinted that the Utah Constitution might "require[] that we be able to consider, in some cases, the merits of claims otherwise barred by the PCRA." *Id.* ¶ 93.

---

[44] The PCRA states that a "petitioner is not eligible for relief under this chapter upon any ground that: . . . was raised or addressed in any previous request for post-conviction relief or could have been, but was not, raised in a previous request for post-conviction relief." UTAH CODE § 78B-9-106(1)(d).

[45] A consequence of the way Gardner framed his argument is that we only talked about our constitutional authority in terms of our ability to apply an exception to the PCRA's time bar. This framing caused us to talk about our constitutional authority as "residual authority" and to seemingly constrain the question of our constitutional authority to whether or not we could apply an exception to the statutory PCRA. But this framing ignored what we had recognized in prior case law. That is, that our writ authority "retain[s] . . . independent constitutional significance" in the face of legislation, *Galetka* 2004 UT 42, ¶ 15, and "the Legislature [has] no power to restrict the writ powers," *Petersen v. Utah Bd. of Pardons*, 907 P.2d 1148, 1152 (Utah 1995).

Or, in other words, that we might have "authority to remedy an egregious injustice." *Id.* ¶ 94.[46] And the State, at that time, agreed that we did, acknowledging that "this court retains constitutional authority, even when a petition is procedurally barred, to determine whether denying relief would result in an egregious injustice." *Id.* ¶ 93. But we did not decide the question because to do so would have been inconsistent with "our obligation to 'avoid addressing constitutional issues unless required to do so.'" *Id.* (citation omitted).

¶188   Two years later, in *Winward*, a petitioner again argued that we should apply an exception to save his otherwise time-barred petition. 2012 UT 85. Unlike in *Gardner*, the petitioner did not preserve an argument that there was a pre-PCRA exception to apply to his case. *Id.* ¶¶ 8–11. Instead, Winward latched onto the "egregious injustice" language we had used in *Gardner* and argued that we had the constitutional authority to excuse a procedural bar to prevent an egregious injustice. *Id.* ¶¶ 13, 16.

¶189   As in *Gardner*, the State did not contest *Winward's* assertion that there might be an "'egregious injustice' exception" to the PCRA. *See id.* ¶¶ 15–16 (quoting *Gardner*, 2010 UT 46, ¶¶93–94). But, again as in *Gardner,* we declined to reach the constitutional question because we concluded that Winward would not qualify for whatever exception we might announce. *Id.* ¶ 13.

¶190 But even though we again invoked constitutional avoidance principles, we did not stop there. Although we agreed that Winward would not qualify for an exception, and although we recognized that the parties had not briefed the issue, we "articulate[d] a framework for considering a petitioner's claim that he qualifies for an exception to the PCRA's procedural bars." *Id.* ¶ 17. Under *Winward*, we first look to see whether the case raises the "the type of issue" that would inspire us to consider whether an exception exists. *See id.* ¶ 18. If the petitioner can meet that burden, she must then convince us that an egregious injustice exception exists through briefing that includes "an articulation of the exception

---

[46] It is not entirely clear from where the "egregious injustice" nomenclature hails. In *Gardner*, we say that the State acknowledged that "this court retains constitutional authority, even when a petition is procedurally barred, to determine whether denying relief would result in an egregious injustice." 2010 UT 46, ¶ 93. But it does not appear that we had ever used that phraseology before.

itself, its parameters, and the basis for this court's constitutional authority for recognizing such an exception." *Id.*

¶191   Unfortunately, since *Winward,* parties like Patterson have been forced to aim at an amorphous, and possibly non-existent, "egregious injustice exception." And the guidance we did provide suggested a "we will know it when we see it" type of test. The State credibly reports that this has created a legal atmosphere where "arguments over the existence of an 'egregious injustice' exception to the PCRA's procedural bar have become ubiquitous in the district court, the court of appeals, and [the supreme court]." The State supports this contention with citations to fifteen recent cases in which the parties have briefed whether the petitioner had articulated and merited application of an egregious injustice exception. With the benefit of hindsight, we can see that our invitation to explore the contours of a potential exception has not benefitted petitioners, their counsel, nor the bench.

¶192   And *Winward*'s framing of the question has obstructed our path to the question we need to answer. The question lingering in *Gardner* and *Winward* is not whether there is a pre-PCRA exception that we can apply to save a time-barred petition. We eliminated any such exception when we adopted rule 65C. Nor is the question whether there is some new "egregious injustice" exception that we might define and apply in an appropriate case.

¶193   The real question is the one that *Gardner* presaged and *Winward* obfuscated: whether application of the procedural bars found in the PCRA and rule 65C violate a petitioner's constitutional right to avail herself of the writ the Utah Constitution guarantees. In other words, are the bars and exceptions we borrowed from the PCRA and adopted in rule 65C so narrow that without some sort of additional exception like those we had previously recognized, rule 65C and the PCRA violate a petitioner's constitutional rights?

¶194   We appreciate the *Gardner* and *Winward* courts intuiting the trouble that would flow from foreclosing the possibility that a case may exist that we should hear even though the PCRA and rule 65C would bar them. But we believe the time has come to make explicit what *Gardner* intimated: under the current version of rule 65C, we can only hear a time-barred case, like Patterson's, when failure to do so would violate a petitioner's constitutional rights.

## IV. PATTERSON HAS NOT DEMONSTRATED THAT APPLICATION OF THE RULE 65C TIME BAR TO HIS CLAIMS VIOLATES HIS CONSTITUTIONAL RIGHTS

¶195 Patterson offers two ways that the application of any statute of limitations to bar his claims would violate the Utah Constitution. He first asserts that it would be at odds with precedent suggesting that imposing any statute of limitation on a habeas petition is at odds with our constitution's Open Courts Clause. *See Julian v. State*, 966 P.2d 249 (Utah 1998). He also asserts that it would violate the Suspension Clause of the Utah Constitution.[47]

*A.* Julian v. State *and the Open Courts Clause*

¶196 Patterson argues that *Julian* dictates that any statute of limitations on our writ authority violates the Open Courts Clause of the Utah Constitution.[48]

¶197 Julian filed a petition for extraordinary relief eight years after his conviction. *Julian*, 966 P.2d at 250. Julian alleged that the district court had erred by admitting certain evidence and his trial counsel had provided ineffective assistance. *Id.* The State moved to dismiss the petition, arguing that it was untimely under both the four-year catch-all time bar for civil claims that applies when no other provision is made in law and the PCRA's one year limitations period. *Id.* at 250–51. The district court denied the motion, heard the

---

[47] Patterson also argues that Utah Rule of Civil Procedure 65C does not apply to his petition for relief under this court's constitutional authority because rule 65C states that it applies to "petitions for post-conviction relief filed under" the PCRA. Although rule 65C states that it governs PCRA petitions, it also states that the PCRA sets forth the rules for a person, like Patterson, who challenges the legality of a conviction after the conviction and sentence have been confirmed in a direct appeal or the time for such an appeal has expired. *See* UTAH R. CIV. P. 65C. In petitioning for relief under our writ power, Patterson is just such a person; he is challenging the legality of his conviction after the conviction and sentence have been confirmed in a direct appeal. Therefore, by its terms, rule 65C applies to Patterson.

[48] The Open Courts Clause states that "[a]ll courts shall be open, and every person . . . shall have remedy by due course of law, . . . and no person shall be barred from prosecuting or defending . . . any civil cause to which the person is a party." UTAH CONST. art. I, § 11.

writ, and released Julian from custody. *Id.* at 252. The State appealed. *Id.*

¶198 We upheld the district court's decision to not apply the four-year catch-all statute of limitations. *Id.* at 253. We stated that "[a]pplying the catchall statute to bar habeas petitions . . . violates the Utah Constitution's open courts provision." *Id.* But the entirety of our Open Courts Clause "analysis" consisted of one sentence. *See id.* We quoted *Hurst*, saying, "[T]he separation of powers provision, Article V, Section 1 of the Utah Constitution, requires, and the Open Courts Provision of the Declaration of Rights, Article I, Section 11, presupposes, a judicial department armed with process sufficient to fulfill its role as the third branch of government." *Id.* (alteration in original) (quoting *Hurst v. Cook*, 777 P.2d 1029, 1033 (Utah 1989)).[49]

¶199 We also upheld the district court's decision to apply the one-year statute of limitation in the PCRA, but to nonetheless hear the case pursuant to the "interests of justice" exception that the statute then contained. *Id.* at 253–54. The State argued that the district court had abused its discretion by deciding that Julian's case triggered the "interests of justice" exception. *Id.* at 254. The State contended that the statutory exception should come into play "only under truly exceptional circumstances" and that allowing Julian to invoke that exception would run contrary to the policies of promoting finality and not requiring the State to litigate stale claims. *Id.*

¶200 In the course of concluding that the district court had not abused its discretion in finding that hearing the writ petition served the interests of justice, we said, "Under our reasoning in this case, proper consideration of meritorious claims raised in a habeas corpus

---

[49] Patterson also references language from *Julian* where we noted that the court of appeals had said that a strict thirty-day statute of limitation "remove[d] flexibility and discretion from state judicial procedure, thereby diminishing the court's ability to guarantee fairness and equity in particular cases." *Julian*, 966 P.2d at 253 (alteration in original) (citation omitted). Patterson suggests we found the four-year statute of limitation unconstitutional for the same reason. This is not clear from *Julian*, but even if it were, *Julian* talked about this principle in the context of preserving the habeas writ from legislative restrictions. *See id.* Here, this court has adopted the statute of limitations so we are not dealing with the separation of powers problem that preoccupied the *Julian* court.

petition will *always* be in the interests of justice." *Id.* And we observed that it "necessarily follows that *no* statute of limitations may be constitutionally applied to bar a habeas petition." *Id.* This is the language on which Patterson relies.

¶201 There are two problems with Patterson's reliance on *Julian*. First, Patterson makes no attempt to reconcile *Julian* with the rest of our Open Courts Clause jurisprudence. We have stated that "[t]o determine whether legislation violates the Open Courts Clause, we first look to see whether the legislature has abrogated a cause of action." *Petersen v. Utah Lab. Comm'n*, 2017 UT 87, ¶ 20, 416 P.3d 583.

¶202 But we have also suggested that a challenge to a statute of limitation "does not pass even the first step of the Open Courts Clause analysis—the legislature has not 'abrogated' a cause of action by specifying a reasonable period of time after accrual during which the cause of action must be asserted." *Id.* ¶ 9 n.7 (citing *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 672 (Utah 1985) ("To be constitutional, a statute of limitations must allow a reasonable time for the filing of an action after a cause of action arises.")). As noted, Patterson does not apply the *Petersen* framework to rule 65C's time bar.

¶203 Second, the sweeping language on which Patterson relies has been overtaken by cases like *Winward*, in which we upheld the application of time bars to petitions for extraordinary writs. Once again, Patterson does not try to square the holding of cases like *Winward* with *Julian*. As such, we cannot accept Patterson's argument that any statute of limitations on a petition for extraordinary relief violates the Open Courts Clause.

¶204 Simply stated, Patterson has not convinced us that application of the PCRA/rule 65C time bars to his petition violates his rights under the Open Courts Clause of the Utah Constitution.

### B. Suspension of the Writ

¶205 Patterson also argues that applying the statute of limitations to his petition would "violate the suspension clause of the Utah Constitution because Mr. Patterson has raised serious claims of constitutional error." But he has not convinced us that the Suspension Clause of the Utah Constitution either forbids all statutes of limitations on our writ power nor that the application of the time bar to Patterson's petition violates the Suspension Clause.

¶206 Article I, section 5 of the Utah Constitution provides: "The privilege of the writ of habeas corpus shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it." It is not

evident from the constitution's text what the people of Utah in 1895 would have understood a suspension of the writ of habeas corpus to mean. This court has not directly addressed the question, and federal courts have likewise had limited opportunity to review this question as it pertains to the federal Suspension Clause.[50] And the historical record presently in front of us does not shed much light on the question either.

¶207   Looking to readily available contemporary sources, we can see that when the people of the Utah Territory adopted the Utah Constitution, for something to be "suspended" meant much as it does now: to stop something, usually temporarily. Dictionaries published close to the time of statehood define suspend as: "to cause to cease for a time; to interrupt temporarily; to intermit; to hold in a state undetermined; to debar temporarily from some privilege or office or place held; to stay; to cause to cease for a time from operation or effect." *See Suspend,* THE STUDENT'S ENGLISH DICTIONARY (1896).[51]

---

[50] Our Suspension Clause is nearly identical to the Suspension Clause of the United States Constitution. *See* U.S. CONST. art. I, § 9, cl. 2 ("The Privilege of the Writ of Habeas Corpus shall not be suspended, unless when in Cases of Rebellion or Invasion the public Safety may require it."). The United States Supreme Court has recognized that it has had little opportunity to opine on what it means for the clause to be suspended or the meaning of suspension. *Boumediene v. Bush*, 553 U.S. 723, 773 (2008) ("Our case law does not contain extensive discussion of standards defining suspension of the writ or of circumstances under which suspension has occurred.").

[51] *See also Suspension*, THE STUDENT'S ENGLISH DICTIONARY (1896) (defining suspension as "[t]he act of suspending or state of being suspended; . . . the act of delaying, interrupting, or stopping for a time; a cessation of operation; intermission; stoppage; temporary abeyance; deprivation of office, privileges, or functions for a time"); *Suspend*, WEBSTER'S ACADEMIC DICTIONARY (1895) (defining "suspend" in relevant part as "[t]o cause to cease for a time; to interrupt; to delay; to stay[;] . . . [t]o hold in an undecided state[;] . . . [t]o debar temporarily from any privilege, execution of an office, enjoyment of income, etc."); *Suspension, id.* (defining suspension as the "temporary delay, interruption, or cessation (of labor, pain, judgment, opinion, payment, execution of law, etc.)").

¶208    The record of the Utah Constitutional Convention does not shed much light on the topic either. Almost all of the discussion on the Suspension Clause revolved around a suggestion that the phrase "and then only in such manner as shall be prescribed by law" be added to the clause. PROCEEDINGS AND DEBATES OF THE CONVENTION ASSEMBLED TO ADOPT A CONSTITUTION FOR THE STATE OF UTAH, DAY 18, https://le.utah.gov/documents/conconv/18.htm. The delegates discussed what this addition would mean for the ability to suspend the writ, including who could suspend the writ and how that body would do it. But the entire discussion took place in the context of suspending the writ during emergencies like "rebellion or invasion." *See id.*

¶209    It appears that the framers assumed that, when there is a rebellion or invasion, the writ could be suspended to permit the State to hold prisoners captured in that conflict.[52] Indeed, the suspension was likened to martial law, something that we might need in times of domestic conflict. *Id.* Thus, the evidence currently before us suggests that the Suspension Clause contemplates measures that "stay," "cause to cease," or "interrupt" the ability of a prisoner to challenge her detention. But we recognize that we do not have extensive briefing on the original public meaning of the term "suspension."

¶210    Although the State does not provide much that would speak to the original public understanding of a suspension, it does forward persuasive authority for the proposition that a statute of limitations does not necessarily amount to a suspension of the writ. For example, several federal circuits have held that a one-year statute of limitations on habeas petitions does not violate the federal Suspension Clause. *See, e.g.*, *Delaney v. Matesanz*, 264 F.3d 7, 12 (1st Cir. 2001) (noting cases from the Second, Fifth, Tenth, and Eleventh Circuits that likewise found no suspension clause violation); *Wyzykowski v. Dep't of Corr.*, 226 F.3d 1213, 1217 (11th Cir. 2000); *Miller v. Marr*, 141 F.3d 976, 977–78 (10th Cir. 1998).

---

[52] By way of example, Delegate William Grant Van Horne opined that the "object of providing that in those two cases the writ of habeas corpus may suspend, is that those may be imprisoned who are secretly giving aid and comfort to the enemy." PROCEEDINGS AND DEBATES OF THE CONVENTION ASSEMBLED TO ADOPT A CONSTITUTION FOR THE STATE OF UTAH, DAY 18, https://le.utah.gov/documents /conconv/18.htm.

¶211   Several of our sister states also have held that statutes of limitations do not violate their respective suspension clauses. The Oregon Supreme Court has said that "[i]t is [the habeas] *system* of judicial inquiry that may not be suspended." *Bartz v. State*, 839 P.2d 217, 224 (Or. 1992). That court continued, "[a]ny legal system, including habeas corpus, requires procedures to implement it. . . . [S]o long as those procedures are reasonable for persons who seek redress—they do not offend the state constitutional ban on suspending habeas corpus." *Id.*[53] The Colorado Supreme Court has found its statute of limitations on habeas petitions constitutional because it does not "den[y] persons an adequate avenue of relief." *People v. Wiedemer*, 852 P.2d 424, 435 (Colo. 1993).[54] And in Pennsylvania, the superior court has reasoned that its statute of limitation, which is similar to ours, does not suspend the writ because the "[petitioner] had the opportunity to exercise his right to petition for writ of *habeas corpus*, but simply failed to do so in a timely fashion." *Commonwealth v. Zuniga*, 772 A.2d 1028, 1032 (Pa. Super. Ct. 2001).[55] While the decisions of other courts do not dictate the interpretation of our constitution, they certainly cause us to stop before we would presume to declare that any statute of limitations violates the Suspension Clause.

¶212   In the end, Patterson's argument regarding the original public meaning of the Suspension Clause is too bare for us to engage in serious constitutional interpretation. Simply stated, Patterson has not convinced us that the flexible one-year statute of limitations to file a post-conviction writ amounts to a suspension of the writ of habeas corpus. But we leave open the possibility that another petitioner, on another set of facts, might be able to demonstrate that the application of the time bars in the PCRA and rule 65C run afoul

---

[53] Article I, section 23 of the Oregon Constitution states that the "privilege of the writ of *habeas corpus* shall not be suspended unless in case of rebellion, or invasion the public safety require it."

[54] Article II, section 21, of the Colorado Constitution provides that the "privilege of the writ of habeas corpus shall never be suspended, unless when in case of rebellion or invasion, the public safety may require it."

[55] Article I, section 14 of the Pennsylvania Constitution states, in part, that "the privilege of the writ of habeas corpus shall not be suspended, unless when in case of rebellion or invasion the public safety may require it."

of the Suspension Clause, or some other provision, of the Utah Constitution.

## V. PATTERSON'S CLAIMS FOR RELIEF BASED ON NEW EVIDENCE

¶213   Finally, Patterson argues that two of his claims are timely under the PCRA. Under section 78B-9-107(2)(e) of the Utah Code, a claim may accrue on "the date on which petitioner knew or should have known, in the exercise of reasonable diligence, of evidentiary facts on which the petition is based." Patterson claims that grounds 4 and 5 of his amended petition are based on new evidence.

¶214   Ground 4 alleges that Patterson's trial counsel was ineffective for failing to offer expert evidence of faulty interviewing techniques. And he claims that the new evidence that supports this claim comes from an expert he recently retained.

¶215   Ground 5 alleges that Patterson's trial counsel was ineffective for failing to investigate and locate impeachment evidence. Patterson avers that he has now found a document that would impeach a critical witness against him and claims his trial counsel should have found this document.

¶216   Patterson argues that he could not reasonably have discovered this evidence until the federal court appointed his current counsel. And because his counsel filed this petition within one year of having uncovered these new facts, Patterson argues that his claims based upon this evidence are timely filed under the PCRA.

¶217   Patterson raised these arguments in response to the State's motion for summary judgment, but the district court did not rule on them. We therefore remand to the district court to address them in the first instance without offering comment on the strength or weakness of these contentions.

## CONCLUSION

¶218   The writ of habeas corpus is an important tool that the people of Utah enshrined in the state constitution for their protection. And the people of this state have entrusted the courts with the authority to hear those entreaties. But we adopted Utah Rule of Civil Procedure 65C, which mirrors the PCRA, to regulate that authority, and Patterson's petition fails at its hands. To convince us to hear a petition that rule 65C and the PCRA bar, Patterson would need to demonstrate that failure to entertain his petition violates his constitutional rights. Patterson has failed to make that showing. We affirm the dismissal of the petition except as to the two claims for relief that are based on evidence Patterson argues is newly

LEE, A.C.J. concurring in part and concurring in the judgment

discovered. The district court did not address those arguments, so we remand to the district court for consideration of those two claims.

———————————

ASSOCIATE CHIEF JUSTICE LEE, concurring in part and concurring in the judgment:

¶219  Scott Kirby Patterson filed a post-conviction challenge to his convictions of child sex abuse and other offenses. His petition was dismissed as time-barred under the Post-Conviction Remedies Act (PCRA)—an exclusive framework for post-conviction review not only enacted by our legislature, *see* UTAH CODE § 78B-9-102(1)(a), but also endorsed by this court in our rules governing the procedural grounds for such review, *see* UTAH R. CIV. P. 65C. Patterson challenges the dismissal of his petition on this appeal, asserting that the time bar in the PCRA (and reinforced in rule 65C) should be subject to tolling, his untimeliness should be excused under a common-law "egregious injustice" exception, and the operative time bar runs afoul of the open courts clause and the suspension clause of the Utah constitution.

¶220 The majority appropriately affirms the dismissal of Patterson's petition. It does so, moreover, on a range of grounds that I endorse: (1) Patterson's claims are time-barred under the controlling provisions of the PCRA and civil rule 65C and are not saved by any principle of tolling,[56] *see supra* ¶¶ 34–65; (2) there is no

———————————

[56] Though I agree with the court's ultimate decision on this point, I would not affirm the district court on the ground that attorney Wall's legal advice was not deficient. *See supra* ¶¶ 44–48. The actions of an individual who is neither paid nor employed by the state (but rather retained by Patterson) cannot constitute "state action in violation of the United States Constitution" that "prevented [Patterson] from filing" his petition. *See* UTAH CODE § 78B-9-107(3)(a). The federal courts recognize that even a public defender doesn't constitute a state actor for tolling purposes. *See Polk Cnty. v. Dodson*, 454 U.S. 312, 318 (1981) ("[A] lawyer representing a client is not, by virtue of being an officer of the court, a state actor . . . within the meaning of § 1983."); *Mills v. Crim. Dist. Ct. No. 3*, 837 F.2d 677, 679 (5th Cir. 1988) ("[P]rivate attorneys, even court-appointed attorneys, are not official state actors. . . ."). And Wall was Patterson's agent—not some third-party actor. So Wall's actions could not amount to "state action" that "prevented" Patterson from filing a petition.

LEE, A.C.J., concurring in part and in the judgment

common-law "egregious injustice" exception available to Patterson under the PCRA or rule 65C—under our law as it stands, we can hear a time-barred case only "when failure to do so would violate a petitioner's constitutional rights," *supra* ¶ 194; and (3) Patterson has failed to establish that application of the time-bar provisions in our law violates his constitutional rights under the open courts and suspension clauses of the Utah Constitution, *supra* ¶¶ 195–212.

¶221   I concur in the judgment of the court and in these central elements of the majority opinion. I write separately, however, to express my objection to other elements of the opinion that are unnecessary to our decision and are unsupported by the majority's analysis in any event.

¶222   Most of the difficulty comes in Part II of the majority opinion. There the court begins with the observation that our courts have constitutionally guaranteed "original jurisdiction" over "extraordinary writs" that may not be abrogated by the legislature. *See supra* ¶¶ 76–80. That much is uncontroversial. But the court takes that premise as establishing a much broader proposition. It concludes that the legislature lacks the power to enact any "substantive[]" restrictions on the writs that fall within our original jurisdiction and is limited to amending the "procedural" rules adopted by the courts. *See supra* ¶¶ 146, 157–60.

¶223   The majority stops short of defining the scope of the "substantive" or "procedural" powers that it reserves for the courts. It never announces a standard for evaluating the legislature's authority in this field. And it never applies any constitutional standard to an actual provision of the PCRA at issue in this case. Yet the court nonetheless breaks significant, new constitutional ground in its opinion—in suggesting that the legislature has exceeded the bounds of its constitutional authority in enacting the PCRA, by a "substantive" regulation of an extraordinary writ or an improper attempt to amend our "procedural" rules in this field. *See supra* ¶ 160 n.35 (concluding that "the Legislature cannot, consistent with the Utah Constitution, replace the writ with a statutory remedy"); *supra* ¶ 168 (stating that "the Legislature exercises a function that appertains to the Judiciary when it attempts to place substantive restrictions on the writ").

¶224   I object to this portion of the court's opinion on two grounds. First, I find these aspects of the court's constitutional analysis premature and unnecessary to our decision in this case. There is currently no provision of the PCRA that has any independent effect on post-conviction writs, and thus no basis for

LEE, A.C.J., concurring in part and in the judgment

this court to opine on the constitutionality of any such enactment. This is clear from the fact that this court's own rules have long incorporated the PCRA as establishing "the manner and extent to which a person may challenge the legality of a criminal conviction and sentence after the conviction and sentence have been affirmed in a direct appeal . . . or the time to file such an appeal has expired." UTAH R. CIV. P. 65C(a). The point is also underscored by the scope of the majority's analysis. The court is not expressly opining on the constitutionality of any provision of the PCRA because there is no provision that even arguably has an independent effect on the court's power to hear the merits of Mr. Patterson's petition for extraordinary writ. And that renders the court's constitutional analysis premature and unnecessary.

¶225   Second, the court's new standard does not follow from its simple premise. Under the plain language of the constitution and our case law interpreting it, the constitutional prescription of our courts' jurisdiction to issue extraordinary writs *is* a limitation on the legislative power. But the limitation is simply a bar to the legislative restriction or expansion of our courts' *jurisdiction* to issue extraordinary writs. It is not the elimination of the legislature's power to adopt "substantive" limitations on claims that fall within that jurisdiction. This is clear from the text of the constitution, from case law interpreting it, and from longstanding, settled practice.

I

¶226   This is not the right case for our court to be opining on the scope of the legislature's constitutional power to regulate our courts' original jurisdiction over an extraordinary writ. That is so because the majority's analysis has no impact on any of Patterson's claims or on any independently operative provision of the PCRA. The court's constitutional analysis runs afoul of the doctrine of ripeness and the principle of constitutional avoidance.

A

¶227 Our law as it stands today includes our judicial incorporation of the terms and conditions of the PCRA in civil rule 65C. *See* UTAH R. CIV. P. 65C(a) (stating that "the Post-Conviction Remedies Act, Utah Code Title 78B, Chapter 9 . . . . sets forth the manner and extent to which a person may challenge the legality of a criminal conviction and sentence after the conviction and sentence have been affirmed in a direct appeal . . . or the time to file such an appeal has expired"). And the consilience of legislative and judicial standards for post-conviction writs makes it unnecessary for us to

LEE, A.C.J., concurring in part and in the judgment

decide today what the constitution might portend if and when the legal landscape changes.

¶228   If and when either the PCRA or rule 65C are amended in a manner that establishes a conflict, *then* there will be a need for us to decide on the constitutional implications of such conflict—on whether and to what extent our constitutional jurisdiction over extraordinary writs forecloses legislative power to regulate the substantive elements of and defenses to claims for extraordinary writs in a manner that differs from the standards endorsed by the judiciary.

¶229   But that question is simply unripe under our law as it now stands. There is no current "conflict over the application of a legal provision" that "has sharpened into *an actual or imminent clash of legal rights.*" *See Metro. Water Dist. of Salt Lake & Sandy v. Sorf*, 2019 UT 23, ¶ 10, 445 P.3d 443 (citation omitted). All we have is "a difference of opinion regarding the *hypothetical application of a provision* to a situation in which the parties might, at some future time, find themselves." *See id.* (citation omitted) And that renders the constitutional question resolved by the court in Part II.C. of its opinion unripe, and not properly presented for our review. *See id.*

¶230   The *legislative* restrictions of the PCRA, in other words, are not currently restricting Patterson's access to post-conviction relief. Because the PCRA is mirrored in rule 65C, rule 65C itself establishes the time-bar to Patterson's claims.[57] The majority effectively acknowledges this point. When it gets around to deciding whether Patterson has a viable constitutional challenge to the operation of the one-year time-bar, the majority assesses the constitutionality of the PCRA *as incorporated in rule 65C*—upholding the rule against the constitutional challenges raised by Patterson under the open courts and suspension clauses of the Utah constitution. *See supra* ¶¶ 194–212.

¶231   It is true, as the majority notes, that the parties' briefs addressed questions related to the scope of the legislature's power in this field. Patterson argued that "the Legislature does not have the

---

[57] Patterson's district court petition admittedly sought relief under both the PCRA *and under the district court's constitutional authority*. *See supra* ¶ 12. But that is of no consequence under a legal regime in which the district court's power to issue an extraordinary writ is regulated by rule 65C—a rule that embraces and incorporates the terms of the PCRA.

LEE, A.C.J., concurring in part and in the judgment

power to place substantive restrictions on his constitutional right to ask this court for a writ." *Supra* ¶ 74 n.12. And the State responded with an argument that the Legislature has the authority to substantively limit Patterson's right to petition for a writ—and did so through the PCRA. *Supra* ¶ 74 n.12. But the majority resolves this case on grounds that render these arguments immaterial. It rejects Patterson's position on the ground that under rule 65C, the courts have exercised any independent writ power we may possess "in total harmony with the PCRA." *Supra* ¶ 174. And the majority fails to identify any effect that its analysis of the legislature's authority to substantively regulate the writ may have on any aspect of this case, let alone on Patterson's right to petition for a writ.

¶232   It is not just that we *can* resolve the parties' claims without opining on the legislature's constitutional authority to place substantive limitations on the writ. It is that we *actually do so* here. This is evident in the fact that the court fails to apply its analysis of the legislature's authority to any provision of the PCRA (or any other legislation) or to any claim advanced by Patterson on this appeal.

¶233   Part II.C. of the court's opinion is framed as an abstract statement of law divorced from the disposition of any particular claim before the court. It is an articulation of a set of constitutional principles in the abstract, divorced from any application to any provision of the PCRA.

¶234   We need not and should not decide whether the legislature has the power to enact substantive restrictions on post-conviction writs that differ from our judicial restrictions. Such a decision is unripe so long as our court rules remain in lockstep with legislative restrictions.

B

¶235   In resolving the question of the legislature's power to alter substantive standards adopted by the judiciary, the court also runs afoul of the principle of constitutional avoidance. This principle states that we "will not pass upon a constitutional question although properly presented by the record, if there is also present some other ground upon which the case may be disposed of." *State v. Argueta*, 2020 UT 41, ¶ 55, 469 P.3d 938 (citation omitted). We recently emphasized the importance of such avoidance of any unnecessary "venture into murky [constitutional] waters." *Id.* In recognition of the "'great gravity and delicacy' of constitutional questions," we noted that our cases "have gone so far . . . as to assert that it is 'our obligation to avoid addressing constitutional issues unless required

to do so'" — a standard we committed to follow unless and until we reconsider it in a future case ("with the able assistance of counsel and cautiously").[58] *Id.* ¶ 55 & n.14 (citations omitted).

---

[58] I wrote separately in *State v. Argueta*, acknowledging that we could resolve the case on harmless error grounds but indicating that I would have resolved a question on which we granted certiorari — on "whether the court of appeals erred in concluding that Argueta's Fifth Amendment rights were not violated when the prosecutor sought to impeach his credibility by highlighting 'exculpatory details' that Argueta mentioned at trial but omitted in earlier statements to police." 2020 UT 41, ¶ 76, 469 P.3d 938 (Lee, A.C.J., concurring in part and concurring in the judgment). In so doing, I explained that this was an "important question" with a "straightforward answer in controlling precedent of the United States Supreme Court and in a governing decision of this court." *Id.* And I expressed my disagreement with the majority's view of constitutional avoidance, noting that such "avoidance makes sense when we are resolving a case on a statutory or other alternate ground while declining to break new constitutional ground." *Id.* ¶ 83. Because we had "already broken the constitutional ground at issue" in a prior decision, I suggested that it was "not an act of restraint or judicial 'humility'" to issue a majority opinion that openly questioned that decision — as the majority did in *Argueta. Id.* ¶¶ 83–84.

My position here is fully compatible with the approach I took in *Argueta. But see supra* ¶ 71 n.10 (suggesting otherwise). The problem here is that the court is reaching out to assess the legislature's constitutional power to enact a statute that currently has no freestanding, independent effect. We faced no such hurdle in *Argueta.* Yet the *Argueta* majority nonetheless reinforced the notion of an "obligation" to avoid constitutional questions. *See Argueta*, 2020 UT 41, ¶ 55 n.14. And that notion is incompatible with the majority's decision today.

This inconsistency is not averted by the observation that we all agree that "we should address *some* of the constitutional questions the parties have placed before us." *Supra* ¶ 71 n.10 (emphasis added). The question is not whether we should address some of the constitutional questions briefed by the parties. It is whether we should address the constitutional power of the legislature to enact a statute that has no freestanding, independent effect under our law as it stands today. We should not.

LEE, A.C.J., concurring in part and in the judgment

¶236 The majority is overriding these principles in its decision today. We can resolve this case without going out of our way to opine on the constitutional implications of a conflict between the PCRA and rule 65C. *See supra* ¶ 224. These are grave, delicate questions. And the court is passing on them in a case in which they are not directly implicated.[59]

¶237 The majority resists this conclusion on the ground that Patterson's constitutional arguments are a "backstop to his statutory and common law claims." *Supra* ¶ 71. It asserts that we can avoid Patterson's constitutional claims only if we rule in Patterson's favor "on his statutory or common law arguments." *Supra* ¶ 71. Because

---

[59] My position here is consistent with the one I took in my concurring opinion in *State v. Walker*, 2011 UT 53, 267 P.3d 210. In *Walker* I did not suggest that the court should always reach all constitutional questions that are briefed and available for resolution, as the majority implies. *See supra* ¶ 70. Instead, I acknowledged that the principle of constitutional avoidance is a presumption against reaching constitutional questions that are unnecessary to our decision, while noting that the presumption "is rebuttable in cases where specific reasons exist for offering broader guidance." *See Walker*, 2011 UT 53, ¶ 66 (Lee, A.C.J., concurring) (internal quotation marks omitted).

In *Walker* I did not "chid[e] th[e] court for *failing to reach*" the constitutional question that I addressed in my concurrence. *Supra* ¶ 70. I concurred in the majority opinion in full and indicated that I could understand the majority's decision not to reach the constitutional question that I proposed to analyze. *See Walker*, 2011 UT 53, ¶¶ 27, 62 (Lee, A.C.J. concurring). Yet I also identified a range of reasons for my determination nonetheless to do so—noting that the majority was already resolving the dispute on a constitutional ground, and explaining why I thought it important to clarify the law on an additional, related ground before it "could become so ingrained in our jurisprudence that its reconsideration would be difficult." *Id.* ¶¶ 59, 61, 62.

I am applying this same framework here. I am just coming to a different conclusion on whether the presumption of avoidance is rebutted in this instance. The constitutional question at issue here is quite different from the one I proposed to reach in *Walker*. This is not a question that has been previously opined on and is becoming "ingrained in our jurisprudence." It is a new question that has not been presented previously and is not necessary to our decision.

the majority "conclude[s] that Patterson's statutory and common law arguments fail," it states that it "must examine whether the constitution affords him any remaining form of redress." *Supra* ¶ 71. And it goes so far as to suggest that I am not "really advocat[ing] for constitutional avoidance," but arguing only for avoidance of "the constitutional questions" that I "disagree[] with" — as even I endorse the court's conclusion "that there is no egregious injustice exception to the time-bars of the PCRA or rule 65C," and agree "that Patterson has not convinced us that those time-bars violate the Utah constitution's Open Courts Clause or Suspension Clause." *Supra* ¶¶ 71–72.

¶238   The majority is half right. As noted above, I am not objecting to every point of constitutional analysis in the majority opinion. I agree, as the court notes, with the conclusion that there is no constitutional basis for the court to override the "time-bars of the PCRA or rule 65C" under an "egregious injustice exception" or "the Utah constitution's Open Courts Clause or Suspension Clause." *Supra* ¶¶ 71–72; *see also supra* ¶¶ 220–21 (noting my concurrence in those aspects of the majority opinion). But my concurrence on these points is not an indication that I don't "really advocate for constitutional avoidance," or endorse it only for "the constitutional questions [I] . . . disagree[] with." *Supra* ¶ 72. It is an indication that I accept that we must address constitutional questions that are required for our resolution of the case before us, and advocate avoidance of constitutional questions that are not necessary.

¶239   I thus concur in the court's determination that there is no open courts or suspension clause basis for overriding that time bar. But that is not just because I agree with the court's analysis on these points. It is because this analysis is necessary to our resolution of this case. Our law as it now stands includes a judicially imposed time bar on a claim for post-conviction review — under rule 65C, which incorporates the terms and conditions of the PCRA. And we thus cannot resolve this case without deciding whether the time bar established under this law runs afoul of the open courts or suspension clause.

¶240   The constitutional analysis that I oppose goes beyond the questions that form the *necessary* "backstop" to Patterson's statutory and common law claims. After rejecting Patterson's constitutional grounds for challenging the "time bars of the PCRA or rule 65C," and determining that rule 65C "governs the exercise of" our "writ power independent of the PCRA," this court has no need to make a further decision on whether the legislature has any broader constitutional power (under article VIII) to regulate the "substance"

of limitations on the "writ power" as adopted by this court.[60] *See supra* ¶¶ 71, 143–45, 174. The limitations adopted by the court are currently in line with those adopted by the legislature—and have

---

[60] The majority makes a clever turn of phrase with the charge that I am "play[ing] Jenga with the [majority] opinion." *Supra* ¶ 74. But the metaphor masks a misunderstanding of my position. I am not proposing to arbitrarily "pull[] out a couple of conclusions" from the governing constitutional analysis and "hop[e] that the tower still stands in the end." *Supra* ¶ 74. I am identifying independent strands of the court's constitutional analysis, and asserting that we should resolve only the ones that are necessary to our decision.

The constitutional points that I concur in stand on their own footing and are essential to the court's disposition of this case. The points I disagree with are analytically independent, and unnecessary unless and until some tension arises between the PCRA and rule 65C.

Patterson's "egregious injustice," open courts, and suspension clause arguments are challenges to our law as it stands today—to rule 65C, which incorporates the PCRA. For that reason, we must resolve these claims in order to dispose of this case. The challenge to the legislature's power to override judicial limitations on constitutionally guaranteed writs is different. This challenge is not necessary to our decision because it is a challenge that arises only if and when there is a disagreement between the court and the legislature on the operative limits on the issuance of an extraordinary writ. Such disagreement has not yet arisen; it is avoided by the longstanding consilience between the PCRA and rule 65C.

The majority insists that it "cannot persuasively explain to Patterson that the Utah Constitution offers him no relief" without "explaining the source and scope of the writ power the Utah constitution authorizes." *Supra* ¶ 74. But the court's opinion proves otherwise. The court's analysis of the constitutionality of the time bar provision incorporated into rule 65C has nothing to do with the legislature's regulatory power in this field. It turns entirely on questions arising under the open courts and suspension clauses. *See supra* ¶¶ 195–212. And the court is nowhere addressing the constitutionality of any other provision of the PCRA. No other provision of the PCRA has any independent effect on Patterson. That renders the majority's analysis premature and unnecessary to today's decision.

LEE, A.C.J., concurring in part and in the judgment

been for decades. Unless and until that changes, there is no need for our court to go out of our way to opine on the extent of that power. Principles of ripeness and constitutional avoidance counsel against it.[61]

## II

¶241 The above-stated concerns are a sufficient basis for my disagreement with Part II.C. of the majority opinion. Ordinarily, I would leave the matter there—standing only on my observation that the court's constitutional analysis is unnecessary to its disposition of this case. I write further, however, because I am unconvinced by the premises of the majority's analysis of the merits and deem it

---

[61] The majority is right to address the constitutional question that this court sidestepped in *Winward v. State*, 2012 UT 85, 293 P.3d 259—as to the nature and extent of any constitutional basis for an "egregious injustice" exception to the time-bar provisions in the PCRA and rule 65C. I wrote separately in *Winward* to highlight the need for analysis of this constitutional question—explaining that our application of any exception required clarification of what counted as an "egregious injustice," and noting that we could not make any clarification without first identifying a legal basis (in the constitution) for such exception. *Id.* ¶ 43 (Lee, A.C.J., concurring) ("We cannot defensibly find such an exception unsatisfied without describing its content, and we cannot describe its content without articulating its basis in law.") The court today rightly reaches the same conclusion, and correctly concludes that there is no basis in the Utah Constitution for an "egregious injustice" exception to the time bars set forth in the PCRA and rule 65C. *See supra* Part III.

I am thus on board with the majority opinion to this extent of its constitutional analysis. But my vote here is fully in line with my position in *Winward*. As explained above, I am not contending that we can or should avoid constitutional questions that are necessary to our decision. And I am thus not advocating for the kind of "constitutional avoidance" referred to by the majority—if that form of avoidance means "decid[ing] this case the way" the majority decided *Winward*. *See supra* ¶ 72 (suggesting that this is where my position would take us). I am just advocating the avoidance of questions that are not implicated under our law as it stands today—and will not be unless and until the longstanding consilience between the PCRA and rule 65C is eliminated by the legislature or by this court.

LEE, A.C.J., concurring in part and in the judgment

important to present a full rebuttal (in the interest of transparency of the views of members of this court).

¶242 The majority cites both textual and case-based support for its conclusion that the legislature lacks "substantive" power to regulate the terms of a writ and is limited to amending "procedural" rules adopted by the courts. *Supra* ¶¶ 159–62. But the cited text and case law are insufficient to establish a basis for the court's holding. Both sources simply foreclose the legislature from restricting or expanding our courts' "jurisdiction" to issue extraordinary writs.

A

¶243 The language and structure of article VIII, section 3 of the Utah Constitution admittedly draw a distinction between this court's power to exercise "appellate jurisdiction" and its authority to issue "extraordinary writs." As the majority notes, only the former power is expressly subject to legislative restriction. *See supra* ¶ 146. Our court thus exercises "appellate jurisdiction" only "as provided by statute." UTAH CONST. art VIII, § 3. But we have "original jurisdiction to issue all extraordinary writs"—with no mention of any legislative authority of restriction. *Id.*

¶244 For that reason I agree with the majority that the constitution implies a distinction between our exercise of "appellate jurisdiction" and our power of "original jurisdiction" to issue "extraordinary writs." *See supra* ¶¶ 146 & n.30 (concluding that "the omission of 'as provided by statute' . . . was intentional"). The legislature retains power to limit our "appellate jurisdiction" but not our "original jurisdiction" to issue "extraordinary writs."

¶245 To this extent the majority and I are on the same page. "[T]he people of Utah gave the Legislature power to define *when the Supreme Court can exercise* its appellate jurisdiction" but "did not give the Legislature the same ability when it came to" our exercise of original jurisdiction over extraordinary writs. *Supra* ¶ 146 n.30 (emphasis added). This follows from the *expressio unius* canon of interpretation—the settled idea that the "expression of one term or limitation is understood as an exclusion of others." *State v. Wadsworth*, 2017 UT 20, ¶ 7, 393 P.3d 338 (quoting *Nevares v. M.L.S.*, 2015 UT 34, ¶ 31, 345 P.3d 719). Here, the *expressed* term or condition is that the legislature has only the power to "define when the Supreme Court can exercise its appellate jurisdiction." *Supra* ¶ 146 n.30. In context, that clearly implies that it may not exercise such power over our "original jurisdiction"—in restricting or expanding our court's power over cases within our original jurisdiction, or in exercising its own jurisdiction over such cases.

LEE, A.C.J., concurring in part and in the judgment

¶246 I thus agree that we should credit the "words of th[e] constitution" as chosen "with care." *Supra* ¶ 146. And I likewise agree that the words of article VIII, section 3 give the legislature the power to determine how our "appellate jurisdiction" is "to be exercised"—and clearly imply that the legislature lacks such power over our original jurisdiction.

¶247 I cannot agree, however, with the proposition that the constitution therefore forecloses the legislature's power to adopt any "substantive" limits on the scope of a writ, *supra* ¶ 144, or confines it to amending our "procedural" rules in this field, *supra* ¶ 169. I do not see how that follows from the text and structure of the Utah Constitution. If and when we are called upon to interpret these provisions of article VIII, I would be inclined to hold that the legislature is foreclosed only from abrogating or expanding our "original jurisdiction" to issue extraordinary writs. With this in mind, I would be inclined to conclude that the operative constitutional question is whether a given legislative enactment amounts to an abrogation or expansion of our original jurisdiction, not whether it was in some sense "substantive" or "procedural."

¶248 In my view, this approach credits the language of article VIII, section 3, is consistent with historical practice and with the examples cited by the majority, and is reinforced by the provision of the Utah Constitution that speaks directly to the writ at issue here— the suspension clause of article I, section 5, which guarantees that the writ of habeas corpus "shall not be suspended."[62] UTAH CONST. art. I, § 5.

1

¶249 The precise words of the Utah Constitution are an important starting point. They state that this court has the "original jurisdiction to issue all extraordinary writs and to answer questions of state law certified by a court of the United States." UTAH CONST. art. VIII, § 3; *see also id*. art. VIII, § 5 (providing that the district court

---

[62] The majority is of course free to establish its own view of the correct reading of the Utah Constitution. But it is in no position to claim that I have "point[ed] to nothing in the constitutional language that even hints at" my interpretation. *Supra* ¶ 148. Most everything that follows is rooted in the text and structure of the constitution. And much of my textual analysis stands unrefuted in the majority opinion.

LEE, A.C.J., concurring in part and in the judgment

shall have "power to issue all extraordinary writs"). This jurisdiction is constitutionally guaranteed and immune from legislative limitation. That is clear from a parallel provision stating that this court has "appellate jurisdiction over all other matters *to be exercised as provided by statute.*" *Id.* art. VIII, § 3 (emphasis added); *see also id.* art. VIII, § 5 (providing that the district court's other "original jurisdiction" is "as limited by this constitution or by statute" and its "appellate jurisdiction" is "as provided by statute"). The limitation on legislative power is implied, but clear: the legislature has power to limit our "appellate jurisdiction" but not our "original jurisdiction."

¶250   Our "appellate jurisdiction" involves the power to review decisions in cases heard in the first instance by a lower court. *See Jurisdiction*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "appellate jurisdiction" as "[t]he power of a court to review and revise a lower court's decision"). In a case before us on appeal, we are limited to a review for error of the decision of a lower court—on the record developed below, and under established standards of review.[63] Our "original jurisdiction" is distinct. It involves the power to hear a case filed in our court in the first instance—to make our "own determination of the issues" based on evidence submitted to us and to make our own disposition of factual and legal questions in the first instance. *State v. Johnson*, 114 P.2d 1034, 1037 (Utah 1941), *overruled in part on other grounds by Boyer v. Larson*, 433 P.2d 1015 (Utah 1967). In a case before us in our original jurisdiction, we are not "[]concerned or limited by any prior determination, or the action of any other court juridically determining the same controversy." *Id.*; *see also supra* ¶¶ 80 & nn.14–15 (defining original jurisdiction as the power to resolve cases in the first instance).

---

[63] *See Allen v. Friel*, 2008 UT 56, ¶ 7, 194 P.3d 903 (explaining that "an appellant must allege the lower court committed an error that the appellate court should correct" or else the lower court will be "beyond the reach of further review"); *State v. Pliego*, 1999 UT 8, ¶ 7, 974 P.2d 279 ("An appellate court's 'review is . . . limited to the evidence contained in the record on appeal'") (alteration in original) (quoting *Wilderness Bldg. Sys., Inc. v. Chapman*, 699 P.2d 766, 768 (Utah 1985)); *Sawyer v. Dep't of Workforce Servs.*, 2015 UT 33, ¶¶ 9–14, 345 P.3d 1253 (identifying standards of appellate review applied by this court).

LEE, A.C.J., concurring in part and in the judgment

¶251   The constitutional guarantee of our "original jurisdiction" is thus the reservation of judicial power "to issue all extraordinary writs" in the exercise of that power—to make our "own determination" of the issues on a claim for an extraordinary writ, and not just on appeal from a decision by a lower court. By clear implication, the legislature has the power to limit only our "appellate jurisdiction" (and certain other exercises of original jurisdiction by the district courts).[64] It may not restrict or expand the scope of our "original jurisdiction" as guaranteed by the constitution—which includes our power to "issue all extraordinary writs."

¶252   In an appropriate case, I would thus be inclined to agree with the majority to the extent it is asserting that the legislature is foreclosed from expanding or stripping the "original jurisdiction" of our courts in this field. But that is not the premise of the court's analysis. The court is establishing a different proposition. It is holding that the courts have exclusive power to regulate the "substantive" scope of an extraordinary writ, and the legislature is limited to amending the "procedural" rules adopted by this court in this field. *See supra* ¶¶ 144, 160.

---

[64] The legislature has long exercised the power to regulate this court's exercise of appellate jurisdiction. *See* UTAH CODE § 78A-3-102(3) (identifying categories of cases over which this court is to exercise "appellate jurisdiction"); *id.* § 78A-3-102(4) (authorizing this court to "transfer to the Court of Appeals any of the matters over which" it has "appellate jurisdiction" except those falling in certain categories of cases); *id.* § 78A-4-103(2) (prescribing specific categories of cases over which the court of appeals has "appellate jurisdiction"); *id.* § 78A-4-103(3) (authorizing the court of appeals to "certify to the Supreme Court for original appellate review and determination any matter over which the Court of Appeals has original appellate jurisdiction"); *id.* § 78A-3-102(5) (establishing this court's "sole discretion in granting or denying a petition for writ of certiorari for the review of a Court of Appeals adjudication" and authority to "review those cases certified" to us by the court of appeals). It has not generally sought to limit or expand our original jurisdiction, however. The above-cited statutes, in fact, expressly preserve this court's "original jurisdiction to answer questions of state law certified by a court of the United States" and "to issue all extraordinary writs." *Id.* § 78A-3-102(1)–(2).

LEE, A.C.J., concurring in part and in the judgment

¶253   The court has failed to connect its holding to the text and structure of the Utah Constitution. It has also stopped short of defining the proposed line between "substance" and "procedure" in this field. And it has thereby cast a vague constitutional cloud over the PCRA without giving the legislature or the lower courts any indication of the scope of the supposed problem.

¶254   This is problematic. If we are going to cast a cloud of unconstitutionality over an enactment of the legislature, we should do so in a case in which we are analyzing the constitutionality of a specific statutory provision that is affecting the interests of the parties before the court. And in presenting our constitutional analysis, we should articulate a constitutional standard that can guide the legislature and the lower courts in future proceedings.

¶255   Such standard should be based in the text and structure of the constitution. It should clarify that the constitutional limits on the legislature's power do not foreclose it from exercising "substantive" power, or limit it to amendments of rules adopted by the courts through exercise of our "procedural" power, but instead simply foreclose the legislature from abrogating or expanding our original jurisdiction.

2

¶256   The majority's contrary holding runs afoul of a well-established background premise—that the power of the Utah Legislature is presumptively plenary. *See* UTAH CONST. art. VI, § 1. This premise has deep roots in our precedent. Since at least *Kimball v. Grantsville City*, the court has recognized that the "state" has "committed its whole lawmaking power to the legislature"—the "plenary power for all purposes of civil government"—"excepting such as is expressly or impliedly withheld by the state or federal constitution." 57 P. 1, 4 (Utah 1899). In the absence of a constitutional limitation on the legislature's power, the legislature thus retains the authority to regulate the elements of and defenses to claims that fall within our courts' jurisdiction. *See Norton v. Macfarlane*, 818 P.2d 8, 17 (Utah 1991) ("Judicial power to alter, abolish, and create causes of action does not, of course, restrict the right of the Legislature to have the last word with respect to tort law.").

¶257   Our courts admittedly have long exercised *common law* habeas power—in a body of case law tracing back to our Utah founding, which has evolved over the ensuing decades. *See supra* ¶¶ 109–22 (discussing these cases). But the existence of such common-law power of the courts is not an indication that the legislature lacks power to amend or revise the substantive elements

LEE, A.C.J., concurring in part and in the judgment

of common-law claims. That is not how the interplay between the common law and legislation works. To the contrary, the longstanding presumption is that the common-law power of our courts is subject to substantive alteration by the legislature. *See Norton*, 818 P.2d at 17.

¶258 The constitutional prescription of this court's original jurisdiction forecloses the legislature from restricting or expanding that jurisdiction. But it by no means eliminates the legislature's power to refine the elements of and defenses to claims that come before us in the exercise of that jurisdiction. That is all the legislature has done in adopting the PCRA. It has prescribed the elements of a claim that a petitioner must establish as a basis for the issuance of a post-conviction extraordinary writ. *See* UTAH CODE § 78B-9-104; *see also Archuleta v. State*, 2020 UT 62, ¶ 30, 472 P.3d 950 (concluding that a given claim was not provided for by the terms of the PCRA and thus holding that "the PCRA does not recognize the claim as a ground for relief"). And it has established defenses to the issuance of such a writ. *See* UTAH CODE §§ 78B-9-106–107.

¶259 These are standard exercises of legislative power. And the majority has identified no constitutional basis for foreclosing the exercise of this power.

3

¶260 The majority's holding also fails to account for another aspect of our constitutionally guaranteed original jurisdiction. This jurisdiction extends to both the power "to issue all extraordinary writs" and the power "to answer questions of state law certified by a court of the United States." UTAH CONST. art. VIII, § 3. And the constitutional establishment of this jurisdiction thus precludes the legislature from restricting or expanding the scope of this power. But it does not foreclose the legislative regulation of the elements of and defenses to claims that come before us in the exercise of that jurisdiction.

¶261 The legislature indisputably has the power to prescribe the substance of claims that come before us on certification from federal courts. This is a longstanding, widespread practice. *See generally, e.g., Zimmerman v. Univ. of Utah*, 2018 UT 1, 417 P.3d 78 (considering on certification whether a statute of limitations as prescribed by statute applied to a research professor who had been terminated); *Egbert v. Nissan N. Am., Inc.*, 2007 UT 64, ¶ 8, 167 P.3d 1058 (determining on certification whether a jury should be instructed "that a presumption of non-defectiveness" had arisen under the Utah Product Liability Act as prescribed by statute). And no one has ever suggested that

that is an incursion on our constitutionally guaranteed original jurisdiction.

¶262 The wrongful death example proves this point. A common-law claim for wrongful death could properly come before this court under the exercise of our "original jurisdiction" over a case certified to us by a federal court under article VIII, section 3 of the Utah Constitution.[65] But any limit on the legislature's power to regulate a wrongful death claim comes through the express terms of article XVI, section 5—a provision that expressly forecloses the abrogation of a wrongful death claim—not from the article VIII, section 3 prohibition on legislative limitation of our "original jurisdiction."

¶263 This is indisputably the law for claims that fall within our "original jurisdiction" over cases on certification from federal courts. And there is nothing in the "plain language" or "structure" of the Utah Constitution that suggests that claims sounding in an "extraordinary writ" should be treated differently.

¶264 I agree with the majority that the legislature lacks the power to "tell us what types of certified questions we can answer," or in other words to adopt an outright prohibition on our power to hear a given category of certified claims. *See supra* ¶ 162. But as the majority acknowledges, the legislature retains the power to "define[] the elements and defenses" that govern the claims that come before us in the exercise of our original jurisdiction. *Supra* ¶¶ 161, 163. And that is true whether those claims come before us in a certified question or on an extraordinary writ.

¶265 The majority identifies no persuasive ground for any contrary conclusion. And the certified questions analogy thus undermines the constitutional linchpin of the majority opinion.

---

[65] *Cf., e.g.*, *Smith v. United States*, 2015 UT 68, ¶ 2, 356 P.3d 1249 (hearing case on certification by federal court of question of whether a provision in the Utah Health Care Malpractice Act limited recovery for wrongful death cases); *see also Holden v. N L Indus., Inc.*, 629 P.2d 428, 431 (Utah 1981) (noting, on certification of a wrongful death case, that "this Court's answer to a certified question in a case that originated in or is to be adjudicated in a federal court is not an exercise of 'appellate jurisdiction' within the meaning of the Utah Constitution").

¶266  My approach is also reinforced by analogous limitations on the legislative power—in the Open Courts Clause and the article XVI, section 5 ban on the abrogation of a wrongful death cause of action. These provisions establish that a constitutional guarantee of judicial power to hear a given claim forecloses the legislative abrogation of such claim. But they also make clear that the legislature remains free to adopt or refine the elements of a such a claim despite the constitutional reservation of judicial power.

¶267  The wrongful death provision in article XVI, section 5 states that "[t]he right of action to recover damages for injuries resulting in death[] shall never be abrogated, and the amount recoverable shall not be subject to any statutory limitation. . . ." UTAH CONST. art. XVI, § 5. This is a constitutional guarantee of judicial power to hear a wrongful death claim—a claim, like a claim under an extraordinary writ, that was initially established in a body of common law.[66] But this guarantee is not taken as a sweeping foreclosure of the exercise of any and all legislative power in this general field. It is interpreted in accordance with its precise language—which speaks to an "abrogat[ion]" of the claim or a limitation on the "amount recoverable" by a plaintiff.

¶268  Our case law has given voice to these limits on the legislative power. We have noted that "Utah statutes permit recovery for wrongful death" but have "modified the common law" in certain respects. *Grow v. Or. Short Line R. Co.*, 138 P. 398, 408 (Utah 1913). And we have upheld the legislature's power to make such modifications—to "enact reasonable procedures for the enforcement of wrongful death actions" and to "provide for reasonable defenses that are not inconsistent with the fundamental nature of the wrongful death action itself." *Hirpa v. IHC Hosps., Inc.*, 948 P.2d 785, 794 (Utah 1997) (quoting *Berry ex rel. Berry v. Beech Aircraft Corp.*, 717 P.2d 670, 685 (Utah 1985)).

¶269  The "open courts" example reinforces this view. Under the open courts clause, our constitution guarantees that our "courts shall

---

[66] *See generally* Frederick Davis, *Wrongful Death*, 1973 WASH. U.L.Q. 327 (1973) (explaining common law history of wrongful death actions); *Bybee v. Abdulla*, 2008 UT 35, ¶ 18, 189 P.3d 40 (explaining that the Utah Constitution implicitly recognizes the wrongful death action established at common law, despite some difference among courts in 1895).

LEE, A.C.J., concurring in part and in the judgment

be open" and preserves a "remedy by due course of law" in our courts for "an injury done to [a] person in his or her person, property, or reputation." UTAH CONST. art. I, § 11. But again, the reservation of this power for our courts is not viewed as a sweeping foreclosure of all legislative power. Our case law holds that the open courts clause simply precludes the legislature from "abrogat[ing] a cause of action" unless it provides "an effective and reasonable alternative remedy" or establishes that abrogation is "not an arbitrary or unreasonable means" of eliminating a "clear social or economic evil." *Waite v. Utah Lab. Comm'n*, 2017 UT 86, ¶ 19, 416 P.3d 635 (citations omitted). And this standard leaves ample room for the legislative regulation of the substantive elements of claims.

¶270 Both the wrongful death provision and the open courts clause thus cut against the majority's position and in favor of my view. The majority has identified no meaningful basis for interpreting article VIII any differently from these provisions.[67] And the textual and structural parallel among them indicates that the article VIII guarantee of "original jurisdiction" to issue "extraordinary writs" forecloses legislative abrogation or alteration of such jurisdiction but preserves the legislature's power to enact

---

[67] The majority responds by characterizing the wrongful death and open courts provisions as prescribing "a restriction on legislative authority" and the provisions of article VIII as establishing "a constitutional grant of power to a co-equal branch of government." *Supra* ¶ 165. But that is a distinction without a difference. For reasons explained above, the constitutional guarantee of our "original jurisdiction" is a reservation of judicial power with a clear, implied limitation—our courts have constitutionally guaranteed "original jurisdiction" and the legislature is thereby foreclosed from abrogating that jurisdiction.

"When questions concerning the distribution of powers [between the branches of government] arise," we do not *only* "answer them by reference to article V, section 1 of the Utah Constitution." *Supra* ¶ 167. We must begin with the constitutional provision that speaks expressly to the constitutional reservation of power. Here that provision speaks clearly in terms of a guarantee of "original jurisdiction" that may not be abrogated by the legislature. And that construct clearly reserves for the legislature the power to prescribe the elements of and defenses to the claims that come before us within our constitutionally guaranteed jurisdiction.

elements and defenses that are "not inconsistent with the fundamental nature" of such writs.

5

¶271 The text and structure of the Utah Constitution's protection of the writ at issue here cuts even more strongly in favor of this conclusion. Where the Utah Constitution speaks *specifically* of substantive limits on the extraordinary writ at issue here, it provides that "[t]he privilege of the writ of habeas corpus shall not be suspended, unless, in case of rebellion or invasion, the public safety requires it." UTAH CONST. art. 1, § 5. This limitation, moreover, is not a bar on *all* exercises of legislative power over this writ. It is simply a prohibition of "suspension"—of an outright "stay," cessation, or "interrupt[ion]" of the availability of the writ. *See supra* ¶¶ 207–09 (citing this understanding of "suspension").

¶272 That conclusion seems incompatible with the majority's interpretation of article VIII. Of the two provisions, it is the suspension clause that speaks directly and specifically to substantive limits on the writ at issue in this case—in its prohibition of "suspension." (Article VIII is much more removed from the substance of the writ. By its terms, it speaks only to a guarantee of "jurisdiction.")

¶273 These two provisions ultimately can (and should) be read as compatible and mutually reinforcing. When our courts are deprived of "jurisdiction" to issue the writ, the writ is "suspended." *See Ex parte Milligan*, 71 U.S. 2, 130–31 (1866) (explaining that the "suspension of the privilege of the writ of *habeas corpus* does not suspend the writ itself" but instead removes "the right of proceeding any further with it" until the end of the suspension). If the legislature retains the power to adopt elements and defenses to the writ that do not amount to a "suspension," our courts should necessarily be viewed as retaining our "jurisdiction" to issue them. That follows logically from the proposition that the "suspension" of the writ occurs when our courts are stripped of the "jurisdiction" to issue such writ. *Id.* And it is reinforced by case law suggesting that the constitution bars "jurisdiction-stripping" statutes only when they remove the courts' authority to adjudicate a constitutional claim.[68]

---

[68] Though courts and commentators have never settled on a specific formulation of constitutional jurisdiction-stripping, everyone seems to agree that the concept generally refers to a statute that

(continued . . .)

LEE, A.C.J., concurring in part and in the judgment

B

¶274   The majority also cites Utah precedent in support of its view. *See supra* ¶¶ 149–54, 151 n.31 (citing *State ex rel. Robinson v. Durand*, 104 P. 760 (Utah 1908); *Winnovich v. Emery*, 93 P. 988 (Utah 1908); *Petersen v. Utah Bd. of Pardons*, 907 P.2d 1148 (Utah 1995); *Brown v. Cox*, 2017 UT 3, 387 P.3d 1040). But the cited cases do not support the court's approach. They reinforce my position—in establishing that the legislature has the power only to regulate our "appellate jurisdiction" and lacks the power to limit our "original jurisdiction" to issue extraordinary writs. And they do not hold that this limitation implies a further restriction on the legislature's power to regulate the substance of the claims that come before our courts in the exercise of our jurisdiction to issue extraordinary writs.

*Winnovich & Durand*

¶275 *Winnovich* and *Durand* are two cases that are key to understanding the scope of our constitutional writ power. In both cases, the court considered whether and to what extent an extraordinary writ may be allowed to displace the appellate jurisdiction of our courts—review on the record and on the merits of a lower court decision. And in both cases, our court repudiated such

---

removes the court's ability to hear and resolve any cases involving a constitutional claim. *See Ex parte McCardle*, 74 U.S. 506, 514 (1868) (finding that Congress had not stripped the Court's habeas corpus jurisdiction because it could still hear claims under extraordinary original jurisdiction); *Boumediene v. Bush*, 553 U.S. 723, 736 (2008) (explaining that the "threshold matter" in resolving a habeas corpus jurisdiction-stripping case involves determining whether a statute "denies the . . . courts jurisdiction to hear habeas corpus actions"); *United States v. Klein*, 80 U.S. 128, 147 (1871) (holding unconstitutional a statute that removed the Supreme Court's jurisdiction to hear certain cases in which a party had received a pardon); *Durousseau v. United States*, 10 U.S. 307, 313 (1810) (declaring, in a discussion of the extent of the Court's jurisdiction, that "[e]very question originating in the constitution of the United States claims, and will receive, the most serious consideration of [the Supreme Court]").

displacement.[69] Yet in so doing, we also reaffirmed the existence of other exercises of legislative power over extraordinary writs. [70]

¶276   The key background principle is highlighted in the *Durand* opinion. There the court began by observing that the then-existing provisions of article VIII of the Utah Constitution guaranteed the "original jurisdiction" of the Utah Supreme Court "to issue writs of mandamus, certiorari, prohibition, quo warranto, and habeas corpus" and the "power" of the district courts to "issue" the same writs. *Durand*, 104 P. at 762 (citation omitted). It also observed that this constitutionally guaranteed jurisdiction—unlike the appellate jurisdiction of the courts—was not subject to regulation by the legislature. *Id.* And it therefore held that the legislature lacked the power to "enlarge[]" the jurisdiction of our courts to issue extraordinary writs by extending such jurisdiction to encompass what amounts to appellate review—to "review mere error" of a lower court. *Id.* at 763.

¶277   The *Durand* court observed that the constitution "would have said so" if it meant to make the jurisdiction of our courts to issue extraordinary writs "as may be prescribed by law" by the legislature. *Id.* at 764. But it emphasized that the constitution does not so provide. And it therefore held that it is not within the power of the legislature either to "abridge" or to "enlarge" our courts' jurisdiction in this field—emphasizing that "the power of courts to issue the writs" is no more "dependent upon the will and discretion of the Legislature" than is the "cases to which [such writs] may apply." *Id.*

---

[69] *See Winnovich v. Emery*, 93 P. 988, 993 (Utah 1908) (holding that at least "in the absence of a statute conferring the right," "[t]he writ of habeas corpus cannot be made to serve the purpose of an appeal"); *State v. Durand*, 104 P. 760, 763 (Utah 1908) (holding that it is not "within the power of the Legislature" to enact a statute providing for what amounts to appellate review on a writ of prohibition).

[70] *See Winnovich*, 93 P. at 990 (holding that "[i]n modern times habeas corpus may . . . be considered as a statutory proceeding, although it had its origin in the common law"); *Durand*, 104 P. at 764 (noting that "the remedy by writ of prohibition . . . is the common law writ *recognized and regulated by statute* (citation omitted) (emphasis added)).

LEE, A.C.J., concurring in part and in the judgment

¶278   In so holding, the *Durand* court contrasted review upon extraordinary writ with review on appeal. An appeal, the court noted, is direct review on the merits "as provided by the Code of Civil Procedure" (a statute regulating, among other things, the terms and conditions of the appellate jurisdiction of the Utah courts). *Id.* at 765. And the appellate jurisdiction of our courts (the power of this court to review the merits of a lower court decision on the record) was then, as now, expressly subject to legislative regulation. UTAH CONST. of 1907, art. VIII, § 9 ("The appeal shall be . . . under such regulations as may be provided by law.").

¶279   The constitutional defect in the *Durand* case was in the legislature's failure to respect this distinction. The statute at issue purported to provide for the district court review of certain decisions of the "justices' courts" upon a "writ of prohibition" filed in the district court as an alternative to merits review on appeal. *Durand*, 104 P. at 761 (citing Rev. St. § 3724 (1898)). In striking down this statute, the court noted that the long-settled "office" or "function" of the "writ of prohibition" was the "power" of a court to "arrest[] the proceedings of any tribunal, corporation, board, or person . . . when such proceedings are without or in excess of the jurisdiction of such tribunal corporation, board or person." *Id.* at 764 (citing both case law and a territorial statute regulating this writ and noting that "the only office of the writ was to prevent usurpation of jurisdiction and to restrain acts in excess of or without jurisdiction"). It also contrasted that function or office with that of review for "error" — on an appeal on the record of the lower court decision. *Id.* And it held that the legislature lacked the power to regulate the jurisdiction of our courts to issue extraordinary writs, whether by "abridg[ing]" or "enlarg[ing]" this "power." *Id.*

¶280   The *Durand* opinion is accordingly not in line with the majority's view. *Durand* did not hold that the constitutional guarantee of jurisdiction of our courts to issue extraordinary writs forecloses all legislative power "to regulate the substance of the writ." *Supra* ¶ 160 (citing *Brown v. Cox* for this proposition); *infra* ¶ 285 (noting that "*Brown* is a natural extension of *Durand*"). It simply noted the limited function of the extraordinary writ at issue (the writ of prohibition), emphasized that the legislature had no power to abridge or enlarge the judicial power to issue such a writ, and struck down a statute seeking to put the square peg of appellate review into the round hole of the writ.

¶281   The core basis of *Durand* is the distinction between the courts' jurisdiction to issue extraordinary writs (which could not be abridged or enlarged by the legislature) and the courts' appellate

jurisdiction (which was and is subject to legislative regulation). Direct review for error on appeal was a matter governed by statute under "the Code of Civil Procedure." *Durand*, 104 P. at 765. Because that was not the "office" or "function" of the writ of prohibition, the *Durand* court struck down the statute in question on the ground that it sought to "enlarge" the scope of our courts' jurisdiction to issue an extraordinary writ.

¶282 That holding is fully consistent with my position and incompatible with the majority's. *Durand* holds that the legislature lacks the power to abridge or enlarge our courts' jurisdiction to issue extraordinary writs—an act it deemed "repugnant to the meaning" of the reservation of constitutional jurisdiction in this field. *Id.* at 764. But it does not foreclose any and all "substantive limitations on the writ." *Supra* ¶ 159. If anything, it leaves the door open to limitations so long as they do not abridge or enlarge our courts' jurisdiction and are not repugnant to the writs that are reserved for our judicial power. *See also supra* ¶¶ 260–65 (noting that other limitations on legislative power reserve the power to make reasonable regulations).

*Petersen & Brown*

¶283 The *Petersen* and *Brown* cases are consistent with this view. In neither of these cases did we call into question the legislature's power to regulate the substance of an extraordinary writ. As in *Winnovich* and *Durand*, we simply held that the legislature may not abridge or enlarge our jurisdiction to issue such writs.

¶284 In *Petersen* we reinforced the distinction between our courts' appellate jurisdiction (subject to legislative restriction) and our jurisdiction to issue extraordinary writs (which is constitutionally guaranteed). We thus recognized the legislature's power to "refuse to provide a statutory appeal from orders of a governmental agency." *Petersen*, 907 P.2d at 1152. But we held that the legislature may not "curtail the constitutional powers of this Court to issue extraordinary writs in appropriate circumstances." *Id.* Citing article VIII, section 3, we emphasized that "the Utah Constitution provides that the Supreme Court has 'original jurisdiction to issue all extraordinary writs.'" *Id.* Because the petitioner in *Petersen* was asserting a "challenge to the authority of a governmental agency or officer to restrain a person's liberty" (in a challenge to the authority of the Board of Pardons to revoke his parole), we found that we had jurisdiction to hear that challenge as a matter falling within our constitutionally guaranteed jurisdiction to issue extraordinary writs. *Id.* And we did so despite the legislature's obviation of any right of appeal from decisions of that agency,

LEE, A.C.J., concurring in part and in the judgment

emphasizing that "the Legislature ha[s] no power to restrict [our] writ powers." *Id.* In so holding, we said nothing about the power of the legislature to regulate the substance of an extraordinary writ. That question was not presented to the court.

¶285   The *Brown v. Cox* decision is along similar lines. *Brown* is a natural extension of *Durand*. As in *Durand*, the legislature had sought to "extend this court's original jurisdiction" to issue extraordinary writs—in a statute purporting to authorize a challenge to a multi-county primary election in an original action in this court. *Brown*, 2017 UT 3, ¶ 12. While recognizing that "[t]he Utah Constitution provides that this court possesses 'appellate jurisdiction over . . . matters to be exercised as provided by statute,'" we emphasized that "the Utah Constitution does not grant the Legislature authority to alter our original jurisdiction." *Id.* ¶ 13 (second alteration in original) (citation omitted). Because article VIII, section 3 limits our original jurisdiction to the issuance of extraordinary writs, we held that the legislature exceeded its authority in extending that jurisdiction beyond the constitutional scope. "The Legislature can neither increase nor decrease this court's constitutionally derived powers" to issue extraordinary writs. *Id.* ¶ 14. So the legislature exceeds its power when it seeks to "enlarge[] or abridge[]" our jurisdiction. *Id.* (citation omitted).

¶286   This is our settled constitutional law. But it does not support the majority's conclusion that the legislature lacks all "substantive" power. It just reinforces what is apparent from the language and structure of article VIII, section 3—that our courts' "jurisdiction" to issue extraordinary writs is constitutionally guaranteed, and may not be altered by the legislature.

III

¶287   Today this court makes a sweeping pronouncement of constitutional law. It draws an important constitutional line in the sand—holding that the legislature lacks the power to adopt "substantive" limits on extraordinary writs and is limited to amending "procedural" rules adopted by this court.

¶288   I see no basis in our law for this broad holding. And I see no reason for the court to establish it in a case in which there is as yet no independent exercise of this legislative power—no defense to a claim for an extraordinary writ that has not been separately endorsed in the rules of this court.

———————